<u>**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**</u>

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 23-1282, 23-1284, 23-1289, 23-1297, 23-1299, 23-1305, 23-1310, 23-1312, 23-1313, 23-1320, 23-1327, 23-1330, 23-1346, 24-1093, 24-1106, 24-1112, 24-1136, 24-1137, 24-1139, 24-1140, 24-1141 (consolidated)

ADVANCED ENERGY UNITED, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

_____

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

# BRIEF OF THE TRANSMISSION PROVIDER PETITIONERS

_____

Catherine P. McCarthy
Bracewell LLP
2001 M Street NW, Suite 900
Washington, DC 20006
(202) 828-5839
(800) 404-3970 (fax)
cathy.mccarthy@bracewell.com


*Counsel for Avangrid, Inc.*


Paul Savage
Associate Counsel
Joshua Kirstein
Senior Attorney
Consolidated Edison Co. of
New York, Inc.
Orange and Rockland Utilities, Inc.
4 Irving Place
New York, New York 10003
(212) 460-2764
(929) 656-5971
kirsteinj@coned.com
savagep@coned.com


*Counsel for Consolidated Edison Co. of New York, Inc. and Orange and Rockland Utilities, Inc.*

Cheri Yochelson
Assistant General Counsel - DEV
Dominion Energy Services, Inc.
120 Tredegar Street, RS-5
Richmond, VA 23219
(804) 819-2691
cheri.yochelson@dominionenergy.com


Paul A. Colbert
Associate General Counsel -
Regulatory Affairs
Central Hudson Gas & Electric
Corporation
284 South Avenue
Poughkeepsie, New York 12601
(845) 486-5831(telephone)
pcolbert@cenhud.com


*Counsel for Central Hudson Gas & Electric Corporation*


John Lee Shepherd, Jr.
Blake Grow
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com
bgrow@hunton.com


*Counsel for FirstEnergy Service Company, Dominion Energy Services, Inc., and Exelon Corporation*

Sara Weinberg
Assistant General Counsel - DESC
Dominion Energy Services, Inc.
220 Operation Way, MC OSC 1A,
Cayce, SC 29033
(803) 217-5753
sara.weinberg@dominionenergy.com


*Counsel for Dominion Energy Services, Inc.*

Lisa B. Luftig
Assistant General Counsel
Exelon Corporation
701 Ninth Street, NW
Washington, DC 20068
(202) 428-1067
Lisa.Luftig@exeloncorp.com

*Counsel for Exelon Corporation*

Christopher D. Supino
Managing Senior Corporate Counsel
Midcontinent Independent
System Operator, Inc.
720 City Center Drive
Carmel, IN 46032
Telephone: (317) 249-5400
csupino@misoenergy.org

Ilia Levitine
Duane Morris LLP
901 New York Avenue, N.W.
Suite 700 East Washington, DC 20001
Phone: (202)776-5218
ILevitine@duanemorris.com

*Counsel for Midcontinent Independent System Operator, Inc.*

Ted Murphy
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1588
tmurphy@hunton.com

*Counsel for New York Independent System Operator, Inc.*

Andrew W. Tunnell
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3439 (telephone)
atunnell@balch.com

*Counsel for the Long Island Power Authority*

Wendy N. Reed
Matthew J. Binette
Abraham F. Johns III
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005
(202) 393-1200 (phone)
reed@wrightlaw.com
binette@wrightlaw.com
johns@wrightlaw.com

*Counsel for the MISO Transmission Owners*

Lyle D. Larson
Abigail C. Fox
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3441 (telephone)
llarson@balch.com

*Counsel for New York State Electric & Gas Corporation and Rochester Gas and Electric Corporation*

Andrew W. Tunnell
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3439 (telephone)
atunnell@balch.com

*Counsel for Niagara Mohawk Power
Corporation d/b/a/ National Grid*

Robert V. Eckenrod
Assistant General Counsel
PacifiCorp
825 N.E. Multnomah
Suite 2000
Portland, OR 97232
(503) 367-7259
robert.eckenrod@pacificorp.com

Adrienne Thompson
Troutman Pepper
Hamilton Sanders LLP
100 SW Main Street
Suite 1000
Portland OR 97204
(503) 290-2347
adrienne.thompson@troutman.com

Christopher R. Jones
Antonia M. Douglas
Troutman Pepper
Hamilton Sanders LLP
401 9th Street, NW
Suite 1000
Washington, DC 20004
(202) 662-2181
chris.jones@troutman.com
antonia.douglas@troutman.com

*Counsel for PacifiCorp*

Wendy B. Warren
David S. Berman
Elizabeth P. Trinkle
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005
(202) 393-1200 (phone)
warren@wrightlaw.com
berman@wrightlaw.com
trinkle@wrightlaw.com

*Counsel for PJM Interconnection, L.L.C.*

October 30, 2024

Matthew J. Binette
Elizabeth P. Trinkle
Priyanka Vashisht
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005-3898
(202) 393-1200 (phone)
binette@wrightlaw.com
trinkle@wrightlaw.com
vashisht@wrightlaw.com

*Counsel for Southwest Power Pool, Inc.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with Circuit Rule 27, Petitioners state as follows:

**I.      Parties, Intervenors, and Amici Before the Court**

Advanced Energy United
Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois and Ameren Transmission Company of Illinois
American Clean Power Association
American Transmission Company LLC
Avangrid, Inc.
Big Rivers Electric Corporation
Central Hudson Gas & Electric Corporation
Central Minnesota Municipal Power Agency
City Water, Light & Power
Cleco Power LLC.
Consolidated Edison Co. of New York, Inc.
Consumers Energy Company
Cooperative Energy
Dairyland Power Cooperative
Dominion Energy Services, Inc. on behalf of Virginia Electric and Power Company d/b/a Dominion Energy Virginia and Dominion Energy South Carolina, Inc.
Duke Energy Business Services, LLC for Duke Energy Indiana, LLC
East Texas Electric Cooperative
Entergy Arkansas, LLC
Entergy Louisiana, LLC
Entergy Mississippi, LLC
Entergy New Orleans, LLC
Entergy Texas, Inc.
Environmental Defense Fund
Exelon Corporation
Federal Energy Regulatory Commission
FirstEnergy Service Company
Great River Energy
GridLiance Heartland LLC
Hoosier Energy Rural Electric Cooperative, Inc.
Indiana Municipal Power Agency

Indianapolis Power & Light Company d/b/a AES Indiana
International Transmission Company d/b/a ITC*Transmission*
ITC Midwest LLC
Lafayette Utilities System
Long Island Power Authority
Michigan Electric Transmission Company, LLC
MidAmerican Energy Company
Midcontinent Independent System Operator, Inc.
Minnesota Power (and its subsidiary Superior Water, L&P)
Missouri River Energy Services
Montana-Dakota Utilities Co.
Natural Resources Defense Council
New York Independent System Operator, Inc.
New York Power Authority*
New York State Electric & Gas Corporation
Niagara Mohawk Power Corporation
Northern Indiana Public Service Company LLC
Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.
NorthStar Clean Energy Company
Northwestern Wisconsin Electric Company
Orange and Rockland Utilities, Inc.
Otter Tail Power Company
PacifiCorp
PJM Interconnection, L.L.C.
Prairie Power, Inc.
Rochester Gas and Electric Corporation
Sierra Club
Solar Energy Industries Association
Southern Illinois Power Cooperative
Southern Indiana Gas & Electric Company d/b/a CenterPoint Energy Indiana South
Southern Minnesota Municipal Power Agency
Southwest Power Pool, Inc.
Superior Water, Light & Power Company
Versant Power
Wabash Valley Power Association, Inc.
Wolverine Power Supply Cooperative, Inc.

New York Power Authority voluntarily dismissed its appeal in Case No. 23-1330.  The petitions of all other New York Transmission Owners filed in Case No. 23-1330 remain pending.

## II.  Parties Before the Federal Energy Regulatory Commission

The parties who submitted comments in the Federal Energy Regulatory Commission (FERC) rulemaking proceeding are listed below:

| <u>Commenter Name(s)</u> | <u>Abbreviation in FERC Docket</u> |
|---|---|
| Americans for a Clean Energy Grid | ACEG |
| Alliance for Clean Energy-New York | ACE-NY |
| American Council on Renewable Energy | ACORE |
| Associated Electric Cooperative, Inc. | AECI |
| Advanced Energy Economy | AEE |
| American Electric Power Service Corporation | AEP |
| AES Clean Energy Development, LLC | AES |
| Affected Interconnection Customers: Acciona Energy USA Global LLC; Copenhagen Infrastructure IV K/S; Hecate Energy LLC; Leeward Renewable Energy Development, LLC; and Tri Global Energy, LLC | Affected Interconnection Customers |
| Allen Meyer | Allen Meyer |
| Alliant Energy Corporate Services, Inc. | Alliant Energy |
| Amazon Energy LLC | Amazon |
| Ameren Services Company | Ameren |
| Ampjack Industries Ltd | Ampjack |
| Anbaric Development Partners, LLC | Anbaric |
| American Public Power Association and Large Public Power Council | APPA-LPPC |
| Apple Inc. | Apple |
| Arizona Public Service Company | APS |
| Arizona Corporation Commission | Arizona Commission |
| Avangrid, Inc. | Avangrid |

| **Commenter Name(s)** | **Abbreviation in FERC Docket** |
|---|---|
| Bonneville Power Administration | Bonneville |
| Bretton C Little | Bretton C Little |
| California Independent System Operator Corporation | CAISO |
| California Energy Storage Alliance | CESA |
| The American Clean Power Association and RENEW Northeast | Clean Energy Associations |
| Clean Energy Buyers Association | Clean Energy Buyers |
| Clean Energy States Alliance | Clean Energy States |
| ClearPath, Inc. | ClearPath |
| Colorado Public Utilities Commission | Colorado Commission |
| Interconnection Cost Consumer Protection Coalition: Advanced Energy Economy; American Clean Power; American Council on Renewable Energy; Americans for a Clean Energy Grid; Cypress Creek Renewables, LLC; Clean Energy Buyers Association; Clean Grid Alliance; Clearway Energy Group LLC; Electricity Consumers Resource Council; Enel North America, Inc.; ENGIE North America Inc.; Hannon Armstrong Sustainable Infrastructure; Capital, Inc.; Hanwha Qcells USA Corp.; Interwest Energy Alliance; Leeward Renewable Energy, LLC; National Audubon Society; Rocky Mountain Institute; Solar Energy Industries Association; The Rail Electrification Council; Working for Advanced Transmission Technologies (WATT) Coalition. | Consumer Protection Coalition |
| Consumers Energy Company | Consumers Energy |
| Community Renewable Energy Association and NewSun Energy LLC | CREA and NewSun |
| CTC Global Corporation | CTC Global |
| Cypress Creek Renewables, LLC | Cypress Creek |
| Dominion Energy Services, Inc | Dominion |

| Commenter Name(s) | Abbreviation in FERC Docket |
| --- | --- |
| Duke Energy Carolinas, LLC; Duke Energy Progress, LLC; and Duke Energy Florida, LLC | Duke Southeast Utilities |
| Duke Energy Carolinas, LLC; Duke Energy Progress, LLC; Dominion Energy South Carolina Inc.; PacifiCorp; Public Service Company of Colorado; and Tri-State Generation and Transmission Association, Inc. | Early Adopters Coalition |
| Environmental Defense Fund | Environmental Defense Fund |
| EDF Renewables LLC | EDF Renewables |
| Edison Electric Institute | EEI |
| El Paso Electric Company | El Paso Electric |
| Electricity Consumers Resource Council | ELCON |
| Elevate Renewable Energy F7, LLC | Elevate |
| North American Electric Reliability Corporation; Midwest Reliability Organization; Northeast Power Coordinating Council, Inc.; ReliabilityFirst Corporation; SERC Reliability Corporation; Texas Reliability Entity, Inc.; and Western Electricity Coordinating Council | NERC |
| Enel North America, Inc. | Enel |
| Energy Keepers, Inc. | Energy Keepers |
| ENGIE North America, Inc. | ENGIE |
| Electric Power Research Institute | EPRI |
| Electric Power Supply Association | EPSA |
| Equinor Wind US LLC | Equinor Wind |
| Evergreen Action | Evergreen Action |
| Eversource Energy Service Company | Eversource |
| Fervo Energy Company | Fervo Energy |
| Golden State Clean Energy | GCSE |
| Google LLC | Google |
| Guzman Energy LLC | Guzman Energy |
| Hannon Armstrong Sustainable Infrastructure Capital, Inc. | Hannon Armstrong |

| **Commenter Name(s)** | **Abbreviation in FERC Docket** |
|---|---|
| Rye Development, LLC; rPlus Hydro, LLP; Nelson Energy LLC; Advanced Hydro Solutions LLC; Hydro Green Energy, LLC; Natel Energy, Inc.; and Sorenson Engineering, Inc. and its affiliates, Cat Creek Energy, LLC and National Hydropower Association | Hydropower Commenters |
| Idaho Power Company | Idaho Power |
| Illinois Commerce Commission | Illinois Commission |
| Citizens Utility Board of Illinois | Illinois CUB |
| Indicated PJM Transmission Owners: American Electric Power Service Corporation on behalf of its affiliates, Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., AEP Ohio Transmission Company, Inc., and AEP West Virginia Transmission Company, Inc.; The Dayton Power and Light Company (d/b/a AES Ohio); Dominion Energy Services, Inc. on behalf of Virginia Electric and Power Company (d/b/a Dominion Energy Virginia); Duke Energy Corporation on behalf of its affiliates Duke Energy Ohio, Inc., Duke Energy Kentucky, Inc., and Duke Energy Business Services LLC; Duquesne Light Company; East Kentucky Power Cooperative; Exelon Corporation; FirstEnergy Service Company, on behalf of its affiliates American Transmission Systems, | Indicated PJM TOs |

| Commenter Name(s) | Abbreviation in FERC Docket |
|---|---|
| Incorporated, Jersey Central Power & Light Company, Mid-Atlantic Interstate Transmission LLC, West Penn Power Company, The Potomac Edison Company, Monongahela Power Company, Keystone Appalachian Transmission Company, and Trans-Allegheny Interstate Line Company; PPL Electric Utilities Corporation; Public Service Electric and Gas Company (PSE&G); Rockland Electric Company; and UGI Utilities Inc | |
| Undersigned 4,293 people as collected by Evergreen Action | Individual Signatories |
| Interwest Energy Alliance | Interwest |
| Invenergy Solar Development North America LLC; Invenergy Thermal Development LLC; Invenergy Wind Development North America LLC; and Invenergy Transmission LLC | Invenergy |
| Iowa Utilities Board | Iowa Commission |
| Interstate Renewable Energy Council | IREC |
| ISO New England Inc. | ISO-NE |
| ISO/RTO Council: California Independent System Operator; ISO New England Inc.; Midcontinent Independent System Operator, Inc; New York Independent System Operator, Inc.; PJM Interconnection, L.L.C.; and Southwest Power Pool, Inc. | ISO/RTO Council |
| Los Angeles Dept. of Water and Power | LADWP |
| Longroad Energy Holdings, LLC | Longroad Energy |
| Lori Ecker | Lori Ecker |
| Microgrid Resources Coalition | Microgrid Resources |
| Midcontinent Independent System Operator, Inc. | MISO |
| MISO Transmission Owners: Ameren Services Company, as agent for Union Electric Company d/b/a | MISO TOs |

| **Commenter Name(s)** | **Abbreviation in FERC Docket** |
|---|---|
| Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, Ameren Transmission Company of Illinois; American Transmission Company LLC; Big Rivers Electric Corporation; Central Minnesota Municipal Power Agency; City Water, Light & Power (Springfield, IL); Cleco Power LLC; Cooperative Energy; Dairyland Power Cooperative; Duke Energy Business Services, LLC for Duke Energy Indiana, LLC; East Texas Electric Cooperative; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; Entergy Texas, Inc.; Great River Energy; GridLiance Heartland LLC; Hoosier Energy Rural Electric Cooperative, Inc.; Indiana Municipal Power Agency; Indianapolis Power & Light Company d/b/a AES Indiana; International Transmission Company d/b/a ITC*Transmission*; ITC Midwest LLC; Michigan Electric Transmission Company, LLC; Lafayette Utilities System; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Missouri River Energy Services; Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power, | |

| Commenter Name(s) | Abbreviation in FERC Docket |
|---|---|
| Inc.; Southern Illinois Power Cooperative; Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South); Southern Minnesota Municipal Power Agency; Wabash Valley Power Association, Inc.; and Wolverine Power Supply Cooperative, Inc. | |
| National Association of Regulatory Utility Commissioners | NARUC |
| National Grid Plc | National Grid |
| New England Power Pool Participants Committee | NEPOOL |
| New England States Committee on Electricity | NESCOE |
| New Jersey Board of Public Utilities | New Jersey Commission |
| New York State Department of State Utility Intervention Unit | New York State Department |
| NextEra Energy, Inc | NextEra |
| North Carolina Utilities Commission and North Carolina Utilities Commission Public Staff | North Carolina Commission and Staff |
| North Dakota Public Service Commission | North Dakota Commission |
| Northwest & Intermountain Power Producers Coalition | Northwest and Intermountain |
| National Rural Electric Cooperative Association | NRECA |
| Navajo Tribal Utility Authority | Navajo Utility |
| Nevada Power Company and Sierra Pacific Power Company | NV Energy |
| New York Public Service Commission and New York State Energy Research and Development Authority | NY Commission and NYSERDA |
| New York Transmission Owners: Central Hudson Gas & Electric Corporation, Consolidated Edison Company of New York, Inc., Long Island Power Authority, Niagara | NYTOs |

| Commenter Name(s) | Abbreviation in FERC Docket |
|---|---|
| Mohawk Power Corporation (d/b/a National Grid), New York Power Authority, New York State Electric & Gas Corporation, Orange and Rockland Utilities, Inc., and Rochester Gas and Electric Corporation. | |
| New York Independent System Operator, Inc. | NYISO |
| Public Commission of Ohio's Office of the Federal Energy Advocate | Ohio Commission Consumer Advocate |
| Omaha Public Power District | Omaha Public Power |
| Organization of MISO States, Inc. | OMS |
| Ørsted North America, Inc. | Ørsted |
| OCETI Sakowin Power Authority | OSPA |
| Renewable Northwest and NW Energy Coalition | Pacific Northwest Organizations |
| Avista Corporation; Idaho Power Company; Portland General Electric Company; and Puget Sound Energy, Inc. | Pacific Northwest Utilities |
| PacifiCorp | PacifiCorp |
| Pattern Energy Group LP | Pattern Energy |
| Payton Alaama | Payton Alaama |
| Pennsylvania Public Utility Commission | Pennsylvania Commission |
| Pacific Gas and Electric Company | PG&E |
| Pine Gate Renewables, LLC | Pine Gate |
| PJM Interconnection, L.L.C. | PJM |
| PJM Cities and Communities Coalition | PJM Coalition |
| Organization of PJM States, Inc. | OPSI |
| PPL Electric Utilities Corporation | PPL |
| Puget Sound Energy, Inc. | Puget Sound |
| Sustainable FERC Project, Sierra Club, Natural Resources Defense Council, Earthjustice, Acadia Center, Environmental Defense Fund, National Audubon Society, Southern Environmental Law Center, and Southface | Public Interest Organizations |

| Commenter Name(s) | Abbreviation in FERC Docket |
|---|---|
| R Street Institute | R Street |
| Rick K. Lathrop | Rick K Lathrop |
| Roy J Shanker Ph.D. | Roy J Shanker |
| rPlus Hydro, LLLP | rPlus |
| RWE Renewables Americas, LLC | RWE Renewables |
| San Diego Gas & Electric Company | SDG&E |
| Solar Energy Industries Association | SEIA |
| U.S. Senators John D. Hickenlooper and Angus King | Senators Hickenlooper and King |
| Shell Energy North America | Shell |
| Southern California Edison Company | SoCal Edison |
| Southern Company Services, Inc. | Southern |
| Southwest Power Pool, Inc. | SPP |
| Connecticut Department of Energy and Environmental Protection, Connecticut Attorney General, Connecticut Office of Consumer Counsel, Delaware Attorney General, Delaware Division of the Public Advocate, Attorney General for the District of Columbia, District of Columbia Office of People's Counsel, Attorney General of Maryland, Maryland Office of People's Counsel, Massachusetts Attorney General, Pennsylvania Office of Consumer Advocate, and the Rhode Island Attorney General | State Agencies |
| Sue Hilton | |
| Transmission Access Policy Study Group | TAPS |
| Tesla, Inc. | Tesla |
| Tri-State Generation and Transmission Association, Inc. | Tri-State |
| Uda Law Firm, P.C. | Uda Law Firm |
| Utah Municipal Power Agency | UMPA |
| Union of Concerned Scientists | Union of Concerned Scientists |
| US Chamber of Commerce | U.S. Chamber of Commerce |
| United States Department of Energy | U.S. DOE |
| VEIR Inc. | VEIR |

| Commenter Name(s) | Abbreviation in FERC Docket |
|---|---|
| Vermont Electric Power Company, Inc. | Vermont Electric and Vermont Transco |
| Vistra Corp. | Vistra |
| Western Area Power Administration | WAPA |
| WATT Coalition | WATT Coalition |
| Colorado Public Utilities Commission Chair Megan Decker, Oregon Public Utility Commission Chair Cynthia Hall, New Mexico Public Regulation Commission Chair Cynthia Hall and Vice-Chair Joe Maestas, Arizona Corporation Commission Chair Lea Marquez Peterson, Nevada Public Utilities Commission Chair Hayley Williamson, California Public Utilities Commission Commissioner Cliff Rechtschaffen, and Washington Utilities and Transportation Commission Commissioner Ann Rendahl | Western Regulators |
| WIRES | WIRES |
| Xcel Energy Services Inc. | Xcel |

## III. Rulings Under Review

*Improvements to Generator Interconnection Procedures and Agreements*, Order No. 2023, 184 FERC ¶ 61,054 (2023);

*Improvements to Generator Interconnection Procedures and Agreements*, Order No. 2023-A, 186 FERC ¶ 61,199 (2024).

## IV. Related Cases

Undersigned counsel are not aware of any related cases pending in this Court or any other Court.

Respectfully submitted,

_/s/John Lee Shepherd, Jr._
John Lee Shepherd, Jr.
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com

*On behalf of Petitioners*

# CORPORATE DISCLOSURE STATEMENT

To the extent that the requirement to identify each of the Petitioners' general nature and purpose is relevant to this proceeding, *see* Circuit Rule 26.1(b), Petitioners consist of FERC-jurisdictional investor-owned transmission companies, cooperative utilities, and municipal utilities that own electric transmission facilities as well as regional transmission organizations or independent system operators. Unless otherwise specified below, no publicly-traded entity owns 10% or more of a Petitioner or a Petitioner's ultimate parent, if any. Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

**1. Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and Ameren Transmission Company of Illinois**

Ameren Services Company is a centralized services company that provides administrative support services to Ameren Corporation and its operating companies, subsidiaries, and affiliates, including the following public utility affiliates: Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and Ameren Transmission Company of Illinois (Ameren Companies). The Ameren Companies are wholly-owned subsidiaries of Ameren Corporation, a publicly traded holding company. At this time, Ameren Services Company believes

that T. Rowe Price and the Vanguard Group, Inc. (Vanguard) (which is not publicly traded) each own more than 10% of the outstanding shares of Ameren Corporation.

### 2. American Transmission Company LLC (American Transmission)

American Transmission is governed by its corporate manager, ATC Management Inc. American Transmission's owners include utilities, municipalities, municipal electric companies, and electric cooperatives from Wisconsin, Michigan, Minnesota, and Illinois. Two publicly-held corporations (through wholly-owned subsidiaries) own 10% or more of American Transmission's ownership interests: WEC Energy Group, Inc. and Alliant Energy Corporation.

### 3. Avangrid, Inc.

Avangrid, Inc. is part of the Iberdrola Group, which is controlled by Iberdrola S.A. Avangrid's ownership includes publicly traded shares listed on the New York Stock Exchange under the symbol AGR, with Iberdrola Group holding a majority ownership interest.

### 4. Big Rivers Electric Corporation

Big Rivers Electric Corporation is a member-owned, not-for-profit, generation and transmission cooperative. Big Rivers Electric Corporation has no corporate parent.

**5. Central Hudson Gas & Electric Corporation (Central Hudson)**

Central Hudson is a wholly-owned subsidiary of CH Energy Group, Inc. and an indirect subsidiary of Fortis Inc., a Canadian company publicly traded on the Toronto stock exchange.

**6. Central Minnesota Municipal Power Agency**

Central Minnesota Municipal Power Agency is a non-stock, joint-action agency organized under the laws of the State of Minnesota. Central Minnesota Municipal Power Agency has no corporate parent.

**7. City Water, Light & Power (Springfield, IL)**

City Water, Light & Power is the operating name of the Office of Public Utilities, a division of the City of Springfield, Illinois, a home rule municipal corporation and political subdivision of the State of Illinois, organized and existing pursuant to the Illinois Constitution. The City of Springfield is a political subdivision, and no publicly owned corporation has any ownership share in the city or its electric system.

**8. Cleco Power LLC**

Cleco Power LLC is a wholly-owned subsidiary of Cleco Corporate Holdings LLC, a privately-held holding company.

**9. Consolidated Edison Co. of New York, Inc. and Orange and Rockland Utilities, Inc.**

Consolidated Edison Company of New York, Inc. and Orange and Rockland Utilities, Inc. are wholly-owned subsidiaries of Consolidated Edison, Inc., which is publicly traded on the New York Stock Exchange.  Vanguard, a non-publicly-held company is believed, based on the Schedule 13G/A it has most recently filed with the Securities and Exchange Commission, to hold greater than 10 percent of the voting equity interests in Consolidated Edison, Inc.  In addition, BlackRock, Inc., a publicly traded company, is believed, based on the Schedule 13G/A it most recently filed with the Securities and Exchange Commission to hold greater than 10 percent voting interests in Consolidated Edison, Inc.

**10. Cooperative Energy**

Cooperative Energy is an incorporated, not-for-profit, cooperative electric power association that is owned and controlled by its eleven members, which are distribution rural electric power associations.  Cooperative Energy has no corporate parent.

**11. Dairyland Power Cooperative (Dairyland)**

Dairyland is a non-stock cooperative association made up of twenty-four distribution cooperatives.  Dairyland has no corporate parent.

**12. Dominion Energy Services, Inc. (Dominion), on behalf of its affiliates Virginia Electric and Power Company d/b/a Dominion Energy Virginia (DEV) and Dominion Energy South Carolina, Inc. (DESC)**

Dominion is the centralized service company for DEV and DESC. Dominion, DEV, and DESC are each wholly-owned subsidiaries of Dominion Energy, Inc. (NYSE: D), which is a publicly-held company. Dominion Energy has no parent company.

**13. Duke Energy Business Services, LLC for Duke Energy Indiana, LLC (Duke Indiana)**

Duke Indiana is owned 100% by Duke Energy Indiana Holdco, LLC (Duke Indiana Holdco). Duke Indiana Holdco is owned 80.1% by Cinergy Corp. and 19.9% by Epsom Investment Pte. Ltd., (Epsom Investment). Cinergy Corp. is owned 100% by Duke Energy Corporation, a publicly-traded energy holding company. Epsom Investment is a wholly-owned subsidiary of GIC Infra Holdings Pte. Ltd. (GIC). GIC is a direct, wholly-owned subsidiary of GIC (Ventures) Pte. Ltd. (GIC Ventures). GIC Ventures is wholly-owned by the Government of Singapore through the Minister for Finance, a statutory corporation set up by the Government of Singapore to own and administer government assets.

**14. East Texas Electric Cooperative**

East Texas Electric Cooperative is a non-stock, generation and transmission electric cooperative corporation. East Texas Electric Cooperative is owned and

controlled by its eight members, which are seven distribution cooperatives and one generation and transmission cooperative. East Texas Electric Cooperative has no corporate parent.

**15. Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, and Entergy Texas, Inc. (Entergy Operating Companies)**

The Entergy Operating Companies are utility operating subsidiaries of Entergy Corporation. Entergy Corporation is a registered public utility holding company. Entergy Corporation, either directly or indirectly, owns all or a majority of the outstanding shares of stock of the Entergy Operating Companies.

**16. Exelon Corporation (Exelon)**

Exelon has no parent company. Vanguard, a non-publicly-held company, is believed, based on the Schedule 13G/A it most recently filed with the Securities and Exchange Commission, to hold a greater than 10 percent voting interest in Exelon. In addition, BlackRock, Inc. holds a greater than 10 percent voting interest in Exelon.

**17. FirstEnergy Service Company (FirstEnergy)**

FirstEnergy is a wholly-owned service company subsidiary of FirstEnergy Corp., a publicly traded company registered as a public utility holding company under the Public Utility Holding Company Act of 2005.

### 18. Great River Energy

Great River Energy is a non-stock, generation and transmission cooperative corporation made up of twenty-seven member distribution cooperatives. Great River Energy does not have a parent corporation and has not issued shares to the public.

### 19. GridLiance Heartland LLC

GridLiance Heartland LLC is a wholly-owned subsidiary of GridLiance Eastern Holdings LLC. GridLiance Eastern Holdings is a wholly-owned subsidiary of GridLiance Heartland Holdings LLC, which is, in turn, a wholly-owned subsidiary of GridLiance Holdco, LP.

GridLiance Holdco is an indirect, wholly-owned subsidiary of NextEra Energy Transmission, LLC, which in turn is an indirect wholly-owned subsidiary of NextEra Energy, Inc. (NextEra). NextEra is a publicly-held company with shares listed on the New York Stock Exchange. No publicly-held company has a 10 percent or greater ownership interest in NextEra. While not publicly-held, Vanguard reported that, as of the end of the third quarter (*i.e.*, Q3) of 2023, its family of funds held 10.86% of NextEra's outstanding voting securities, making it NextEra's ultimate upstream affiliate.

**20.     Hoosier Energy Rural Electric Cooperative, Inc. (Hoosier Energy)**

Hoosier Energy has no parent company or controlling entity.  Hoosier Energy has no stock or partnership share ownership.

**21.     Indiana Municipal Power Agency**

The Indiana Municipal Power Agency is a body corporate and politic and political subdivision of the State of Indiana.

**22.     Indianapolis Power & Light Company d/b/a AES Indiana**

AES Indiana is a subsidiary of IPALCO Enterprises, Inc. (IPALCO). IPALCO is majority owned (82.35%) by AES U.S. Investments, Inc., which is majority owned (85%) by AES U.S. Holdings, LLC (IPALCO and AES U.S. Holdings' minority ownership is described immediately below).  AES U.S. Holdings is wholly-owned by The AES Corporation (AES).  AES has issued shares of stock and debt securities to the public.  Investment funds owned by Vanguard hold over ten percent of the publicly-traded shares of AES.  Vanguard is investor-owned by its fund shareholders.

IPALCO is minority owned (17.65%) by CDP Infrastructures Fund L.P. (CDP Fund), and AES U.S. Investments is also minority owned by CDP Fund (15%).  CDP Fund is an indirect, minority investor having certain investor protection rights, while AES has majority ownership and control over both AES U.S. Investments and IPALCO.  CDP Fund is wholly-owned by Caisse de dépôt et placement du Québec,

a Canadian institutional investor that manages public and private pension plans and insurance programs in Quebec.

**23.** **International Transmission Company d/b/a ITC*Transmission*, ITC Midwest LLC, and Michigan Electric Transmission Company, LLC**

International Transmission Company d/b/a ITC*Transmission* and ITC Midwest LLC are wholly-owned subsidiaries of ITC Holdings Corp. Michigan Electric Transmission Company, LLC is an indirect wholly-owned subsidiary of ITC Holdings.

ITC Holdings' sole shareholder is ITC Investment Holdings Inc. FortisUS Inc. owns 80.1% of ITC Investment Holdings Inc. FortisUS Holdings Nova Scotia Limited wholly owns FortisUS Inc. Fortis Inc. wholly owns FortisUS Holdings Nova Scotia Limited. Fortis Inc. has no parent company, and no publicly-held company has a 10% or greater ownership interest in Fortis Inc. Eiffel Investment Pte. Ltd., which is wholly-owned by GIC Ventures, directly owns 19.9% of ITC Investment Holdings. GIC Ventures is affiliated with GIC Private Limited (GIC Private), an investment company that manages the Government of Singapore's foreign reserves, and GIC Special Investments Pte. Ltd., the private equity and infrastructure arm of GIC Private. GIC Private and GIC Ventures are each wholly-owned by the Government of Singapore through the Ministry for Finance, a statutory corporation set up by the Government of Singapore to own and administer

government assets.  The Ministry for Finance has no parent company, and no publicly-held company has a 10% or greater ownership interest in the Ministry for Finance.

### 24.    Lafayette Utilities System (Lafayette)

Lafayette is a municipal utility organized under the laws of the State of Louisiana.  The governing authority of Lafayette is the Lafayette City Council.  Lafayette has no corporate parent and issues no stock.

### 25.    Long Island Power Authority (LIPA)

LIPA is a corporate municipal instrumentality and a political subdivision of the State of New York, which operates on a non-profit basis.  LIPA does not have any parent companies, subsidiaries, or affiliates with any outstanding shares that are owned by the public.

### 26.    MidAmerican Energy Company (MidAmerican)

MidAmerican is an indirect subsidiary of Berkshire Hathaway Energy Company (BHEC).  Intermediate parent entities of MidAmerican are MHC Inc. and MidAmerican Funding, LLC.  Neither MHC Inc., which is 100% owned by MidAmerican Funding, LLC, nor MidAmerican Funding, LLC, which is owned 100% by BHEC, has publicly traded equity securities.  BHEC is a consolidated subsidiary of Berkshire Hathaway Inc., a publicly traded entity, which owns approximately 100% of the voting equity of BHEC.

**27. Midcontinent Independent System Operator, Inc. (MISO)**

MISO is a non-stock, not-for-profit corporation organized under the laws of the State of Delaware. MISO is a FERC-authorized independent regional transmission organization and has no parent corporation.

**28. Minnesota Power (and its subsidiary Superior Water, Light & Power Company)**

ALLETE, Inc., d/b/a Minnesota Power, which owns Superior Water, Light & Power Company, is a publicly traded company.

**29. Missouri River Energy Services**

Missouri River Energy Services is a municipal joint action agency existing under the joint action laws of the States of Iowa, Minnesota, North Dakota, and South Dakota. Missouri River Energy Services is comprised of sixty-one member municipal utilities. Missouri River Energy Services does not issue any stock.

**30. Montana-Dakota Utilities Co.**

Montana-Dakota Utilities Co. is a subsidiary of MDU Resources Group, Inc. MDU Resources Group, Inc. is a publicly-held company whose common stock is publicly traded on the New York Stock Exchange. Based on a review of institutional investors' filings with the Securities and Exchange Commission, Vanguard (which is not publicly traded) owns more than 10% of the outstanding shares of MDU Resources Group, Inc.

**31.  New York Independent System Operator, Inc. (NYISO)**

The NYISO is a not-for-profit, non-publicly held corporation.  It does not have a parent company.

**32.  New York State Electric & Gas Corporation and Rochester Gas and Electric Corporation**

New York State Electric & Gas Corporation and Rochester Gas and Electric Corporation are wholly-owned subsidiaries of Avangrid Networks, Inc.  Avangrid Networks is a wholly-owned subsidiary of Avangrid.  Avangrid is listed on the New York Stock Exchange.

**33.  Niagara Mohawk Power Corp. (Niagara Mohawk)**

Niagara Mohawk is an indirect wholly-owned subsidiary of National Grid plc, a publicly-held company.

**34.  Northern Indiana Public Service Company LLC**

Northern Indiana Public Service Company LLC is a wholly-owned subsidiary of NIPSCO Holdings II LLC.  NIPSCO Holdings II LLC is owned 80.1% by NIPSCO Holdings I LLC, 15.3841% by BIP Blue Buyer L.L.C., and 4.5159% by BIP Blue Buyer VCOC L.L.C.  NIPSCO Holdings I LLC is a wholly-owned subsidiary of NiSource Inc.  NiSource Inc. is a public utility holding company whose common stock is publicly traded on the New York Stock Exchange.

**35. Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.**

Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, are wholly-owned utility operating company subsidiaries of Xcel Energy Inc.  The securities of Xcel Energy Inc. are publicly traded.  Based on a review of institutional investors' filings with the Securities and Exchange Commission, Vanguard (which is not publicly traded) owns 13.0% of the outstanding shares of Xcel Energy Inc.  Certain operating company subsidiaries of Xcel Energy Inc., including Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, have issued first mortgage bonds and other debt securities. A complete list of all debt securities of Xcel Energy Inc. subsidiaries is available at the Xcel Energy Inc. website (www.xcelenergy.com) under Investor Relations.

**36. Northwestern Wisconsin Electric Company**

Northwestern Wisconsin Electric Company is an investor-owned utility.  No corporation, partnership, or business trust owns a controlling interest in Northwestern Wisconsin Electric Company.

**37. Otter Tail Power Company**

Otter Tail Power Company is a wholly-owned subsidiary of Otter Tail Corporation.  As of December 31, 2023, BlackRock, Inc. and Vanguard each owned

more than 10% of the shares outstanding of Otter Tail Corporation. BlackRock, Inc. is a publicly traded entity, while Vanguard is not.

### 38. PacifiCorp

PacifiCorp is a subsidiary of PPW Holdings, LLC. PPW Holdings, LLC, is a subsidiary of BHEC, which in turn is a consolidated subsidiary of Berkshire Hathaway, Inc. Other than Berkshire Hathaway, Inc., there are no publicly-held corporations that own any common stock of, or any other voting interest in, PacifiCorp.

### 39. PJM Interconnection, L.L.C. (PJM)

PJM has no parent companies. PJM's members do not purchase interests or otherwise provide capital to obtain interests in PJM. PJM is not operated to produce a profit, has never made any distributions to its members, and does not intend to do so (absent dissolution).

### 40. Prairie Power, Inc.

Prairie Power, Inc. is a wholesale generation and transmission electric cooperative that is wholly-owned by its member electric cooperatives, none of which is publicly traded. Prairie Power, Inc. does not have a parent corporation, and no publicly-held corporation owns 10% or more of its stock.

**41.  Southern Illinois Power Cooperative**

Southern Illinois Power Cooperative does not have any parent company. Southern Illinois Power Cooperative is a generation and transmission cooperative made up of seven member distribution cooperatives.

**42.  Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South)**

Southern Indiana Gas & Electric Company's parent is Vectren, LLC, with Vectren Utility Holdings, LLC as the intermediate parent.  Vectren Utility Holdings, LLC is the holder of interest in Southern Indiana Gas & Electric Company.  Vectren, LLC is an indirect wholly owned subsidiary of CenterPoint Energy, Inc.  CenterPoint Energy, Inc. is a publicly held company..

**43.  Southern Minnesota Municipal Power Agency**

Southern Minnesota Municipal Power Agency is a joint-action agency comprised of seventeen member municipalities.  Southern Minnesota Municipal Power Agency is a non-profit political subdivision of the State of Minnesota.

**44.  Southwest Power Pool, Inc. (SPP)**

SPP is a FERC-authorized independent regional transmission organization, which has no parent corporation, and is an Arkansas non-profit corporation that does not issue stock.

**45.  Wabash Valley Power Association, Inc. (Wabash)**

Wabash is a not-for-profit, generation and transmission electric cooperative made up of twenty-three member distribution cooperatives.  Wabash has no parent corporation and issues no stock.

**46.  Wolverine Power Supply Cooperative, Inc. (Wolverine)**

Wolverine is a not-for-profit, generation and transmission electric cooperative made up of five distribution cooperative members.  Wolverine has two other members, one of which operates solely as a Michigan alternative retail electric supplier and the other of which operates both as a Michigan alternative retail electric supplier and as a FERC-jurisdictional entity.  Wolverine's members are its customers and its owners.  Wolverine has no publicly issued stock.

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com

*On behalf of Petitioners*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ...................................... xiv

TABLE OF CONTENTS.........................................................xxx

TABLE OF AUTHORITIES ............................................... xxxiii

GLOSSARY OF ABBREVIATIONS ................................................. xl

INTRODUCTION ...............................................................1

JURISDICTIONAL STATEMENT ...............................................4

STATEMENT OF ISSUES ......................................................5

STATUTES AND REGULATIONS.................................................5

STATEMENT OF THE CASE...................................................6

    A.   Statutory and Regulatory Overview.......................................6

        1.   FPA Section 206 ................................................6

        2.   The "First-Come, First Served" Interconnection Approach Under Order Nos. 2003, 2006, 792, and 845 .............7

    B.   Early Adopters of Cluster Study Reforms .............................9

    C.   Proceedings Below ....................................................12

SUMMARY OF THE ARGUMENT ....................................................16

STANDING ..................................................................18

STANDARD OF REVIEW ........................................................19

ARGUMENT ..................................................................20

I.   The Strict Liability Penalty Scheme FERC Imposed Violates Constitutional Protections and the Federal Power Act...............................20

    A.   A "Guilty Unless Proven Innocent" Penalty Violates Due Process Protections..............................................21

    B.   Assessing Penalties Without Regard to Causation Is Confiscatory and Constitutes a Regulatory Taking ..........................30

    C.   The Other "Safeguards" FERC Adopted Do Not Ameliorate the Due Process Defects in FERC's Strict Liability Penalty Regime.......34

    D.   FERC Exceeded Its Authority Under the FPA by Imposing Automatic Penalties..............................................38

II.    The Strict Liability Penalty Scheme FERC Imposed Is Not the Product of Reasoned Decisionmaking Under the Administrative Procedure Act ...............................................................................41

       A.    There Is No Evidence, Substantial or Otherwise, that Transmission Providers are a Primary Cause of Interconnection Study Delays........................................................42

       B.    FERC Lacked a Valid Evidentiary Basis to Justify Imposing a Generic Interconnection Study Penalty Regime Under FPA Section 206 Because Most Tariffs Had Already Been Reformed ......48

       C.    The Study Penalty Framework Unduly Discriminates Against Transmission Providers in Regions With Substantial Renewable Generation in Development .............................................52

       D.    FERC Has Not Demonstrated That Imposing Interconnection Study Penalties on Transmission Providers Will Directly Affect, Much Less Ensure, Just And Reasonable Rates ....................54

       E.    FERC Did Not Adequately Address Arguments that a Strict Liability Penalty Regime Would Create Perverse Incentives that Would Undermine FERC's Own Goals................................56

III.   The Defects of the Strict Liability Penalty Scheme Are Exacerbated When Applied to System Operators ...............................................58

       A.    It Is Unduly Discriminatory to Apply the Strict Liability Penalty Scheme to System Operators and FERC Has Not Offered a Reasoned Explanation for Doing So.................................62

       B.    System Operators' Uncertain Opportunity to Recover Study Delay Penalty Costs Does Not Provide Adequate Protection Against Unduly Discriminatory Penalties...........................65

       C.    FERC's Other Theoretical "Safeguards" Do Not Provide System Operators with Meaningful Protection..................................69

       D.    The Orders' Deadline for Completing Interconnection Studies is Arbitrary and Cannot Reasonably Be Imposed on System Operators .........................................................................71

       E.    FERC Unreasonably Failed to Consider Alternatives to a Strict Liability Penalty Scheme for System Operators ...............................73

IV.    FERC Departs from Reasoned Decisionmaking by Imposing a Generic Finding and New Set of Rules Under FPA section 206 Based on Outdated Evidence................................................................75

V.    Mandating that Affected System Transmission Providers Use Only Energy Service Standards Is Arbitrary and Capricious ...................................79

    A.    Requiring the Use of Energy Service Modeling for All Affected System Studies Is Arbitrary and Capricious ......................................80

    B.    Order No. 2023's Affected Systems Ruling Is Contrary to FERC Precedent ..............................................................................85

CONCLUSION ..............................................................................................86

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

Attachment A: Statutory Addendum

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Electric Cooperative v. FERC*, 684 F.2d 20 (D.C. Cir. 1982) ................62

*Ameren Services Co. v. FERC*, 880 F.3d 571 (D.C. Cir. 2018) .............................32

*Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984)................................................34

*Arkansas Electric Energy Consumers v. FERC*, 290 F.3d 362 (D.C. Cir. 2002) ........................................................................................................62

*\*Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C. Cir. 1987)................49

*Bangor Hydro-Electric Co. v. FERC*, 925 F.2d 465 (D.C. Cir. 1991) ....................33

*Belmont Municipal Light Dep't v. FERC*, 38 F.4th 173 (D.C. Cir. 2022) .........................................................................................................78

*\*Bluefield Water Works & Improvement Co. v. Public Service Comm'n of West Virginia*, 262 U.S. 679 (1923) ..........................................30, 31

*\*California Independent System Operator Corp. v. FERC*, 372 F.3d 395 (2004)...............................................................................................6, 38, 54

*Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289 (D.C. Cir. 2001) ......................................................................................................19

*Carolina Power & Light Co. v. FERC*, 716 F.2d 52 (D.C. Cir. 1983)....................33

*China Telecom (Americas) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022) ........................................................................................................22

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013)................................18

*Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) .......................21

*Consolidated Edison Co. of New York, Inc. v. FERC*, 347 F.3d 964 (D.C. Cir. 2003) ...............................................................................................33

*Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021) ......................................................18

*Authorities chiefly relied upon are marked with an asterisk.

*Duquesne Light Co. v. Barasch, 488 U.S. 299 (1989) ...........................................31

Electric Power Supply Ass'n v. FERC, 753 F.3d 216 (D.C. Cir. 2014)..................39

*Emera Maine v. FERC, 854 F.3d 9 (D.C. Cir. 2017) .........................................6, 48

Environmental Integrity Project v. EPA, 425 F.3d 992 (D.C. Cir. 2005) ...........................................................................................33

FERC v. Electric Power Supply Ass'n, 577 U.S. 260 (2016).......................6, 39, 54

*FCC v. Fox Television Stations, Inc., 556 U.S. 502 (2009) .................................20

Florida Gas Transmission Co. v. FERC, 604 F.3d 363 (D.C. Cir. 2010) ...........................................................................................19

Florida Municipal Power Agency v. FERC, 315 F.3d 362 (D.C. Cir. 2003) ...........................................................................................19

*FPC v. Hope Natural Gas, 320 U.S. 591 (1944).....................................................31

General Electric Co. v. EPA, 53 F.3d 1324 (D.C. Cir. 1995) ................................26

Hayes v. New York Att'y Grievance Committee of the Eighth Judicial District, 672 F.3d 158 (2d Cir. 2012) ................................................................26

Hecate Energy LLC v. FERC, No. 23-1089 (filed D.C. Cir. Mar. 31, 2023) ...........................................................................................11

International Transmission Co. v. FERC, 988 F.3d 471 (D.C. Cir. 2021) .........................................................................................6, 64

Interstate Natural Gas Ass'n of America v. FERC, 285 F.3d 18 (D.C. Cir. 2002) ...........................................................................................50

Jersey Central Power & Light Co. v. FERC, 810 F.2d 1168 (D.C. Cir. 1987) ...........................................................................................31

*Kokesh v. SEC, 581 U.S. 455 (2017) .......................................................39, 40, 41

Louisiana Ass'n of Independent Producers & Royalty Owners v. FERC, 958 F.2d 1101 (D.C. Cir. 1992).........................................................24

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ...........................................18

*Authorities chiefly relied upon are marked with an asterisk.

*Mathews v. Eldridge, 424 U.S. 319 (1976) ......................................................21, 22

McCarthy v. Madigan, 503 U.S. 140 (1992) ..........................................................33

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto
Insurance Co., 463 U.S. 29 (1983)......................................................19, 47, 75

National Ass'n of Regulated Utility Comm'rs v. FERC, 475 F.3d 1277
(D.C. Cir. 2007) ....................................................................................................7

National Mining Ass'n v. United States Dep't of Interior, 251 F.3d
1007 (D.C. Cir. 2001) .......................................................................................22

*New England Generators Ass'n, Inc. v. FERC, 881 F.3d 202 (D.C.
Cir. 2018) ..........................................................................19, 20, 47, 75, 78

Public Utility District No. 1 of Snohomish County v. FERC, 272 F.3d
607 (D.C. Cir. 2001) .........................................................................................18

South Carolina Public Service Authority, 762 F.3d 41 (D.C. Cir.
2014) ....................................................................................................................50

State Corporation Comm'n of Kansas v. FERC, 876 F.3d 332 (D.C.
Cir. 2017) ............................................................................................................62

Statewide Bonding, Inc. v. United States Dep't of Homeland Security,
980 F.3d 109 (D.C. Cir. 2020).......................................................................21

*Tenaska Clear Creek Wind, LLC. v. FERC, 108 F.4th 858 (D.C. Cir.
2024) ........................................................................................................79, 80, 86

*TransCanada Power Marketing Ltd. v. FERC, 811 F.3d 1 (D.C. Cir.
2015) ........................................................................................................44, 54, 56

Transmission Access Policy Study Group v. FERC, 225 F.3d 667
(2000)....................................................................................................................50

Transmission Agency of Northern California v. FERC, 628 F.3d 538
(D.C. Cir. 2010) ................................................................................................62

UDC Chairs Chapter, American Ass'n of University Professors v.
Board of Trustees of University of the District of Columbia, 56
F.3d 1469 (D.C. Cir. 1995)............................................................................21

*Authorities chiefly relied upon are marked with an asterisk.

*Union Pacific Fuels, Inc. v. FERC, 129 F.3d 157 (D.C. Cir. 1997)......................24

United States Telecom Ass'n v. FCC, 825 F.3d 674 (D.C. Cir. 2016) ....................26

United States v. Strauss, 999 F.2d 692 (2d Cir. 1993) ..........................................26

United States v. Williams, 553 U.S. 285 (2008) ....................................................26

West Deptford Energy, LLC v. FERC, 766 F.3d 10 (D.C. Cir. 2014)....................20

Villages of Chatham and Riverton v. FERC, 662 F.2d 23 (D.C. Cir. 1981) ...............................................................................................................33

## Constitution

*United States Constitution Amendment V.......................................................21, 30

## Statutes

5 U.S.C. § 706 ...............................................................................2, 19, 20, 41

Federal Power Act (FPA), 16 U.S.C. §§ 791-825r

FPA section 205, 16 U.S.C. § 824d...............................................................65

FPA section 206, 16 U.S.C. § 824e...................................................1, 6, 48

FPA section 313, 16 U.S.C. § 825l.......................................................4, 48

FPA section 316A, 16 U.S.C. § 825o-1 ...............................................23, 38

## FERC Rulemaking Orders

Improvements to Generator Interconnection Procedures and Agreements, Order No. 2023, 184 FERC ¶ 61,054 (2023)............................. 1 & n.1, 13, 23, 24, 25, 27, 29 & n.7, 42, 44, 45, 52, 55, 61, 71, 72, 76, 78, 80, 81, 83, 84, 85

Improvements to Generator Interconnection Procedures and Agreements, 184 FERC ¶ 62,163 (2023) (Notice of Denial) ...............1 n.1, 4, 14

Improvements to Generator Interconnection Procedures and Agreements, 185 FERC ¶ 61,063 (2023) (Modification Order)...........1 n.1, 4, 15

Improvements to Generator Interconnection Procedures and Agreements, Order No. 2023-A, 186 FERC ¶ 61,199 (2024) .. 1 & n.1, 2, 13, 15,

*Authorities chiefly relied upon are marked with an asterisk.

18, 23, 24, 26, 33, 34, 36, 37, 38, 39, 42, 46, 47, 49, 50, 53, 55, 56, 57, 59, 61, 64, 65, 67, 68, 69, 72, 74, 77, 78, 80, 82, 83, 84, 86

*Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119 (2007).....................................28, 29

*Reform of Generator Interconnection Procedures and Agreements*, Order No. 845, 163 FERC ¶ 61,043 (2018).................................................9 & n.5

*Reform of Generator Interconnection Procedures and Agreements*, Order No. 845-A, 166 FERC ¶ 61,137 (2019) ................................... 9 & n.5, 83

*Small Generator Interconnection Agreements and Procedures*, Order No. 792, 145 FERC ¶ 61,159 (2013).....................................................8 & n.4

*Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103 (2003).............. 7 & n.2, 8, 84

*Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003-A, 106 FERC ¶ 61,220 (2004)........ 7 & n.2, 81, 84

*Standardization of Small Generator Interconnection Agreements and Procedures*, Order No. 2006, 111 FERC ¶ 61,220 (2005).........................8 & n.3

**FERC Adjudicatory Orders**

*Avista Corp.*, 179 FERC ¶ 61,183 (2022).......................................................11, 52

*California Independent System Operator Corp.*, 124 FERC ¶ 61,292 (2008).............................................................................................................11

*City of Hamilton, Ohio*, 82 FERC ¶ 61,144 (1998)..................................................22

*Dominion Energy South Carolina, Inc.*, Docket No. ER22-301-000, Delegated Letter Order (Dec. 28, 2021) ...............................................................11

*Duke Energy Carolinas, LLC*, 176 FERC ¶ 61,075 (2021)....................................11

*EDF Renewable Energy Inc. v. Midcontinent Independent System Operator, Inc.*, 168 FERC ¶ 61,173 (2019).........................................................86

*ISO New England Inc.*, 161 FERC ¶ 61,123 (2017)................................................11

*Kings River Conservation District*, 36 FERC ¶ 61,365 (1986).............................22

*Authorities chiefly relied upon are marked with an asterisk.

*Midcontinent Independent System Operator, Inc.*, 171 FERC ¶ 61,275 (2020)...............................................................................................81, 86

*Midcontinent Independent System Operator, Inc.*, 178 FERC ¶ 61,141 (2022)...............................................................................................49, 52

*Midwest Independent Transmission System Operator, Inc.*, 124 FERC ¶ 61,183 (2008) ...........................................................................10

*New York Independent System Operator, Inc.*, 108 FERC ¶ 61,159 (2004).................................................................................................10

*PacifiCorp*, 171 FERC ¶ 61,112 (2020) ...........................................................11, 49

*PacifiCorp,* 179 FERC ¶ 61,089 (2022) ...................................................................49

*\*PJM Interconnection, L.L.C.*, 181 FERC ¶ 61,162 (2022)..................11, 49, 51, 52

*Public Service Company of Colorado*, 169 FERC ¶ 61,182 (2019).........................11

*Southwest Power Pool, Inc.*, 128 FERC ¶ 61,114 (2009) ......................................10

*Southwest Power Pool, Inc.*, 178 FERC ¶ 61,015 (2022) ..................................49, 52

*Tenaska Clear Creek Wind, LLC v. Southwest Power Pool, Inc.*, 180 FERC ¶ 61,160 (2022) .............................................................................85

*Tri-State Generation & Transmission Ass'n, Inc.*, 174 FERC ¶ 61,021 (2021) .................................................................................................11

**Tariff Provisions**

Agreement Between New York Independent System Operator, Inc. and Transmission Owners § 6.14 .......................................................67 n.9

**Other**

*\*Enforcement of Statutes, Regulations and Orders*, 123 FERC ¶ 61,156 (2008) ...........................................................................23, 29

*Improvements to Generator Interconnection Procedures & Agreements*, 179 FERC ¶ 61,194 (2022).........................................................12

*Authorities chiefly relied upon are marked with an asterisk.

*Midcontinent Indep. Sys. Operator, Inc*., Docket No. ER24-2046, Protest of Shell Energy North America (US), L.P., Shell New Energies US, LLC, and Savion, LLC (June 20, 2024) ......................................73

*PJM Interconnection, L.L.C.*, Docket No. ER22-2110-001, Tariff Revisions for Interconnection Process Reform, Request for Commission Action by October 3, 2022, and Request for 30-Day Comment Period (June 14, 2022) .........................................................76

*PJM Interconnection, L.L.C.*, Docket No. ER24-2045, Protest of Public Interest Organizations (June 20, 2024)...................................................73

*Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Affected System | A transmission provider system that neighbors a transmission system where a generating resource seeks to interconnect, that is impacted by such interconnection on the neighboring system |
| APA | Administrative Procedure Act |
| *CAISO* | *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395 (2004) |
| CAISO | California Independent System Operator |
| Commission | Federal Energy Regulatory Commission |
| Energy Service | Energy Resource Interconnection Service, a level of interconnection service studied on a non-firm basis |
| *EPSA* | *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016) |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| GIAs | Generator Interconnection Agreements |
| GIPs | Generator Interconnection Procedures |
| ISO | Independent System Operator |
| ISO-NE | ISO New England Inc. |
| *Hope* | *FPC v. Hope Natural Gas*, 320 U.S. 591 (1944) |

| | |
|---|---|
| LGIA | Large Generator Interconnection Agreements |
| LGIP | Large Generator Interconnection Procedures |
| MISO | Midcontinent Independent System Operator, Inc. |
| Modification Order | *Improvements to Generator Interconnection Procedures and Agreements*, 185 FERC ¶ 61,063 (Oct. 25, 2023) |
| *NEPGA* | *New Eng. Generators Ass'n, Inc. v. FERC*, 881 F.3d 202 (D.C. Cir. 2018) |
| NERC | North American Electric Reliability Corporation |
| Network Service | Network Resource Interconnection Service, a level of interconnection service that is studied assuming firm delivery of the generating resource |
| NOPR | *Improvements to Generator Interconnection Procedures and Agreements*, 179 FERC ¶ 61,194 (2022) |
| Notice of Denial | *Improvements to Generator Interconnection Procedures and Agreements*, 184 FERC ¶ 62,163 (Sept. 28, 2023) |
| NYISO | New York Independent System Operator, Inc. |
| Order No. 792 | *Small Generator Interconnection Agreements and Procedures*, Order No. 792, 145 FERC ¶ 61,159 (2013) |

| | |
|---|---|
| Order No. 845 | *Reform of Generator Interconnection Procedures and Agreements*, Order No. 845, 163 FERC ¶ 61,043 (2018) |
| Order No. 890 | *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119 (2007) |
| Order No. 2003 | *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103 (2003) |
| Order No. 2006 | *Standardization of Small Generator Interconnection Agreements and Procedures*, Order No. 2006, 111 FERC ¶ 61,220 (2005) |
| Order No. 2023 | *Improvements to Generator Interconnection Procedures and Agreements*, Order No. 2023, 184 FERC ¶ 61,054 (2023) |
| Order No. 2023-A | *Improvements to Generator Interconnection Procedures and Agreements*, Order No. 2023-A, 186 FERC ¶ 61,199 (2024) |
| Orders | Order No. 2023 and Order No. 2023-A |
| PJM | PJM Interconnection, L.L.C. |
| *PJM Interconnection Reform Order* | *PJM Interconnection, L.L.C.*, 181 FERC ¶ 61,162 (2022) |
| RTO | Regional Transmission Organization |
| SGIA | Small Generator Interconnection Agreements |

| | |
|---|---|
| SGIP | Small Generator Interconnection Procedures |
| SPP | Southwest Power Pool, Inc. |
| System Operators | RTOs and ISOs |
| Tariff | Open Access Transmission Tariff |

# INTRODUCTION

In Order No. 2023, the Federal Energy Regulatory Commission (Commission or FERC) required all jurisdictional transmission providers to make substantial modifications to their procedures for processing interconnection requests from new electric generation facilities.[1] Invoking its remedial authority under Federal Power Act (FPA) section 206, 16 U.S.C. § 824e, FERC found the existing interconnection procedures used by transmission providers, including transmission-owning utilities, regional transmission organizations (RTOs), and independent system operators (ISOs, together with RTOs, System Operators), unlawful because those procedures were permitting "large interconnection queue backlogs and uncertainty regarding the cost and timing of interconnecting to the transmission system, increasing costs for consumers." Order No. 2023 at P 3, JA____. To improve the speed and efficiency of the interconnection process, FERC required transmission providers to "(1) implement a first-ready, first-served cluster study process; (2) increase the speed of interconnection queue processing; and (3) incorporate technological advancements into the interconnection process." *Id.* P 4.

---

[1] *Improvements to Generator Interconnection Procs. & Agreements*, Order No. 2023, 184 FERC ¶ 61,054 (2023), *reh'g denied by operation of law*, 184 FERC ¶ 62,163 (Notice of Denial), *modified*, 185 FERC ¶ 61,063 (2023) (Modification Order), *order on reh'g*, Order No. 2023-A, 186 FERC ¶ 61,199 (2024) (collectively, the Orders).

For two decades, FERC required transmission providers to study interconnection requests under the "reasonable efforts" standard, which permitted transmission providers flexibility to complete interconnection studies when their actions were "timely and consistent with good utility practice and are otherwise substantially equivalent to those a party would use to protect its own interests." Order No. 2023-A, Appx. C, JA____. Order No. 2023 jettisoned that standard in favor of more aggressive interconnection study deadlines and further required transmission providers to pay penalties to interconnection customers for any failure to meet those deadlines. FERC found the long-standing "reasonable efforts" standard for processing interconnection requests no longer just and reasonable and replaced it with mandatory penalties imposed on a strict liability basis, without regard to "reasonable efforts" or any inquiry into the actual causes of study delays. *See* Order No. 2023-A at P 426, JA____.

FERC's imposition of this punitive system deprives transmission providers of due process and does not comply with reasoned decisionmaking requirements under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2). There is no evidence, much less substantial evidence, that transmission providers cause delays in the interconnection process or that they systematically fail to employ "reasonable efforts" to address the enormous increase in interconnection requests caused by the transition to renewable energy resources. FERC relied on stale evidence to justify

its erroneous conclusions and unreasonably disregarded Petitioners' objections. Imposing these financial penalties on transmission providers is not only unnecessary to improve efficiency, but is also unduly discriminatory and counterproductive.

System Operators, which shoulder the overwhelming majority of interconnection requests, are not-for-profit entities that have no shareholders or retained earnings. They cannot pay penalties without FERC making a discretionary decision to allow them to recover the costs from their customers. System Operator members include "traditional" transmission owners, which cannot recover penalty costs from their customers under any circumstances, which the new rule reinforced. The shareholders of transmission owners are responsible for penalties, even when those transmission owners have little to no control over the interconnection process or fault for delays.

In addition to the onerous and unlawful penalty scheme FERC imposed on transmission providers, FERC substituted a generic set of interconnection procedures and agreements across the nation for the existing generator interconnection procedures and agreements that System Operators and their stakeholders have developed and tailored to fit their regional needs. Worse, FERC's orders are based on outmoded data and disregard the disruption Order No. 2023 creates for existing and transitioning generator interconnection processes.

FERC also mandated that transmission providers use a lower standard to study impacts on their systems caused by generator interconnections on adjacent systems, even when those generators are guaranteed deliverability on their host transmission system, potentially causing significant reliability issues on the neighboring system (*i.e.*, the Affected System in FERC parlance). FERC's default imposition of an Energy Resource Interconnection Service (Energy Service) modeling standard on Affected Systems even when the interconnection customer seeks Network Resource Interconnection Service (Network Service) on its host system is arbitrary and capricious.

## JURISDICTIONAL STATEMENT

FERC issued Order No. 2023 on July 28, 2023. The Petitioners each timely requested rehearing on or before August 28, 2023. *See* JA____-__. FERC denied rehearing by operation of law on September 28, 2023. Notice of Denial, JA____. Petitions for review were timely filed in several circuits, and those petitions were consolidated in this Court. On October 25, 2023, FERC modified the Order No. 2023 compliance deadlines. Modification Order, JA____. On March 21, 2024, FERC issued Order No. 2023-A in response to petitioners' rehearing requests. JA____. Petitioners timely filed new or amended petitions for review in this Court on or before May 21, 2024 to add Order No. 2023-A. This Court has jurisdiction under FPA section 313(b), 16 U.S.C. § 825*l*(b).

4

## STATEMENT OF ISSUES

1. Whether the strict liability penalty regime imposed by Order No. 2023 violates constitutional due process requirements and imposes a confiscatory rate in violation of the Fifth Amendment and the FPA.

2. Whether the strict liability penalty regime imposed by Order No. 2023 is arbitrary, capricious, an abuse of discretion, in excess of FERC's statutory authority, and unsupported by substantial evidence in violation of the FPA and APA.

3. Whether the legal defects of the strict liability penalty regime imposed by Order No. 2023 on a generic basis are exacerbated when applied to System Operators, whose financial viability is threatened by penalties.

4. Whether FERC's imposition of generic interconnection processes and agreements on System Operators unreasonably and unlawfully disrupts cluster study procedures FERC contemporaneously found to be just and reasonable.

5. Whether FERC's mandate that Affected System operators study neighboring Network Service interconnection requests using the Energy Service modeling standard is arbitrary, capricious, unsupported by substantial evidence, and contrary to precedent.

## STATUTES AND REGULATIONS

Pertinent statutes are appended in Attachment A.

**STATEMENT OF THE CASE**

**A.      Statutory and Regulatory Overview**

**1.      FPA Section 206**

FPA section 206 permits FERC to modify public utilities' filed rates and tariffs only if FERC finds that "any rule, regulation, practice, or contract affecting [a jurisdictional] rate, charge or classification is unjust, unreasonable, unduly discriminatory or preferential." *See* 16 U.S.C. § 824e(a).  This remedial jurisdiction is limited "to rules or practices that '*directly* affect the [wholesale] rate.'" *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016) (*EPSA*) (adopting *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 403 (2004) (*CAISO*)).

This is a two-step analysis:  FERC must first determine that the existing rate or practice is unjust, unreasonable, unduly discriminatory or preferential.  "Only *after* having made the determination that the utility's existing rate fails that test may FERC exercise its section 206 authority to impose a new rate." *Emera Maine v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017) (listing cases).  FERC bears the burden of demonstrating that an existing rate or practice is unlawful.  If FERC satisfies that first burden of proof, FERC must then also satisfy its second of burden of proof to establish that its replacement rate is just and reasonable and not unduly discriminatory.  *See, e.g.*, *id.* 854 F.3d at 21, 24-25; *Int'l Transmission Co. v. FERC*, 988 F.3d 471, 485 (D.C. Cir. 2021).

6

## 2. The "First-Come, First Served" Interconnection Approach Under Order Nos. 2003, 2006, 792, and 845

Beginning in 2003, FERC established a uniform set of procedures to govern generator interconnections to the transmission system. This series of orders, beginning with FERC Order No. 2003[2] required all public utilities owning, controlling, or operating facilities used to transmit electric energy in interstate commerce to file *pro forma* Large Generator Interconnection Procedures (LGIPs) and Large Generator Interconnection Agreements (LGIAs) for interconnecting facilities larger than 20 MW. *See* Order No. 2003 at P 2. FERC found that these reforms would (i) prevent undue discrimination by increasing the amount and types of new generation in the wholesale electricity market and (ii) facilitate market entry by reducing the time and costs needed to interconnect. *Id.* PP 1, 12.

Order No. 2003 created a "first-come, first-served" interconnection study process in which transmission providers studied interconnection requests individually in the order they were submitted. *Id.* P 35. Generators sequentially initiated their individual interconnection requests by submitting a refundable deposit of $10,000. *Id.* Review occurred in three phases: the interconnection feasibility

---

[2] *Standardization of Generator Interconnection Agreements & Procs.*, Order No. 2003, 104 FERC ¶ 61,103 (2003), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220, *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007).

study, the interconnection system impact study, and the interconnection facilities study. Order No. 2003 required transmission providers to use "reasonable efforts" to complete feasibility studies within 45 calendar days, system impact studies within 60 calendar days, and facilities studies within 90 to 180 calendar days. *Id.* P 36.

FERC allowed transmission providers to seek variations from these requirements if those variations were "consistent with or superior to" the terms of FERC's *pro forma* LGIP and LGIA or if justified by regional reliability requirements. *Id.* PP 824-26.

Order No. 2006 extended the standardization of interconnection procedures to small generators at or below 20 MW, requiring public utilities to amend their open access transmission tariffs to adopt *pro forma* Small Generator Interconnection Procedures (SGIPs) and Small Generator Interconnection Agreements (SGIAs).[3] Order No. 2006 also added a "fast track process" for generators smaller than 2 MW and a process to evaluate inverter-based small generating facilities no larger than 10 kW. Order No. 2006 at PP 36, 38-39. FERC later issued Order No. 792,[4] which revised the *pro forma* SGIP and *pro forma* SGIA to increase the fast track threshold

---

[3] *See Standardization of Small Generator Interconnection Agreements & Procs.*, Order No. 2006, 111 FERC ¶ 61,220, *order on reh'g*, Order No. 2006-A, 113 FERC ¶ 61,195 (2005), *clarified*, Order No. 2006-B, 116 FERC ¶ 61,046 (2006).

[4] *Small Generator Interconnection Agreements & Procs.*, Order No. 792, 145 FERC ¶ 61,159 (2013), *clarified*, Order No. 792-A, 146 FERC ¶ 61,214 (2014).

to 5 MW, include electric storage devices, and require certain information about a customer's point of interconnection to be provided before submitting an interconnection request. *See* Order No. 792 at P 1.

In 2018, FERC issued Order No. 845,[5] which implemented significant revisions to the *pro forma* LGIP and *pro forma* LGIA to mitigate systemic inefficiencies, remedy certain discriminatory practices, and address unprecedented changes in the resource mix and the emergence of new technologies. Order No. 845 at P 7. Among other things, FERC redefined the term "generating facility" to include electric storage resources, permitted generators the option to build interconnection facilities, and required transmission providers to post interconnection study metrics online and file information reports with FERC to improve transparency. *Id.* P 2. However, FERC rejected requests to eliminate the "reasonable efforts" standard or to adopt firm deadlines for interconnection studies in Order No. 845. *See id.* PP 322-23.

### B. Early Adopters of Cluster Study Reforms

Recognizing the potential efficiencies to be gained through studying "clusters" of interconnection requests, rather than individual requests in a serial process, several transmission providers began adopting cluster study interconnection

---

[5] *Reform of Generator Interconnection Procs. & Agreements*, Order No. 845, 163 FERC ¶ 61,043 (2018), Order No. 845-A, 166 FERC ¶ 61,137, Order No. 845-B, 168 FERC ¶ 61,092 (2019).

study procedures after Order No. 2003 was issued. FERC permitted many transmission providers to implement cluster study alternatives and, by the time Order No. 2023 issued, the "early adopters" represented more than half of the United States in terms of both population and geographic area.

Every FERC-jurisdictional System Operator adopted cluster study reforms for their respective states and regions before Order No. 2023 issued. The first cluster study reform occurred in 2004, when FERC accepted a New York Independent System Operator, Inc. (NYISO) proposal to require "all Interconnection Requests received within a given time period [be] studied together on a clustered basis." *N.Y. Indep. Sys. Operator, Inc.*, 108 FERC ¶ 61,159, at P 6 (2004), *reh'g denied*, 111 FERC ¶ 61,347 (2005). In 2008, FERC accepted similar clustering methodologies proposed by the Southwest Power Pool, Inc. (SPP), the Midwest Independent Transmission System Operator, Inc. (MISO),[6] and the California Independent System Operator Corporation (CAISO). *See Sw. Power Pool, Inc.*, 128 FERC ¶ 61,114 (2009) ("SPP proposes moving from a serial study process to a clustering approach based on the geographic location of projects and the proposed site of interconnection."); *Midwest Indep. Transmission Sys. Operator, Inc.*, 124 FERC ¶ 61,183 (2008) (accepting MISO's "proposal to group studies as a means to help

---

[6] In 2013, MISO changed its name from Midwest Independent Transmission System Operator, Inc. to Midcontinent Independent System Operator, Inc.

alleviate the queue backlog"), *order on reh'g*, 127 FERC ¶ 61,294 (2009); *Cal. Indep. Sys. Operator Corp.*, 124 FERC ¶ 61,292 (2008) (replacing the "first-come, first served" approach with a cluster study approach), *reh'g denied*, 127 FERC ¶ 61,177 (2009).

ISO New England Inc. (ISO-NE) adopted a targeted geographic cluster study approach for certain proximate projects in 2017. *See ISO New Eng. Inc.*, 161 FERC ¶ 61,123 (2017). PJM Interconnection, LLC (PJM) became the last System Operator to propose a cluster study reform in 2022, which went into effect in January 2023. *PJM Interconnection, L.L.C.*, 181 FERC ¶ 61,162 (2022) (*PJM Interconnection Reform Order*), *order on reh'g*, 184 FERC ¶ 61,006 (2023), *appeal pending sub nom. Hecate Energy LLC v. FERC*, No. 23-1089 (filed D.C. Cir. Mar. 31, 2023).

Several individual utilities that operate outside System Operators chose to adopt cluster study reforms as well, particularly in combination with other reforms to streamline the study process. *See, e.g., Pub. Serv. Co. of Colo.*, 169 FERC ¶ 61,182 (2019); *PacifiCorp*, 171 FERC ¶ 61,112, *order on reh'g*, 173 FERC ¶ 61,016 (2020); *Duke Energy Carolinas, LLC*, 176 FERC ¶ 61,075 (2021); *Dominion Energy South Carolina, Inc.*, Docket No. ER22-301-000, Delegated Letter Order (Dec. 28, 2021); *Tri-State Generation & Transmission Ass'n, Inc.*, 174 FERC ¶ 61,021 (2021); *Avista Corp.*, 179 FERC ¶ 61,183 (2022).

## C. Proceedings Below

On June 16, 2022, FERC issued a Notice of Proposed Rulemaking (NOPR), which recommended an overhaul of the *pro forma* Generator Interconnection Procedures (GIPs) and Generator Interconnection Agreements (GIAs) adopted in Order Nos. 2003 and 2006. *Improvements to Generator Interconnection Procs. & Agreements*, 179 FERC ¶ 61,194 (2022), JA____. FERC's proposed changes included: (1) requiring transmission providers to implement a "first-ready, first-served cluster study process" to replace the "first-come, first-served" model, *see* NOPR at P 4, JA____; and (2) eliminating the longstanding "reasonable efforts" standard and replacing it with a strict liability, study delay penalty regime, *id.* PP 168-173, JA____-__. FERC proposed to override all existing transmission provider interconnection regimes, even the "early adopter" processes upon which FERC modeled its own reforms. Per FERC, interconnection delays affecting some, but not all, transmission providers justified FERC's mandate "because the interconnection queue backlogs and study delays afflicting generator interconnection service nationwide hinder the timely development of new generation and thereby stifle competition in the wholesale electric markets." *Id.* P 22, JA____.

Petitioners and other commentors challenged FERC's proposed reforms. Certain commenters noted that FERC had not found, as required by FPA section 206, that individual transmission provider tariffs were unjust, unreasonable, or

discriminatory. *See, e.g.*, Joint Comments of the Early Adopters' Coalition at 15-16, JA____-__. Many commenters also objected to the replacement of the "reasonable efforts" standard with a strict liability penalty regime, arguing that is not only unjust and unreasonable, but also ineffective in addressing the sources of interconnection delays. *See, e.g.*, Comments of Southwest Power Pool Inc. at 14-15, JA____-__; MISO TOs Initial Comments at 23-25, JA____-__.

Ultimately, FERC chose the stick rather than the carrot to "incentivize" transmission providers to ensure timely interconnection. First, FERC required all transmission providers, including those with existing cluster study processes, to modify their *pro forma* GIPs and GIAs to implement the specific cluster study methodologies of Order No. 2023. *See* Order No. 2023-A at P 73, JA____. FERC also persisted with its decision to eliminate the "reasonable efforts" standard and replace it with a study delay penalty scheme. *See* Order No. 2023 at P 962 JA____; Order No. 2023-A at P 264, JA____. As a result, cluster study, cluster restudy, Affected System study, and facilities study delays will incur penalties of $1,000, $2,000, $2,000, and $2,500 per business day respectively. *See* Order No. 2023 at P 973, JA____. FERC also implemented heavy-handed requirements, such as prohibiting transmission-owning utilities from recovering study delay penalties through transmission rates, and requiring transmission providers to pay the penalty for each late study "on a *pro rata* basis for each interconnection request to the

interconnection customers and affected system interconnection customers included in the relevant study." *See id.* P 990.

Petitioners each timely requested rehearing. Petitioners argued that Order No. 2023 violated the APA and the FPA because FERC relied on stale evidence and failed to engage with counterarguments and record evidence, failed to base its penalty decision on substantial evidence, inappropriately expanded its precedents, implemented a strict liability penalty regime regardless of individual fault; and improperly enacted a generic nationwide reform without ever finding any individual transmission provider tariffs unjust and unreasonable or finding fault with any individual transmission provider's conduct. *See, e.g.*, Indicated PJM TOs Rehearing Request at 7, 14-17, JA____, ____-__; NYISO Rehearing Request at 58, JA____; NYTOs Rehearing Request at 4, 15-17, JA____-__; MISO Rehearing Request at 8-16, JA____-__; MISO TOs Rehearing Request at 20-26, JA____-__.

On September 28, 2023, FERC denied all rehearing requests by operation of law. *See* Notice of Denial, JA____. Numerous petitions for review were filed in several courts, and those petitions were consolidated here. This Court granted a motion to hold the petitions for review in abeyance, and subsequently granted extensions to the original abeyance period to allow FERC an opportunity to issue a substantive order on rehearing. While the petitions were pending in this Court,

FERC set aside Order No. 2023 in part to extend certain compliance deadlines. *See* Modification Order at PP 9-11, JA____-__.

On March 21, 2024, FERC issued Order No. 2023-A, its substantive response to the rehearing requests. Order No. 2023-A almost uniformly retained the revisions required by Order No. 2023. FERC stated that "while the majority of reforms adopted [in Order No. 2023] are based on individual and incremental improvements that one or more regions have already implemented, no transmission provider has yet to adopt the entirety of Order No. 2023's broad suite of reforms." Order No. 2023-A at P 78, JA____. FERC denied or ignored key arguments raised by Petitioners, including that FERC's strict liability scheme violates due process by taking property without just compensation, *id.* P 360, JA____, that FERC needed to make specific findings as to each transmission provider's tariff enacting a nationwide rulemaking, *id.* P 38, JA____, that FERC did not rely on substantial evidence for its study penalty regime, *see id.* P 291, JA____, and that FERC discriminated against transmission providers in regions with high amounts of renewable generation, *id.* P 326, JA____,

Petitioners amended their petitions for review or filed new petitions to include Order No. 2023-A because it issued six months after the statutory deadline.

**SUMMARY OF THE ARGUMENT**

Order No. 2023 invoked FERC's authority under FPA section 206 to set aside the interconnection procedures used by all FERC-jurisdictional transmission providers because, in FERC's view, the unprecedented quantity of interconnection requests transmission providers must evaluate are not being processed rapidly enough to meet renewable energy objectives. FERC therefore required all transmission providers to adopt a generic cluster study interconnection process with uniform deadlines, eliminated the "reasonable efforts" standard, and required transmission providers to pay financial penalties to interconnection customers if study deadlines are not met, regardless of cause.

The strict liability penalty regime FERC imposed violates fundamental due process and reasoned decisionmaking requirements. FERC claims it mitigated due process concerns by allowing transmission providers to appeal penalties to FERC, but failed to explain how that unprecedented and undefined process will afford transmission providers prior notice or a meaningful opportunity to be heard. FERC's other purported "safeguards" merely delay the imposition of penalties and do not address Petitioners' due process concerns at all.

FERC's decision to jettison the "reasonable efforts" standard fails under FPA section 206 step one because it was based on stale data that only shows interconnection delays exist, not that transmission providers cause them. FERC's

16

strict liability remedy fails under FPA section 206 for the same reason: penalties will not incentivize faster interconnection processing by transmission providers when the cause of those delays is beyond their control. FERC disregarded Petitioners' objections that imposing these financial penalties is not only unnecessary to improve efficiency, but is also unduly discriminatory and counterproductive.

The flaws in FERC's strict liability penalty regime are exacerbated for System Operators. Unlike investor-owned utilities, non-profit System Operators must recover all costs from their customers because they have no shareholders. It is cold comfort that FERC will permit System Operators to attempt to recover penalty costs by filing a request with FERC under FPA section 205. Some System Operators lack the authority to make unilateral section 205 filings without the approval of their stakeholders, who have zero incentive to agree, and FERC itself warns that cost recovery may be denied in response to protests.

In addition to the unlawful strict liability penalty regime, Order No. 2023 imposes generic interconnection process rules on System Operators notwithstanding the fact that FERC approved comprehensive, region-specific interconnection reforms as just and reasonable shortly before Order No. 2023 upended them. FERC thus had no evidence the reforms it had recently approved were no longer just and reasonable.

FERC also disrupted existing interconnection procedures for studying the impact of new interconnection requests on neighboring transmission systems. Specifically, FERC required Affected Systems to use the Energy Service standard, rather than the more stringent Network Service standard, to study impacts on their systems. That mandate undermines reliability and conflicts with FERC precedent.

**STANDING**

FERC's Orders "directly regulate[]" Petitioners' primary conduct. *Corbett v. TSA*, 19 F.4th 478, 483 (D.C. Cir. 2021). FERC required Petitioners to submit compliance filings to modify their interconnection procedures by May 16, 2024 and to institute penalties no later than the third cluster study cycle after those compliance filings were accepted. *See* Order No. 2023-A at PP 9, 285, JA____, ____. Those mandates inflict "an actual or imminent injury that is fairly traceable to the challenged agency action and that will likely be redressed by a favorable decision." *Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607, 613 (D.C. Cir. 2001) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "[T]here is ordinarily little question that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *Lujan*, 504 U.S. at 561-62 (alterations omitted). While FERC's new penalty regime has yet to be implemented, that injury is "certainly impending" absent relief from this Court. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504 U.S. at 565 n.2).

## STANDARD OF REVIEW

The Court must "set aside" agency orders that are "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2). "FERC—like all agencies—must engage in reasoned decisionmaking" and "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *New Eng. Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 210 (D.C. Cir. 2018) (*NEPGA*) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

FERC cannot ignore the perspectives of those it regulates but must "respond meaningfully to the arguments raised before it." *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015). Unless FERC "answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001). Further, if FERC's orders are not based on substantial evidence "support[ing] the Commission's ultimate decision," they should be set aside. *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 363, 645 (D.C. Cir. 2010) (citing *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003)).

FERC must also "provide a reasoned explanation for departing from precedent or treating similar situations differently." *W. Deptford Energy, LLC v.*

*FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) (cleaned up). Although FERC "need not demonstrate to a court's satisfaction that the reasons for [a] new policy change are *better* than the reasons for the old one," it must "ordinarily … display awareness that it *is* changing position." *NEPGA*, 881 F.3d at 210 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)) (alterations in original). FERC therefore "may not … depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* (quoting *Fox Television*, 556 U.S. at 515).

## ARGUMENT

### I. THE STRICT LIABILITY PENALTY SCHEME FERC IMPOSED VIOLATES CONSTITUTIONAL PROTECTIONS AND THE FEDERAL POWER ACT

FERC violated basic due process norms in replacing the "reasonable efforts" standard with a strict liability regime that imposes penalties on transmission providers regardless of who or what actually caused a study delay. A post-penalty appeal process does not save FERC's rule. FERC's other purported "safeguards" are similarly infirm. The various forms of postponement FERC offered do nothing to cure the problem that FERC will automatically impose penalties on transmission providers regardless of fault. And, notwithstanding a penalty cap equal to 100% of interconnection customers' initial study deposits, the new penalty scheme remains unconstitutionally confiscatory. Agency action "contrary to constitutional right" must be set aside. 5 U.S.C. § 706(2)(B).

**A.  A "Guilty Unless Proven Innocent" Penalty Violates Due Process Protections**

Order No. 2023 requires transmission providers to pay a financial penalty to interconnection customers if, for any reason, the transmission provider fails to meet the aggressive new interconnection study deadlines imposed by FERC.  This penalty regime, which operates without regard to fault or causation, establishes a "guilty until proven innocent" regime and denies transmission providers due process by assessing penalties against them without any adjudicatory process or finding of fault.  FERC maintains that a post-penalty appeal process satisfies due process requirements.  FERC is wrong: the newly-devised "appeal" process offers no meaningful remedy.

The Due Process Clause of the Fifth Amendment imposes two fundamental procedural obligations on the government before any person may be deprived of life, liberty, or property—prior notice and a meaningful opportunity to be heard.  U.S. Const. amend. V; *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976); *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985).  The Supreme Court has held that courts must review whether the plaintiffs were deprived of a protected interest and whether they received the necessary process.  *See Mathews*, 424 U.S. at 334; *Statewide Bonding, Inc. v. Dep't of Homeland Sec.*, 980 F.3d 109, 118 (D.C. Cir. 2020) (quoting *UDC Chairs Chapter v. Bd. of Trs. of the Univ. of D.C.*, 56 F.3d 1469, 1471 (D.C. Cir. 1995)).  Specifically, courts consider whether: "(1) 'the private interest

that will be affected by the official action' and (2) the 'risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards' outweigh (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirement would entail.'" *China Telecom (Americas) Corp. v. FCC*, 57 F.4th 256, 270 (D.C. Cir. 2022) (quoting *Mathews*, 424 U.S. at 335).

When evaluating due process claims, courts analyze "the risk of any erroneous deprivation of [a property] interest through the procedures used," and balance the private and public interests against the risk of deprivation to either interest based on the procedures employed. *Nat'l Min. Ass'n v. Dep't of Interior*, 251 F.3d 1007, 1010-11 (D.C. Cir. 2001) (quoting *Mathews*, 424 U.S. at 335). Here, FERC has provided nothing but conjecture based on stale data to justify imposing a strict liability scheme for interconnection study delays and certainly has not demonstrated a public interest in penalties that is enough to outweigh Petitioners' interests in not being deprived of property without due process.

FERC precedent recognizes that "[t]he fundamental requirement of due process is an opportunity to be heard at a meaningful time and in a meaningful manner." *City of Hamilton*, 82 FERC ¶ 61,144, at 61,530 (1998) (quoting *Kings River Conservation Dist.*, 36 FERC ¶ 61,365, at 61,882 (1986)). The FPA also

requires FERC to provide "notice and opportunity" for a public hearing, before imposing penalties and takes into account the severity of the violations and steps by the party to remedy the violations in a timely manner. *See* FPA section 316A, 16 U.S.C. § 825o-1; *see, e.g.*, PJM Rehearing Request at 31, n.67, JA____; NYTOs Rehearing Request at 22-24, JA____. FERC has also recognized the special importance of due process rights when imposing penalties. *See Enforcement of Statutes, Regulations and Orders*, 123 FERC ¶ 61,156, at PP 40, 51 (2008) ("[W]e implement these statutory mandates and [their] due process obligations by taking into account numerous factors in determining the appropriate civil penalty for a violation, including the nature and seriousness of the violation and the company's efforts to remedy it."); *see, e.g.*, PJM Rehearing Request at 31 n.67, JA____ (discussing FERC's penalty authority); NYTOs Rehearing Request at 22-24; JA____-__.

The automatic penalty structure imposed by Order No. 2023 violates these core due process principles by imposing penalties without any preliminary adjudication. While FERC claims that transmission providers can file an appeal with the agency, this does not remedy the violation because the penalties are imposed *before* any opportunity for the provider to challenge the penalty. *See* Order No. 2023 at P 963, JA____. Per FERC, "[i]f an interconnection study is delayed, and mutual agreement cannot be obtained" between the transmission provider and its

interconnection customers, "the transmission provider *will be assessed* the corresponding study delay penalties and may file an appeal with the Commission to explain any relevant circumstances." *Id.* P 983, JA____ (emphasis added). Under the final rule, the transmission provider will be penalized without evidence of malfeasance or failure to implement its tariff properly and without any adjudicatory process. FERC's automatic penalty regime violates due process because it fails to afford transmission providers an opportunity to be heard until *after* they have been assessed a penalty.

Due process requires actual fact-finding procedures to adjudicate genuine issues of material fact, such as the causes of a study delay. *See Union Pac. Fuels, Inc. v. FERC*, 129 F.3d 157, 164 (D.C. Cir. 1997). FERC may not resolve factual issues only on a written record when "there is a dispute over a past event." *Id.* (citing *La. Ass'n of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d 1101, 1113 (D.C. Cir. 1992)).

Critically, FERC admitted that transmission providers may be penalized even when delays are the result of interconnection customer or third-party actions or force majeure. *See* Order No. 2023-A at P 369, JA____ ("We sustain the decision, in Order No. 2023, not to create generic exceptions for study delay penalties or to exempt transmission providers from such penalties in cases where they assert that force majeure applies."); NYTOs Rehearing Request at 27, JA____ (citing Order

No. 2023 at P 989, JA____). Indeed, FERC admits that it "may be difficult to precisely determine the cause of any given delay," Order No. 2023 at P 989, JA____, and that even interconnection customer-caused study delays would represent only a "potentially compelling basis" for meeting the appeal process's vague "good cause" standard. *See* PacifiCorp Rehearing Request at 9, JA_____ (citing Order No. 2023 at P 993, JA____).

Here, the penalized transmission provider must first file an "appeal" *before* the adjudicatory process can begin. *See* Order No. 2023 at P 987, JA____. Under the final rule, the only way to avoid the payment of penalties to interconnection customers is to file an after-the-fact appeal with FERC. *See id.* However, the opportunity to file an appeal and explain any relevant circumstances does not solve the due process problem. FERC's methodology inappropriately shifts the burden from FERC to transmission providers by requiring transmission providers to prove that a penalty is *not* warranted. *See* PacifiCorp Rehearing Request at 8, JA____. Worse, FERC has eliminated the "reasonable efforts" standard as a defense, so it remains entirely unclear how a transmission provider is expected to defend itself from the imposition of a penalty regardless of whether its actions were reasonable in any set of circumstances.

The strict liability penalty scheme FERC imposed below also violates due process by failing to provide clear standards or guidance on how to avoid automatic

penalties. The penalty regime's vague "good cause" appeal mechanism does not provide explicit standards for what constitutes a successful appeal, and FERC has failed to outline the procedural steps for appealing penalties, including clear requirements for burden of proof or standards for establishing mitigating circumstances. FERC's ill-conceived "appeal" regime cannot reasonably be viewed as a due process safeguard.

"A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained . . . 'is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)); *Hayes v. N.Y. Att'y Grievance Comm.*, 672 F.3d 158, 169 (2d Cir. 2012) (a regulation must provide "'explicit standards for those who apply it' . . . to guard against the risk of discriminatory or inconsistent enforcement") (quoting *United States v. Strauss*, 999 F.2d 692, 697 (2d Cir. 1993)). Due process requires regulations to be sufficiently specific to allow a reasonably prudent person to understand the regulation's requirements, *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 736 (D.C. Cir. 2016), such that parties "receive fair notice before being deprived of property," *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328 (D.C. Cir. 1995).

Here, FERC has created a penalty scheme that leaves transmission providers without clear guidance on how to avoid penalties, providing inadequate notice and

failing to establish meaningful procedural safeguards. FERC merely states that "transmission providers will have the ability to appeal any study delay penalties to the Commission, with the Commission determining whether good cause exists to grant the relief requested on appeal." Order No. 2023 at P 963, JA____. In assessing whether there is "good cause" to grant such relief, FERC explained it may consider, among other factors: (1) extenuating circumstances outside the transmission provider's control, such as delays in affected system study results; (2) efforts of the transmission provider to mitigate delays; and (3) the extent to which the transmission provider has proposed process enhancements to prevent future delays either in the stakeholder process or before FERC. *Id.*

FERC's novel penalty "appeal" mechanism, and "good cause" basis for relief fail to define how the appeal process works or prescribe the standard transmission providers must meet to overcome the presumption of fault imposed by Order No. 2023. Nor does FERC provide any guidance about how it will adjudicate such appeals, including whether interventions or discovery will be permitted. Order No. 2023 establishes a "good cause" standard for granting an appeal, but FERC fails to explain what standard must be met to successfully appeal the penalty. FERC's applicable review standards, evidentiary hurdles, and procedural requirements are moving targets. It is difficult for FERC to demonstrate compliance with due process when FERC has failed to even define the process in the first place. *See, e.g.*, MISO

27

TOs Rehearing Request at 35-36, JA\_\_\_\_-\_\_; NYISO Rehearing Request at 33-34, JA\_\_\_\_-\_\_; PacifiCorp Rehearing Request at 9, JA\_\_\_\_; NYTOs Rehearing Request at 12-13, JA\_\_\_\_-\_\_.

The strict liability penalty regime and *post hoc* appeal process created by Order No. 2023 violate the Due Process Clause because, among other defects explained above, (1) transmission providers lack "fair notice" of the grounds for penalty waiver; and (2) FERC failed to develop and explain essential components of the penalty appeal process, such as the burdens of proof, how genuine issues of material fact (such as causation) will be adjudicated, clear exculpation standards, and the appeals process's parameters.

In similar contexts, FERC refused to adopt *per se* penalty schemes out of concern for due process. For example, in the analogous context of study requests for long-term transmission service, as opposed to the generator interconnection studies at issue here, FERC expressly "decline[d] to impose penalties automatically." MISO TOs Rehearing Request at 21, JA\_\_\_\_ (citing *Preventing Undue Discrimination & Preference in Transmission Serv.*, Order No. 890, 118 FERC ¶ 61,119 at P 1347 (2007)). When confronting the issue of transmission service study delays under Order No. 890, FERC established a penalty scheme that applied only after a transmission provider missed a certain number of study deadlines and a notification filing was submitted to FERC. Indeed, as FERC

explained, "we believe the due process afforded the transmission provider is an important element of the penalty regime, so we decline to impose penalties automatically, without a notification filing to the Commission." Order No. 890 at P 1347. In other contexts, FERC permits targeted entities to present evidence demonstrating a lack of fault or mitigating circumstances before a penalty is imposed. *See Enforcement of Statutes, Regulations and Orders*, 123 FERC ¶ 61,156 at PP 40, 51. FERC's Orders failed to explain why these processes could not work for interconnection study penalties.

Petitioners raised these due process concerns in their comments on the NOPR[7] and their requests for rehearing.[8] FERC's answer was merely that a penalized transmission provider's culpability for a study delay would be addressed "to some extent" through the ability to appeal. Order No. 2023 at P 989, JA____. A process that provides due process only "to some extent" does not provide a meaningful opportunity to be heard and, therefore, violates fundamental constitutional protections. Equally unlawful, FERC suggested that even if a transmission provider

---

[7] *See, e.g.*, MISO Initial Comments at 13, 71, JA____, ____; MISO Reply Comments at 19-20, JA____-__; MISO TOs Initial Comments at 18-22, JA____-__; SPP Initial Comments at 14, JA____; NYISO Initial Comments at 40, JA____; WIRES Initial Comments at 10, JA____; Order No. 2023 at P 899, JA____ (listing comments).

[8] *See, e.g.*, MISO TOs Rehearing Request at 27-33, JA____-__; Indicated PJM TOs Rehearing Request at 23-24, JA____-__; NYTOs Rehearing Request at 24-25, JA____.

offers proof that it did not cause the study delay, that fact is only "potentially" exculpatory. *Id.* P 993, JA____ ("If a study delay is caused by an interconnection customer, and not the transmission provider, that would represent a potentially compelling basis for the Commission to find that good cause exists to waive the study delay penalties."); *see also* PacifiCorp Rehearing Request at 9, JA____. Therefore, a transmission provider is presumed liable for a penalty for any study delay—even if the transmission provider is entirely free of fault—unless that transmission provider can convince FERC to waive such penalties through the application of a vague burden under which "reasonable efforts" are no longer an applicable defense.

**B.     Assessing Penalties Without Regard to Causation Is Confiscatory and Constitutes a Regulatory Taking**

The Takings Clause of the Fifth Amendment requires the government to pay "just compensation" before taking property for public use. U.S. Const. amend. V. To be constitutional, rates must be "sufficient to yield a reasonable return on the value of property used at the time it is being used to render the service." *Bluefield Water Works & Improvement Co. v. Pub. Serv. Comm'n of W.Va.*, 262 U.S. 679, 690 (1923). Rates that yield an insufficient return are "unjust, unreasonable, and confiscatory, and their enforcement deprives the public utility of its property in violation of the 14th Amendment." *Id.* This principle governs federal and state rulemaking: if rates do not "afford sufficient compensation, the State has taken the

use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 308 (1989).

In *FPC v. Hope Natural Gas*, 320 U.S. 591, 602 (1944) (*Hope*), the Supreme Court established an end-result standard to review the constitutionality of public utility rates. The Supreme Court found that "[i]f the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end." *Id.* The *Hope* test requires courts to examine the extent to which FERC has balanced the competing interests of utility investors and consumers. *Id.* at 603. Here, FERC has not done so. Order No. 2023 violates FERC cost-based ratemaking principles because it forces transmission providers to perform interconnection studies, but then exposes them to study delay penalties that do not ensure the transmission providers will receive just compensation for that jurisdictional service, even when delays result from circumstances beyond their control.

Binding precedent clearly holds that failure to provide cost recovery to public utilities for the provision of jurisdictional service is confiscatory and, therefore, an uncompensated taking. *See, e.g.*, *Jersey Cent. Power & Light Co.*, 810 F.2d 1168, 1175 (D.C. Cir. 1987); *Hope*, 320 U.S. at 603; *Bluefield*, 262 U.S. at 690.

Under FERC's new penalty regime for interconnection studies, transmission providers are penalized for any study delays that occur, regardless of fault. They

must then redistribute the penalties back to interconnection customers.  The end result of FERC's new penalty regime is confiscatory because it requires all transmission providers to provide a jurisdictional service—*i.e.*, interconnection studies—but does not permit transmission providers to recover the actual costs of that service when a study deadline is missed, and transmission providers could recover none of these costs if FERC imposes the maximum available penalty it has created.  *See* MISO TOs Rehearing Request at 33-34, JA____-__.

This penalty regime conscripts transmission providers into performing services without just and reasonable compensation regardless of whether they acted with "reasonable efforts" and in accordance with Good Utility Practice.  *See* NYTOs Rehearing Request at 25, JA____.  This conscription of services is contrary to longstanding due process and ratemaking precedents.  *See Ameren Servs. Co. v. FERC*, 880 F.3d 571, 580 (D.C. Cir. 2018) (indicating substantial concerns with FERC actions under which "transmission owners will be forced to assume certain costs that are never compensated").  Denying transmission providers the opportunity to recover the cost of penalties, and thereby the cost of interconnection study services, from their customers is inherently confiscatory and violates due process. This Court should vacate FERC's penalty regime on both grounds.

FERC contends this regulatory takings argument is barred because Petitioners did not make it in their *rulemaking* comments—*i.e.*, before FERC's final action was

known. Order No. 2023-A at P 368, JA\_\_\_\_. The cases FERC relies upon were not rulemakings but rather contested adjudications. In notice and comment rulemaking, FERC must ensure any final rule is a logical outgrowth of the proposed rule so that interested parties have a reasonable opportunity to comment without having to divine the agency's unspoken thoughts. *See Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). Moreover, FPA section 313(b) requires petitioners to have brought their objections before FERC "in the application for rehearing," not in their underlying comments. This regulatory takings argument was properly raised in multiple Petitioners' requests for rehearing. *See, e.g.*, Avangrid Rehearing Request at 16, JA\_\_\_\_; MISO TOs Rehearing Request at 33-34, JA\_\_\_\_-\_\_; NYTOs Rehearing Request at 25-26, JA\_\_\_\_-\_\_. This Court has long held that a party before FERC "may propound novel arguments based upon evidence already in the record as late as that party's petition for rehearing and still preserve them for review in the court of appeals." *Villages of Chatham & Riverton v. FERC*, 662 F.2d 23 (D.C. Cir. 1981); *accord, e.g.*, *Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 973 (D.C. Cir. 2003); *Bangor Hydro-Elec. Co. v. FERC*, 925 F.2d 465, 467 (D.C. Cir. 1991); *Carolina Power & Light Co. v. FERC*, 716 F.2d 52, 55 n.9 (D.C. Cir. 1983); *see also McCarthy v. Madigan*, 503 U.S. 140, 147-48 (1992) (exhaustion not required where challenge is to adequacy of agency procedure itself or where agency

is not capable of deciding the constitutionality of agency action); *Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984).

Ultimately, the strict liability penalty regime and *post hoc* appeal process created by Order No. 2023 violate the Due Process Clause because, among other defects explained above: (1) transmission providers lack "fair notice" of the grounds for penalty waiver; and (2) FERC failed to develop and explain essential components of the penalty appeal process, such as the burdens of proof, how genuine issues of material fact (such as causation) will be adjudicated, clear exculpation standards, and the appeals process's parameters.

## C. The Other "Safeguards" FERC Adopted Do Not Ameliorate the Due Process Defects in FERC's Strict Liability Penalty Regime

In addition to the flawed "appeal" process discussed above, FERC relies on four additional "safeguards" to claim that its strict liability penalty regime is consistent with due process requirements. These "safeguards" include: (1) not imposing penalties until the third cluster study cycle after the effective date of the transmission provider's Order No. 2023 compliance filing; (2) providing a 10-business day "grace period" to complete late studies; (3) allowing study deadlines to be extended 30 business days upon the mutual agreement of the transmission provider and *all* interconnection customers in the relevant study; and (4) imposing a cap on penalties at 100% of the initial study deposits received in the study. *See* Order No. 2023-A at P 265, JA____. These "safeguards" are wholly inadequate to

ensure that transmission providers do not bear the burden of penalties for study delays that transmission providers do not cause.

First, FERC's decision to delay implementation of study delay penalties on transmission providers until after the third cluster study cycle is not a due process protection; it merely postpones the new strict liability penalty regime without addressing any of its due process flaws. This provisional "safeguard" will expire by its own terms once the penalty scheme goes into effect, which is when the due process problems start.

Second, the 10-day "grace period" is also not a due process protection, but instead a different type of cosmetic postponement. FERC has simply created a soft deadline for the completion of interconnection studies followed by a hard deadline ten days later. This fluidity only underscores the arbitrary nature of the compliance deadlines FERC has set; it does nothing to address Petitioners' objections about whether or how the fault for interconnection study delays will be determined. Moreover, a 10-day grace period will only benefit the transmission providers with the fewest interconnection requests. Larger System Operators—*i.e.*, PJM, MISO, SPP, and NYISO—will see no material benefit from this purported "safeguard" because of the significantly higher number of studies they must complete in the same timeline as smaller transmission providers. *See* SPP Rehearing Request at 9-10, JA____ (objecting to the arbitrary nature of the study deadlines).

Third, FERC displays willful blindness to reality when it pretends to have created a meaningful "safeguard" by allowing transmission providers to extend study deadlines by 30 business days if *all* interconnection customers agree to the delay. That is magical thinking, not reasoned decisionmaking. FERC's strict liability penalty scheme creates a zero sum game between transmission providers and interconnection customers because study delay penalties are paid by transmission providers to their interconnection customers. It is fanciful to pretend a transmission provider can make scores or hundreds of interconnection customers all agree to a 30-day study extension when interconnection customers simultaneously stand to receive the penalties from the transmission provider. *See, e.g.*, Dominion Rehearing Request at 24, JA____; MISO TOs Rehearing Request at 18-19, JA____-__; NYISO Rehearing Request at 35, JA____. Such consensus is highly unlikely. Transmission providers have no negotiating power in that situation. FERC only relies on optimistic speculation that "the interconnection process . . . by its nature, tends to require cooperation and collaboration" and that "interconnection customers have a particular interest in reliable interconnection studies" that nullifies concerns that they would deliberately reject or hinder an extension. Order No. 2023-A at P 335, JA____; *see* NYISO Rehearing Request at 35, JA____. These conclusory statements do not constitute sound reasoning. There is no evidence, much less substantial evidence, that interconnection customers will overlook their immediate

economic interests in a windfall payment for the sake of communal consensus. Moreover, this third form of potential postponement—in addition to being unrealistic—shares the same flaws as the other postponement "safeguards": it does not address the core due process problem with imposing automatic penalties on transmission providers regardless of fault.

Fourth, while FERC has capped the transmission providers' maximum liability for penalties at 100% of the initial study deposits received, that limit remains cripplingly large and confiscatory. For example, System Operators such as PJM can have potentially hundreds of interconnection requests in a single cluster. *See* PJM Rehearing Request at 23-24, JA____-__. Given that individual initial study deposits range from $55,000 to $250,000 per interconnection customer, PJM and similarly-situated transmission providers could face eight-figure penalties for delays without any adjudication of fault. *See* Indicated PJM TOs Rehearing Request at 25, JA____.

FERC suggests that, cumulatively, these "safeguards" are sufficient to ensure due process. *See, e.g.*, Order No. 2023-A at P 335, JA____ ("Moreover, this 30-day extension is just one safeguard among several . . . such that we would still reach the same result even if invocation of this safeguard turns out to be uncommon in practice."). Not so. FERC's postponement measures do not address the core due process issue at all. Neither does the maximum penalty limit, which does not prevent

FERC's strict liability penalty regime from imposing a confiscatory rate for interconnection studies even if that penalty limit is not reached.

**D.     FERC Exceeded Its Authority Under the FPA by Imposing Automatic Penalties**

FERC's authority to impose civil penalties under the FPA is strictly limited to what Congress has explicitly granted.  FERC is a "creature of statute." *CAISO*, 372 F.3d at 398.  FPA section 316A permits FERC to impose civil penalties for violations of the FPA and FERC's rules, regulations, and orders issued thereunder.  *See* 16 U.S.C. § 825o-1(a).  It also outlines the process by which civil penalties are imposed, including that FERC must provide notice and opportunity for a hearing in accordance with 5 U.S.C. § 554 *before* assessing any penalties, 16 U.S.C. § 825o-1(b)(1)-(2).

However, Order Nos. 2023 and 2023-A circumvent this process by imposing automatic penalties for missed study deadlines without the required hearing.  Instead, FERC offers a post-penalty appeal mechanism that is both unprecedented and vague.  In Order No. 2023-A, FERC attempts to recharacterize these automatic penalties as a form of liquidated damages, claiming they serve to compensate interconnection customers by providing upfront refunds of study charges.  *See* Order No. 2023-A at PP 413-14, JA____-__.  Despite this rebranding, the penalties remain automatic and conflict with section 316A's requirement for a hearing before any penalty can be assessed.

The Supreme Court's analysis in *Kokesh v. SEC*, 581 U.S. 455, 457 (2017) provides a framework for determining when a sanction constitutes a penalty, focusing on two factors: (a) whether the sanction's purpose is to punish and deter future violations or to compensate for specific harm; and (b) whether the wrong addressed is a violation of a public law or a private harm. Under *Kokesh*, sanctions aimed primarily at deterrence are considered penalties, regardless of how they are labeled. This Court is not obliged to accept FERC's attempt at "creative characterizations." *Elec. Power Supply Ass'n v. FERC*, 753 F.3d 216, 221 (D.C. Cir. 2014), *rev'd on grounds not relevant*, 577 U.S. 260.

FERC argues that the automatic penalties imposed by Order No. 2023 are not intended to punish transmission providers, but rather to incentivize the timely completion of interconnection studies. *See* Order No. 2023-A at PP 412-14, JA\_\_\_\_-\_\_. However, the penalties are set according to a fixed schedule and are not tied to any harm suffered by interconnection customers. Indeed, FERC never calculated the harm of late studies on interconnection customers. This suggests a purpose more aligned with deterrence than compensation. According to *Kokesh*, penalties that seek to influence behavior through deterrence, even if not explicitly punitive, are classified as penalties if their main goal is to alter conduct rather than address a specific harm. 581 U.S. at 464.

In this context, FERC's automatic penalties appear to be more aimed at deterring transmission providers from taking the time needed to prudently evaluate impacts of a candidate interconnection (*i.e.*, reasonable efforts), rather than at compensating interconnection customers for delays. This distinction is critical under *Kokesh*, which would likely categorize such sanctions as penalties, given FERC's focus on shaping future behavior rather than redressing actual harm. *See id.* The absence of a direct connection between the penalties and specific losses by interconnection customers further supports this interpretation, making the penalties seem more like punitive measures intended to change behavior than a means of compensation.

FERC's characterization of its automatic penalties as a form of refund akin to liquidated damages does not change their punitive nature under the *Kokesh* framework. The penalties mandated by Order No. 2023 and reaffirmed in Order No. 2023-A are imposed regardless of fault and without the hearing process required by FPA section 316A. This approach contradicts the principle that penalties should be imposed only after a finding of wrongdoing or fault. Moreover, imposing automatic penalties, with *post hoc* appeals that place the burden of proof on transmission providers, fails to meet the due process requirements outlined in the statute.

Even if FERC contends that the penalties are meant to address inefficiencies in the interconnection process—a hypothetical "commercial wrong" rather than a

public violation—*Kokesh* emphasizes that sanctions aimed at achieving broader regulatory goals affecting the public interest are more likely to be considered penalties. Thorough and prudently prepared interconnection studies are crucial for maintaining access to reliable energy infrastructure, which is a matter of public interest. As such, the penalty regime in Order No. 2023 purports to address a public wrong and is thus subject to the FPA section 316A statutory constraints governing civil penalties.

In sum, FERC's automatic penalties under Orders No. 2023 and 2023-A align with *Kokesh*'s description of punitive sanctions. Because they aim to deter delays without compensating for specific harms, and because they lack the hearing process required by FPA section 316A, the orders exceed FERC's statutory authority and should be vacated. To comply with the FPA, as well as basic principles of due process, any such penalties should be imposed only after a hearing that determines whether the transmission provider was at fault for the delays.

## II. THE STRICT LIABILITY PENALTY SCHEME FERC IMPOSED IS NOT THE PRODUCT OF REASONED DECISIONMAKING UNDER THE ADMINISTRATIVE PROCEDURE ACT

In addition to its constitutional infirmities, FERC's adoption of Order No. 2023 was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. 5 U.S.C. § 706(2).

**A. There Is No Evidence, Substantial or Otherwise, that Transmission Providers are a Primary Cause of Interconnection Study Delays**

FERC did not provide substantial evidence to demonstrate that transmission providers are responsible for interconnection study delays or to support its claim that penalties are necessary to "incentivize transmission providers to take appropriate steps to meet the study deadlines in their tariffs." Order No. 2023 at P 114, JA____. In fact, FERC made a critical concession in Order No. 2023-A, acknowledging that "Order No. 2023 did not invoke a need to punish or to label transmission providers as wrongdoers as a rationale for its action." Order 2023-A at P 414, JA____. Despite this finding, FERC made transmission providers *de facto* responsible for all study delays.

Petitioners raised these points on rehearing, explaining that the evidence presented in Order No. 2023 merely showed that study delays continued to occur, not that transmission providers were responsible for them. *See* PacifiCorp Rehearing Request at 6, 14-15, JA____, ____-__; MISO TOs Rehearing Request at 27-29, JA____-__. Moreover, the evidence FERC relied upon was stale and incomplete. FERC did not account for the substantial differences in delays between regions that had already adopted cluster study processes (which were small) and those that had not (which were large), and thus significantly inflated FERC's estimate of the need for reform. *See* Indicated PJM TOs Rehearing Request at 17-18, JA____-__. FERC failed to respond to the flaws in its data exposed by Petitioners. In light of these

uncorrected flaws in FERC's analysis, FERC did not have substantial evidence to support its conclusion that existing interconnection procedures were unjust and unreasonable under FPA section 206 step one, or that it was necessary to impose study delay penalties to ensure just and reasonable interconnection procedures under FPA section 206 step two.

First, FERC's evidence only demonstrates that delays exist, not that transmission providers cause them. *See, e.g.*, PacifiCorp Rehearing Request at 6-7, JA____-__; Avangrid, Inc. Reply Comments at 8, JA__. Petitioners identified many causes of delay that are outside a transmission provider's control. *See, e.g.*, SPP Rehearing Request at 7, JA____. And FERC conceded that it has never found that a transmission provider has violated the "reasonable efforts" standard. *See* NOPR at PP 28, 167, JA____, ____; SPP Comments at 13, JA____. Nor does FERC demonstrate that transmission providers systematically, or even individually, fail to employ "reasonable efforts" when administering interconnection requests. *See, e.g.*, Avangrid, Inc. Reply Comments at 9-10, JA____-__; MISO TOs Rehearing Request at 27-29, JA____-__. Petitioners argued below that Order No. 2023 "contains no evidence that action or inaction by transmission providers is the predominant, or even contributing, factor in study delays. Rather, the record is replete with evidence and comments arguing just the opposite." PacifiCorp Rehearing Request at 6-7, JA____-__ (collecting comments). Order No. 2023-A did

not acknowledge that argument at all, much less "respond meaningfully" to it, as the APA requires. *TransCanada Power Mktg.*, 811 F.3d at 12. In the absence of evidence showing that transmission providers are responsible for delays—and, if so, to what degree—FERC cannot establish the penalty regime it has instituted will improve interconnection speeds.

To be sure, the infliction of penalties tends to induce changes in behavior, but penalties are only effective if they address the cause of the problem one is trying to solve. Imposing penalties where the root cause is outside the transmission provider's control is ineffective and unjustified.

Second, FERC grounded the need for change on outdated and misleading data, resulting in flawed conclusions. The premise of the Order No. 2023 penalty regime—that transmission providers are at least partially responsible for study delays—is based on data that failed to reflect the realities of the current system. For example, the data transmission providers compiled to comply with Order No. 845 is no longer representative. *See* Indicated PJM TOs Rehearing Request at 17, JA\_\_\_\_. FERC relied on data showing that 2,544 System Operator interconnection studies were delayed by the end of 2022, but 2,211 of those delays (*i.e.*, approximately 87%) occurred in PJM before PJM adopted the cluster study process. *See* Order No. 2023 at P 40 & n.116, JA\_\_\_\_ (citing Order No. 845 data); *see also id.* App'x B, tbls. 2-5, JA\_\_\_\_-\_\_. FERC also excluded data from the SPP region on the basis that SPP

was transitioning to a new interconnection process, *see* Order No. 2023 at P 40 & n.115, JA_____, but at the same time did not exclude PJM's data even though it, too, was transitioning to a reformed interconnection process in 2021 and 2022 and had paused interconnection studies as part of its transition, *see* PJM Rehearing Request at 25 n.50, JA____. And nothing in FERC's data identified the *cause* of the delays, only that they occurred.

These flaws in FERC's data undermine FERC's conclusion that it was necessary to impose penalties on transmission providers to enforce firm study deadlines on a nationwide basis. During the period in which this data was collected, PJM was moving from a "first-come, first served" serial queue process to a cluster-based, "first-ready, first-served" process and paused studies for projects that would be studied under the new rules so it could clear the backlog of older projects that had to be addressed before the transition to the new rules could begin. *See* PJM Rehearing Request at 25 & n.50, JA____. The other System Operators accounted for only 333 delayed studies because most of them had already completed the transition to cluster study approaches. FERC's data only shows the problems caused by the serial study approach under Order No. 2003, which most public utilities abandoned long before FERC issued Order No. 2023, and ignores the challenges associated with transitioning to a new process.

FERC did not deny that its figures were inflated by the inclusion of PJM and the exclusion of SPP. However, FERC stated that it relied on the "most recent data available." Order No. 2023-A at P 294, JA____. This does not justify relying on skewed or incomplete data to impose a penalty regime on all transmission providers. Petitioners are not questioning the accuracy of FERC's data but the data's relevance and the reasonableness of the inferences FERC has drawn from it. On rehearing, FERC acknowledged that PJM had adopted a cluster study process modeled on the Order No. 2023 NOPR. *See id.* P 292, JA____. Yet by failing to distinguish between regions that had already implemented reforms and those that have not, FERC has imposed an arbitrary and capricious penalty framework.

Nevertheless, FERC found that its data was "sufficient to show that study delays are not a problem that exists only in isolated pockets" because "even excluding both PJM and SPP, the data show that three of the four remaining RTOs/ISOs reported delayed studies at the end of 2022." *Id.* Yet the fact remains that 87% of the study delays occurred in PJM, significantly skewing the perception of nationwide delay trends. FERC also states that "imperfection does not amount to arbitrary decision-making." *Id.* That may be true, but where the bulk of the evidence is heavily skewed by outliers, it casts doubt on the validity of FERC's rationale. Thus, while FERC claimed "trends of worsening queue delays" required the imposition of study penalties, 87% of the study delays FERC used to justify the

"gravity of the problem" came from a single RTO that was already transitioning to a cluster study process before Order No. 2023 issued.  *Id.* P 294, JA____.

FERC's decision to impose penalties was arbitrary and capricious because it did not scale with any change in the evidence:  FERC required transmission provider penalties everywhere so long as interconnection customers experienced delays anywhere.  This does not comply with FERC's duty to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *NEPGA*, 881 F.3d at 210 (quoting *Motor Vehicle Mfrs. Assn*, 463 U.S. 29 at 43).

Finally, FERC rejected rehearing on the basis that the "rehearing requests are premised on speculation that future data might tell a different story than the data the Commission relied upon in Order No. 2023," and further stated that "for purposes of judicial review, the record consists of the information that was before the Commission *at the time* Order No. 2023 was issued."  Order No. 2023-A at P 294, JA____; *see id.* ("[T]he Commission was not required to wait for pending developments before issuing Order No. 2023, nor are we required to retract Order No. 2023 in order to supplement the Commission's decision with new data.").  That is not the law.  The record in this proceeding did not close until the opportunity to request rehearing of Order No. 2023-A had passed; this Court acquired exclusive jurisdiction when the certified index of the record was transmitted to this Court on

47

August 21, 2024. *See* 16 U.S.C. § 825*l*(b). If FERC were correct that the evidentiary record closes once FERC issues its initial rulemaking order, that would reduce the FPA's mandated rehearing requirement to a pointless formality.

**B.  FERC Lacked a Valid Evidentiary Basis to Justify Imposing a Generic Interconnection Study Penalty Regime Under FPA Section 206 Because Most Tariffs Had Already Been Reformed**

FERC erred by enacting generic, nationwide reforms without finding any specific transmission provider tariff unjust and unreasonable. Indeed, FERC issued Order No. 2023 *after* transmission providers had already widely adopted FERC's reforms. There was no basis for FERC to broadly declare all transmission provider tariffs unjust and unreasonable when the majority of transmission providers had already implemented the cluster study reforms directed by Order No. 2023.

FPA section 206 establishes a two-step process FERC must follow before replacing a public utility's existing rate. First, FERC must find that a "rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a). FERC may only impose a new rate after making an "explicit finding that the existing rate is unlawful." *Emera Maine*, 854 F.3d at 24.

Order No. 2023 required *all* transmission providers to modify their tariffs— including those that already adopted many of the order's study reforms—and replaced the longstanding "reasonable efforts" standard with a strict liability regime.

Indeed, it was *because* the prior reforms adopted by specific transmission providers showed material improvements that FERC mandated those reforms nationwide. However, FERC declared all tariffs unjust and unreasonable without establishing that a single transmission provider's interconnection processes was unjust and unreasonable. Rather, FERC used generic findings to enact nationwide reforms, despite, in many cases, having recently accepted transmission provider interconnection processes as just and reasonable. *See, e.g.*, *PJM Interconnection Reform Order*, 181 FERC ¶ 61,162; *Midcontinent Indep. Sys. Operator, Inc.*, 178 FERC ¶ 61,141 (2022); *Sw. Power Pool, Inc.*, 178 FERC ¶ 61,015 (2022); *PacifiCorp,* 171 FERC ¶ 61,112; *PacifiCorp,* 179 FERC ¶ 61,089 (2022).

That action was unlawful. FERC cannot adopt "an industry-wide solution for a problem that exists only in isolated pockets." *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1019 (D.C. Cir. 1987). On rehearing, FERC argued that "where the Commission finds a systemic, nationwide problem that renders the rates, terms, conditions for Commission-jurisdictional services unjust, unreasonable, unduly discriminatory, or preferential," then it can force a nationwide solution. Order No. 2023-A at P 38, JA____. But FERC has not shown that transmission providers are responsible for interconnection delays, much less that delays require a nationwide "once size fits-all" solution. Rather, FERC resorted to stale and misleading evidence to justify its reforms. Specifically, FERC supports its one-size-fits-all approach with

overreliance on *serial* study data, even though transmission providers serving the majority of the United States—including PJM, MISO, SPP, CAISO, NYISO, portions of ISO-NE, and numerous individual utilities—have abandoned the serial study approach.

Unlike the cases FERC relies on to justify its generic rulemaking, *see* Order No. 2023-A at P 38 (citing *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (2000), *Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18 (D.C. Cir. 2002), and *S.C. Pub. Serv. Auth.*, 762 F.3d 41 (D.C. Cir. 2014)), FERC is not operating in an environment of industry-wide noncompliance with its proposed reforms. The opposite is true: FERC is operating in a sea of compliance with possible islands of noncompliance. FERC's cluster study approach has been widely adopted by transmission providers representing the majority of interconnection customers; in fact, transmission providers pioneered this approach.

This has not led FERC to reconsider whether uniform nationwide deadlines and study penalties are appropriate. Petitioners already warned FERC that its cluster study deadlines would be largely unachievable, despite the cluster study approach, and that certain regions would be particularly unlikely to meet deadlines. *See, e.g.*, MISO TOs Rehearing Request at 11-12, JA____-__; NYISO Rehearing Request at 5-11, JA____-__; SPP Rehearing Request at 9-10, JA____-__, PJM Rehearing Request at 32, JA____-__ ("This simply is not possible in a region such as the PJM

Region, where the typical queue over a one-year period in the last few years has included in excess of 1,000 projects."); PacifiCorp Rehearing Request at 5, JA____ (requesting an additional 45 calendar days be added to the study deadlines). Moreover, FERC's study deadlines would be especially impractical for transmission providers, such as MISO, that use multi-phase generation interconnection procedures with multiple sequential interconnection studies. MISO Rehearing Request at 11-14, JA____-__.

Thus, not only is FERC's nationwide rulemaking unlawful, it will also be ineffective in regions with a substantial number of interconnection requests or multi-phase generation interconnection procedures. Those regions should have their unique concerns addressed in separate adjudications, not consolidated under the same nationwide standard used to evaluate transmission providers with relatively few interconnection requests and a one-phase review process. FERC's nationwide rulemaking is arbitrary and capricious and violates the APA.

In sum, FERC arbitrarily and capriciously imposed a nationwide mandate to eliminate the "reasonable efforts" standard and impose a strict liability penalty scheme without finding a single transmission provider tariff unjust or unreasonable. In fact, FERC accepted PJM's interconnection process reform filing, finding it just and reasonable despite the fact that it included a "reasonable efforts" standard and no penalty provisions for late studies. *PJM Interconnection Reform Order*, 181

51

FERC ¶ 61,162.  That happened only eight months before FERC issued Order No. 2023.  Moreover, FERC had found these previously-reformed tariffs just and reasonable without the adoption of a mandatory penalty scheme while FERC's rulemaking Orders below were still pending, *see, e.g.*, *PJM Interconnection Reform Order*, 181 FERC ¶ 61,162; *Avista Corp.*, 179 FERC ¶ 61,183, or immediately prior to issuance of the NOPR, *see, e.g.*, *Midcontinent Indep. Sys. Operator*, 178 FERC ¶ 61,141; *Sw. Power Pool*, 178 FERC ¶ 61,015.

**C.  The Study Penalty Framework Unduly Discriminates Against Transmission Providers in Regions With Substantial Renewable Generation in Development**

Order No. 2023 states that reform is necessary to keep pace with the unprecedented explosion of interconnection requests by developers of renewable generation resources.  *See* Order No. 2023 at P 27, JA__.  However, Petitioners explained to FERC that the system of uniform deadlines and strict liability penalties imposed in Order No. 2023 places a disproportionate burden on transmission providers located in areas that are particularly suited for renewable development or in states that have aggressive renewable energy mandates.  For example, in the PJM region, Petitioners provided recent studies demonstrating that "the [American Electric Power] and Dominion Zones had 688 and 661 active projects in the interconnection queue, respectively, while some transmission owners had fewer than 10 active projects in their zones."  Indicated PJM TOs Rehearing Request at 31-32,

52

JA____-__. These disparities between zones within specific System Operator regions remain an ongoing issue. *See PJM Interconnection, L.L.C.*, Docket No. ER19-1958-003, Informational Report on Interconnection Study Performance Metrics at tbl. 6 (Feb. 14, 2024) (showing 2,748 projects under study in 18 zones, with approximately half concentrated in two zones—American Electric Power (660) and Dominion (626)).

FERC takes no account of the discriminatory impact Order No. 2023 has on the transmission providers that bear the heaviest burdens in implementing the energy transition that Order No. 2023 professes to foster. Transmission providers are not similarly situated in this regard. FERC discriminates against transmission providers experiencing substantial renewable generation development and those administering large, multi-state, multi-transmission owner systems like System Operators by imposing a uniform study delay penalty regime without consideration of obvious distinctions between regions and utilities. *See* Avangrid, Inc. Reply Comments at 11-12, JA____-__. These variations would have been captured under the "reasonable efforts" standard FERC has abandoned.

To remedy this problem, Petitioners argued that FERC "must either eliminate the penalty structure or alter it to consider the unique workload faced by each public utility's planners." *Id.* at 32, JA____. FERC acknowledged Petitioners' discriminatory impact argument, *see* Order No. 2023-A at P 310, JA____, but FERC

never addressed it. FERC's complete lack of engagement with the Petitioners' argument violates FERC's duty under the APA to "respond meaningfully" to arguments raised on rehearing. *TransCanada Power Mktg.*, 811 F.3d at 12. This requires remand.

**D.** **FERC Has Not Demonstrated That Imposing Interconnection Study Penalties on Transmission Providers Will Directly Affect, Much Less Ensure, Just And Reasonable Rates**

FERC has failed to show that interconnection delays have any direct impact on just and reasonable rates, let alone that its punitive framework will remedy those rates. By mandating penalties without first demonstrating that those penalties will "directly affect" rates, FERC has overstepped its authority under FPA section 206 and violated the APA.

FERC's authority to impose new rules and practices under FPA section 206 is not a blank check: FERC may only regulate those practices "that *directly affect* the rate or are closely related to the rate." *EPSA*, 577 U.S. at 278 (quoting, with emphasis, *CAISO*, 372 F.3d at 403). This authority does not extend to "*all those remote things beyond the rate structure that might in some sense indirectly or ultimately*" affect rates. *CAISO*, 372 F.3d at 403 (emphasis added). Yet, that is exactly what FERC has done here.

While FERC baldly asserts that interconnection delays cause unjust and unreasonable rates to consumers, it has not provided evidence supporting that stance.

*See, e.g.*, Order No. 2023 at PP 27, 37, 44, JA____, ____, ____; Order No. 2023-A at PP 26, 296, JA___, ____ ("While the Commission could have taken a more gradual approach in addressing interconnection queue backlogs, we find that such an approach would not represent a just and reasonable replacement rate.").  Nor has FERC demonstrated that penalties will directly affect, much less ensure, just and reasonable rates.  Instead, FERC makes two assumptions without supporting evidence:  first, that interconnection delays directly affect rates in a harmful manner; and second, that penalties are necessary to ensure just and reasonable rates.

Petitioners raised this point on rehearing, *see, e.g.*, Indicated PJM TOs Rehearing Request at 29-30, JA___-__, and offered compelling reasons to believe that penalties would have the *opposite* effect of securing just and reasonable rates, *see, e.g.*, AEP Rehearing Request at 28-29, JA____-__ (arguing that penalties will overcomplicate the interconnection process and increase litigation, administrative burden, and costs); SPP Rehearing Request at 7, 9, JA____, ____ (arguing that penalties will create a litigious environment that threatens timely study completion); PacifiCorp Rehearing Request at 11-13, JA____-__ ("[O]ne presumes that transmission providers will appeal virtually every penalty that would be assessed. The Final Rule provides no assurances the Commission will act quickly on such petitions, and thus it is highly likely that appeals will be filed faster and more frequently than the Commission can process them.").

Despite these arguments, FERC concluded that "failure to meet [its] deadlines presumptively reflects that a transmission provider has failed to respond appropriately to the need for timely interconnection study processing such that a penalty is warranted." Order No. 2023-A at P 358, JA\_\_\_\_. This dogmatic response does not reflect reasoned decisionmaking. *See TransCanada Power Mktg.*, 811 F.3d at 12. Before FERC can impose penalties, it must first explain how those penalties, or the delays the penalties seek to discourage, directly affect rates. Because FERC has not done so, the Court should remand FERC's Orders.

### E.  FERC Did Not Adequately Address Arguments that a Strict Liability Penalty Regime Would Create Perverse Incentives that Would Undermine FERC's Own Goals

Petitioners warned FERC that a strict liability penalty regime would create perverse incentives for transmission providers to prioritize meeting deadlines over the completeness and quality of studies. On the other side, strict liability penalties would create perverse incentives for interconnection customers to cause study delays since they are held harmless from the penalty assessments and are the beneficiaries of the penalty payments. These incentives would undermine the interconnection study process and outweigh any possible positive benefit associated with increasing "accountability."

All transmission providers would want to protect themselves from exorbitant penalties by providing developers with less flexibility, being less accommodating of

unusual requests, extending themselves less to remedy deficient requests, and acting more quickly to reject such requests. While transmission providers would not consciously sacrifice reliability to avoid penalties, it is nevertheless true that FERC's penalty regime incentivizes speed over accuracy, which tends to diminish the focus on reliability over time. Moreover, ambiguity regarding the assignment of penalties to System Operators and their transmission-owning members would discourage the close collaboration between them that is necessary for the interconnection process to function well. *See, e.g.*, SPP Rehearing Request at 8, JA____. Thus, the practical effect of the study penalty scheme would be to undermine FERC's goal of improving the interconnection process. *See* NYISO Rehearing Request at 27-29, JA____-__.

FERC perfunctorily rejected all of these concerns. It stated that the best way to protect against penalties is to meet study deadlines, Order No. 2023-A at P 376, JA____, entirely neglecting the fact that transmission providers may face unreasonable deadlines that they cannot meet for reasons beyond their control. Again, transmission providers will never sacrifice compliance with mandatory reliability requirements to meet FERC's new study deadlines. Penalties will therefore always be at issue when those two sets of requirements conflict. FERC also fails to acknowledge that the threat of significant penalty exposure gives transmission providers every incentive to prioritize completing studies on time above all else, to the inevitable detriment of study quality and the flexibility of the

study process.  *See* SPP Rehearing Request at 8, JA____.  Put bluntly, transmission providers have no incentive to accommodate any discretionary interconnection customer requests that might cause a delay.  All transmission providers will also have strong corporate and compliance-related incentives to avoid being assigned penalties, which will necessarily be an impediment to open and free collaboration among System Operators and their transmission-owning members.  FERC's failure to adequately consider these points is unsustainable under the arbitrary and capricious standard.

## III.  THE DEFECTS OF THE STRICT LIABILITY PENALTY SCHEME ARE EXACERBATED WHEN APPLIED TO SYSTEM OPERATORS

In every material respect, FERC's strict liability penalty scheme would apply to not-for-profit System Operators in the same way that it applies to for-profit transmission providers.  All of the constitutional and APA problems described above thus apply with *at least* equal force to System Operators.  Indeed, there are several ways in which these legal defects are exacerbated in the case of System Operators.  FERC has refused to adequately address these additional problems even though a Commissioner highlighted the key issue, namely, System Operators' inability to pay penalty costs, in two separate concurrences.

For example, System Operators are subject to the same unjustified presumption that they are always to blame for study delays and bear the same inappropriate burden to demonstrate that they should not be penalized through an

ill-defined appeals process. Concerns involving the lack of fair notice, unconstitutional vagueness, and FERC going beyond its statutory penalty authority are every bit as serious for System Operators as for other transmission providers.

Imposing strict liability penalties on System Operators likewise cannot be squared with reasoned decisionmaking for the same reasons that apply to other transmission providers. In particular, System Operators' boundaries all encompass regions with substantial renewable generation development. They therefore experience the same undue discrimination as other transmission providers facing an unprecedented volume of interconnection requests.

The penalty scheme's defects are exacerbated for System Operators who are unable to recover penalty costs from transmission customers and are unable to pay out of retained earnings or reduced operating income. The crux of the problem is that System Operators lack the same ability to pay penalties as traditional investor-owned utilities. FERC precedent prohibits transmission providers from recovering penalty costs from transmission customers through their rates, and System Operators have no other options. Order No. 2023-A at P 429, JA____. Unlike System Operators, FERC's automatic penalty regime forces "traditional" investor-owned utilities to account for lost profits, regardless of fault, by paying penalty costs out of retained earnings or reducing shareholder dividends. System Operators lack even those highly objectionable means of recovery. Even modest penalties pose serious

financial risks to System Operators because, as pass-through entities, a System Operator must recover all costs from a customer. *See, e.g.*, NYISO Rehearing Request at 18, JA_____ ("[F]inancial penalties pose a potentially existential threat to ISOs/RTOs that could result in bankruptcy if they are denied the ability to recover penalty costs."); MISO Rehearing Request at 9, JA____ ("As a non-profit entity, MISO has no retained earnings out of which to pay penalties and . . . it cannot use any of the current [MISO] Tariff provisions to collect late study penalties from any entity."). The only other alternative is to force System Operators to receive a confiscatory rate for performing jurisdictional services below actual cost.

FERC suggested in Order No. 2023 that System Operators had some undefined "other ways" to fund penalties beyond charges to transmission customers. But FERC failed to explain on rehearing what those alternatives could be. *See, e.g.*, NYISO Rehearing Request at 24-25, JA____.

In addition, the perverse incentives that a strict liability regime creates for all transmission providers—*i.e.*, to prioritize completing studies on time, to the detriment of accuracy, completeness, and flexibility—is exacerbated for System Operators. While System Operators would never knowingly allow the threat of penalties to harm reliability, the strict liability penalty regime incentivizes System Operators to adopt an inflexibly defensive approach toward interconnection customers rather than a collaborative one that risks penalties that System Operators

are uniquely unable to recover. As a practical matter, the strict liability penalty regime will tend to harm interconnection customers and undermine the purpose of Order No. 2023 by creating an adversarial relationship between System Operators and interconnection customers.

FERC acknowledges that imposing study delay penalties on System Operators "may raise several unique issues." Order No. 2023 at P 876, JA____. FERC professes to have addressed these issues by adopting various procedural "safeguards." *See* Order No. 2023-A at PP 384, 414, 426, JA____, ____, ____. These "safeguards" include giving System Operators an opportunity, not afforded to other transmission providers, to make FPA section 205 filings to seek special permission to recover study delay penalty costs from customers. *See id.* P 266, JA____. None of these supposed protections are adequate to remedy the defects in FERC's approach.

As Commissioner Christie put it, FERC "essentially punts" on the question of System Operator cost recovery. Order No. 2023 (Christie, Comm'r, concurring) at P 20, JA____. When FERC continued to leave cost recovery questions unanswered on rehearing, Commissioner Christie's again observed that "the fact that Order No. 2023-A still fails to answer the fundamental question of 'who pays?' illustrates the legal and policy flaws in the penalty scheme as applied to RTOs/ISOs." Order No. 2023-A (Christie, Comm'r, concurring) at P 7, JA____.

Commissioner Christie is correct. FERC's failure to adequately respond to System Operator concerns, and to leave the cost recovery question unresolved, is incompatible with due process, the APA, and the FPA.

**A.** **It Is Unduly Discriminatory to Apply the Strict Liability Penalty Scheme to System Operators and FERC Has Not Offered a Reasoned Explanation for Doing So**

System Operators argued on rehearing that it is unduly discriminatory to subject System Operators to the same penalties as traditional transmission providers that typically have shareholders and retained earnings. *See, e.g.*, NYISO Rehearing Request at 39, JA____. The FPA prohibits undue discrimination, *i.e.*, it forbids entities that are "similarly situated" from being treated differently without a valid reason. *State Corp. Comm'n of Kan. v. FERC*, 876 F.3d 332, 335 (D.C. Cir. 2017) (quoting *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 549 (D.C. Cir. 2010) and citing *Ark. Elec. Energy Consumers v. FERC*, 290 F.3d 362, 367 (D.C. Cir. 2002)). The corollary is also true: it is unduly discriminatory to treat fundamentally dissimilar entities in the same manner. *See Ala. Elec. Coop. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982) ("If the costs of providing service to one group are different from the costs of serving the other, the two groups are in one important respect quite dissimilar."). Here, imposing the same penalties on System Operators as traditional transmission providers is unduly discriminatory because System

Operators can only raise the money to pay penalties by assessing additional charges to their customers.

Even a relatively small penalty could pose a significant financial risk that can threaten the financial viability of a System Operator, creating a punitive effect that is disproportionate compared to imposing the same penalty on a traditional transmission provider. Equal penalties would not incentivize System Operators to meet deadlines "in the same manner" as traditional transmission providers because of their limited means to cover penalties.

System Operators argued further that ignoring this unduly discriminatory impact was arbitrary and capricious. NYISO emphasized that "Order No. 2023's assertion that 'RTOs/ISOs do not face differing or greater burdens that warrant different treatment than non-RTO/ISO transmission providers' because, '[t]he *pro forma* LGIP applies to all transmission providers, RTO/ISO and non-RTO/ISO alike'" is conclusory and did not provide reasoned support for applying the penalty scheme to System Operators." NYISO Rehearing Request at 39, JA____.

FERC reaffirmed its stance in Order No. 2023-A, holding that:

[W]e disagree with arguments that applying the penalty regime to RTOs/ISOs is inappropriate or unduly discriminatory because RTOs/ISOs do not have shareholders or guaranteed means of absorbing penalty costs whereas non-RTO/ISO transmission providers do. We believe that it would be inappropriate to categorically exempt RTOs/ISOs from the study delay penalties adopted in Order No. 2023. RTOs/ISOs manage interconnection queues and process interconnection studies like non-RTO transmission providers. The

63

available evidence indicates that study delays are just as significant a problem in RTOs/ISOs as non-RTO/ISO regions. RTOs/ISOs, just like non-RTOs, are facing increases in interconnection queue size, study duration, and length of time interconnection customers are spending in the queue.

Order No. 2023-A at P 400, JA____.

FERC's response is not reasoned decisionmaking because FERC side-stepped the pivotal issue. The relevant question is not whether System Operators "manage interconnection queues and process interconnection studies like non-RTO transmission providers." *Id.* That is a *non sequitur*. FERC ignored the critical point that it is unduly discriminatory to impose the same study delay penalties on System Operators as other transmission providers without taking account of their disparate cost recovery capabilities and mechanisms. That is undue discrimination.

Furthermore, by ignoring System Operators' undue discrimination arguments, FERC failed to provide a just and reasonable and not unduly discriminatory replacement rate in violation of FPA section 206. *See Int'l Transmission Co.*, 988 F.3d at 485. Unless FERC establishes the necessary link between penalty recovery and distribution by System Operators—*i.e.*, conditions any penalty distribution to interconnection customers on the existence of an approved penalty recovery mechanism—there is no just and reasonable replacement rate. MISO Rehearing Request at 10-11, JA____-__. FERC's oversight in this regard is untenable because

System Operators and traditional transmission providers are fundamentally different kinds of entities.

Because FERC has not provided a rationale for treating System Operators the same as traditional transmission providers, the penalty scheme is unduly discriminatory under the FPA. FERC also failed to provide a reasoned explanation for its ruling.

**B. System Operators' Uncertain Opportunity to Recover Study Delay Penalty Costs Does Not Provide Adequate Protection Against Unduly Discriminatory Penalties**

System Operators emphasized on rehearing that they could not pay study delay penalties without recovering the costs from customers in some form and that being denied cost recovery could threaten their financial viability. *See, e.g.*, NYISO Rehearing Request at 28, JA____; MISO Rehearing Request at 9-10, JA____-__. System Operators' also explained that their ability to seek potential recovery of penalty costs under FPA section 205 does not eliminate the risk of penalties. *See* NYISO Rehearing Request at 18, JA____; MISO Rehearing Request at 10-11, JA____-__. Section 205 filings are mere proposals that third parties may protest. *See* 16 U.S.C. § 824d(e). FERC expressly reserved the authority to reject such filings and emphasized that acceptance is not automatic. *See, e.g.*, Order No. 2023-A at P 428, JA____ ("To the extent that RTOs/ISOs seek to recover the costs of penalties assessed to them through section 205 filings, whether through individual

filings or a default structure, the Commission will review those filings to determine whether they are just and reasonable, and not unduly discriminatory or preferential."); *id.* P 442, JA____ ("In instances where an RTO/ISO incurs a penalty and seeks to recover the cost of that penalty from transmission-owning members, such transmission owners would have the right to intervene in any proceeding under FPA section 205 or file a complaint challenging the recovery of that penalty cost under FPA section 206, as appropriate.").

Commissioner Christie expressed serious reservations about allowing System Operators to ever recover penalty costs from customers, casting significant uncertainty over whether FERC in general, and he in particular, would vote to approve a System Operator's section 205 penalty cost recovery mechanism. *See* Order No. 2023-A (Christie, Comm'r, concurring) at P 7, JA____ ("Order No. 2023-A . . . [states] that it will address any future RTO/ISO section 205 proposal to recover the costs of study delay penalties on [a] case-by-case basis. I urge that any such RTO/ISO filing make protections to consumers paramount. In any scenario, the costs of penalties should not be imposed on retail customers, for the obvious reason they are not the cause of the penalties.") (footnote omitted).

The uncertainty concerning the section 205 filing option is especially acute for System Operators that lack unilateral authority to make section 205 filings in the first place. For example, the NYISO explained that it "must obtain supermajority

stakeholder approval to submit tariff revisions under section 205." NYISO Rehearing Request at 42, JA____. Thus, some System Operators would have to obtain the consent of the very stakeholders who would pay penalty costs before those System Operators would have the authority to even seek recovery from FERC. FERC rejected NYISO's request to address this impediment by making a compliance filing that would empower NYISO to unilaterally submit cost recovery proposals. *See* Order No. 2023-A at P 464, JA____.[9] Accordingly, what FERC presents as the primary safeguard against unreasonably punitive penalties for System Operators may not even be available to some of them.

FERC claimed that the risk of System Operators being denied penalty cost recovery is overstated based on the history of penalties for violations of mandatory reliability standards, which are administered by the North American Electric Reliability Corporation (NERC). In the past, when NERC imposed financial penalties for reliability violations on System Operators, FERC allowed System Operators to seek to recover those costs under FPA section 205, and FERC has not denied any such request to date.

_____

[9] Alternatively, FERC suggested NYISO could file an FPA section 206 complaint against its own tariff to seek unilateral authority to make section 205 study penalty cost recovery filings. *See* Order No. 2023-A at P 464, JA____. However, NYISO's contract with its transmission owners can only be changed if the extremely stringent "public interest" standard of review is met. *See* Agreement Between New York Independent System Operator, Inc. and Transmission Owners § 6.14.

However, the Order No. 2023 penalty scheme is clearly distinguishable from the NERC reliability penalty construct. The comparison is inapt because, unlike Order No. 2023, the NERC penalty process permits notice and comment *before* the penalty is imposed. Some System Operators have never had to attempt to recover NERC penalty costs via an FPA section 205 filing. When financial penalties for reliability violations occur, there are numerous mechanisms in place to avoid unfairly harsh results, particularly a "risk-based evaluation of all the facts and circumstances related to an individual violation." NYISO Rehearing Request at 31-32 & n.85, JA____-__. In other words, FERC permits transmission providers to establish a "reasonable efforts" defense in the context of asserted reliability violations, but interconnection study delay penalties are imposed on a strict liability basis that pointedly denies any "reasonable efforts" defense.

FERC gave short-shrift to these distinctions, asserting only that the appeals process outlined in the Orders would eliminate any potential concerns. *See* Order No. 2023-A at P 431, JA____. Petitioners have already identified the critical defects in FERC's conceptual and underdeveloped penalty appeals process. *See supra* at 25. These flaws are even more serious in the case of System Operators that face elevated financial risks from study delay penalties.

68

**C.    FERC's Other Theoretical "Safeguards" Do Not Provide System Operators with Meaningful Protection**

FERC asserts numerous times that it has established several "safeguards" that will together ensure that study delay penalties are not unduly punitive for System Operators.  FERC puts the most weight on its appeals process, which, as discussed above, is no cure for the penalty scheme's defects.  FERC also claims that caps on penalty amounts, the ability to extend a study deadline for 30 days upon agreement of all interconnection customers, a 10-day grace period, and a delay in the implementation of penalties would sufficiently ameliorate the "unique issues" confronting System Operators.

Petitioners showed on rehearing that these "safeguards" fell far short of their intended purpose, both on their individual merits and collectively.  *See, e.g.,* Indicated PJM TOs' Rehearing Request at 24-25, JA\_\_\_\_-\_\_; NYISO Rehearing Request at 32-38, JA\_\_\_\_-\_\_; SPP Rehearing Request at 10, JA\_\_\_\_.  FERC failed to engage in reasoned decisionmaking, or to offer reasoned explanations, in response to any of these concerns.

With respect to the penalty caps, FERC offered a conclusory statement that because the "daily amount of penalties is not punitive and that the penalties will be capped, we do not view the possibility that RTOs/ISOs may face some uncertainty in recovering penalty costs as an existential threat."  Order No. 2023-A at P 401, JA\_\_\_\_.  In fact, FERC increased the maximum penalty amounts in Order No. 2023-

A based on a scenario in which the Order No. 2023 version would have resulted in an overly "modest" $63,000 sanction for missing the 150-day study deadline by 126 days. *See id.* P 383, JA____ ("We sustain the Commission's determination to increase the study delay penalties.").

Putting aside, for now, the question of whether FERC's prescribed deadline was reasonable (*see infra* at 71-73), FERC did not adequately consider that a $63,000 penalty would hardly be "modest" for a System Operator that cannot pay that amount without special permission from FERC. Inability to pay could have serious financial consequences, up to, and including, bankruptcy. In the same vein, FERC noted that the penalties applicable to various violations by interconnection customers were similar or higher than study delay penalties for System Operators. *See id.* P 383, JA____. But that fact is irrelevant because, unlike not-for-profit System Operators whose participation in the interconnection process is mandatory, interconnection customers do not require special cost recovery authorization, and they voluntarily enter the interconnection process knowing the risk of penalties they may face. Furthermore, FERC's finding was not based on record evidence that System Operators' role in causing study delays involved a comparable level of culpability as the referenced failures by interconnection customers. On the contrary, FERC recognized that System Operators often miss study deadlines for reasons

attributable to other entities, including interconnection customers. *See id.* P 423, JA____.

Finally, as noted *supra* at part I.D at 34-37, the purported "safeguards" FERC instituted to mitigate transmission providers' due process objections are even less effective for System Operators than transmission owners. FERC effectively conceded that the 10-day grace period had little practical value standing alone. *See id.* P 337, JA____. FERC unrealistically dismissed concerns that 30-day deadline extensions would be vetoed in System Operator regions by claiming that it was "speculation" to expect that customers would not agree to reasonable extensions. *Id.* P 335, JA____. And, while FERC contended that delaying the implementation of penalties would give System Operators more time to become accustomed to the interconnection process, *see id.* P 337, JA____, that is beside the point because delaying implementation will do nothing to correct the many fundamental legal defects in the penalty regime that have been highlighted throughout this brief.

### D. The Orders' Deadline for Completing Interconnection Studies is Arbitrary and Cannot Reasonably Be Imposed on System Operators

Order No. 2023 established a standard 150-day deadline for completing cluster studies. It declined to allow transmission providers any flexibility to propose alternative deadlines. *See* Order No. 2023 at P 331, JA____.

System Operators demonstrated on rehearing that there was no record basis for the 150-day study period and that FERC had not offered any justification for the requirement. *See e.g.*, SPP Rehearing Request at 9-10, JA___-____. FERC simply cited comments by a limited number of parties that supported the deadline, none of which appeared to be entities that actually performed study work. *See* Order No. 2023 at P 305, JA____. FERC provided no reasoned basis for concluding that deadline was reasonable as applied to System Operators, many of whom were administering more complex, and in some cases multi-phase, interconnection processes with multiple sequential studies and evaluating a much larger number of entrants than transmission providers in other regions. *See* NYISO Rehearing Request at 6, JA____; MISO Rehearing Request at 11-14, JA____-__; SPP Rehearing Request at 9-10, JA___-____.

FERC responded that Order No. 2023-A did "not preempt transmission providers from proposing tariff-defined study deadlines that may differ from the [150-day standard]." Order No. 2023-A at P 156, JA____. This is a welcome development as far as it goes. But FERC did not otherwise address the rehearing requests, concede that the *pro forma* 150-day deadline could be unjust and unreasonable, or offer any certainty regarding the evidence that System Operators would have to provide to be granted longer study deadlines. Subsequently, several System Operators proposed longer study deadlines on compliance that have been

challenged by third parties. *See, e.g.*, *PJM Interconnection, L.L.C.*, Docket No. ER24-2045, Protest of Public Interest Organizations (June 20, 2024); *Midcontinent Indep. Sys. Operator, Inc.*, Docket No. ER24-2046, Protest of Shell Energy North America (US), L.P., Shell New Energies US, LLC, and Savion, LLC (June 20, 2024). FERC has yet to act on any of the pending System Operator requests.

Under the circumstances, this Court should find that FERC has failed to meet its statutory obligation to show that the standard 150-day study deadline is just and reasonable with respect to System Operators. Making that determination would prevent FERC from imposing a deadline that is devoid of record support if FERC rejects the alternative deadlines submitted in System Operators' individual compliance proceedings.

### E. FERC Unreasonably Failed to Consider Alternatives to a Strict Liability Penalty Scheme for System Operators

Finally, the System Operators have never argued that the only possible alternative to applying the strict liability penalty scheme to them was for FERC to do nothing. Instead, the System Operators asked FERC to explore changes that would promote its goal of incentivizing System Operators to complete interconnection studies more quickly without violating constitutional due process protections, the FPA, or the APA. Some System Operators even proposed specific alternative rule changes that would strike a more reasonable balance for their

73

individual regions.  *See, e.g.,* NYISO Rehearing Request at 20-21, JA____-__; MISO Rehearing Request at 11-16, JA____-__.

The Orders overlooked these recommendations.  Order No. 2023-A presented a false dichotomy between subjecting System Operators to, or "categorically exempting" them from, the strict liability penalty scheme.  Order No. 2023-A at P 400, JA____.  In reality, there was ample room for FERC to take a more measured approach that reflects the different characteristics of System Operators and that takes into consideration who is at fault for the delay, if anyone.  For example, FERC could adopt non-financial penalties for System Operators or expressly reserve financial penalties for only the most serious or frequent violations.

To be clear, System Operators have no wish to impose penalty costs on customers that played no role in causing them, or transmission owners that have not been found to be derelict in their responsibilities to complete studies.  The objection is that the Orders have established a system that, as a practical matter, can only result in System Operators being subjected to disproportionately punitive measures that, due to their unique attributes as non-profit and independent System Operators, can threaten their financial viability.  Either outcome can, and should, be avoided.  It is arbitrary and capricious for FERC to unnecessarily create such a choice of evils scenario instead of pursuing more reasonable options to incentivize System Operators to complete interconnection studies more quickly.

## IV. FERC DEPARTS FROM REASONED DECISIONMAKING BY IMPOSING A GENERIC FINDING AND NEW SET OF RULES UNDER FPA SECTION 206 BASED ON OUTDATED EVIDENCE

Order No. 2023 does not constitute reasoned decisionmaking because it imposes a generic interconnection process rule on PJM, notwithstanding FERC having just approved PJM's comprehensive, region-specific interconnection process reform package. FERC lacked any evidence, let alone evidence justifying an FPA section 206 finding, that PJM's newly-reformed interconnection process required further modification to remain just and reasonable. Instead, FERC imposed its interconnection reforms on transmission providers without ever finding that their recently approved interconnection processes were unjust and unreasonable. With FERC's cursory response to PJM's arguments, FERC failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *NEPGA*, 881 F.3d at 210 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29 at 43).

PJM's reformed interconnection process resulted from extensive stakeholder task force efforts. *See PJM Interconnection Reform Order* at P 35, JA____. These efforts included 20 task force meetings lasting approximately 99 hours and provided significant stakeholder engagement with 290 PJM Member Companies and 545 total companies. PJM Rehearing Request at 7, JA____. Substantial stakeholder negotiations produced a reform package that balanced numerous competing interests

through tradeoffs and compromises that cannot readily be undone without destroying some party's desired benefit or a public policy priority.

PJM submitted its comprehensive reform package to FERC two days before FERC issued the NOPR. *PJM Interconnection, L.L.C.*, Docket No. ER22-2110-001, Tariff Revisions for Interconnection Process Reform, Request for Commission Action by October 3, 2022, and Request for 30-Day Comment Period (June 14, 2022). FERC approved the reforms on November 29, 2022, contemporaneous with initial and reply comments on the NOPR. The reformed tariff provisions took effect on January 3, 2023, and PJM began the transition under its revised tariff on July 10, 2023, eighteen days before FERC issued Order No. 2023. PJM Rehearing Request at 8, JA____.

In Order No. 2023, FERC "*recognize[d] that many transmission providers have adopted or are in the process of adopting similar reforms to those adopted in this final rule* . . . [and we] do not intend to disrupt these ongoing transition processes or stifle further innovation," but did not say these reforms complied with the final rule. Order No. 2023 at P 1765, JA____ (emphasis added). PJM argued that FERC had no evidence that PJM's approved interconnection process reform was unjust and unreasonable given the overlapping and concurrent timelines of PJM's reform and FERC's development of Order No. 2023. *See* PJM Rehearing Request at 10, 25, JA____, ____. Thus, FERC failed to satisfy the first step under FPA section 206

before it imposed a generic replacement rate under FPA section 206 step two. *See supra* at 48-49.

PJM requested that FERC indicate whether PJM's entire package of reforms complied with the new rule. Order No. 2023-A at P 63, JA____. PJM explained that its reformed interconnection process constituted a carefully negotiated package of integrated reforms that cannot be easily separated or replaced. PJM Rehearing Request at 10, JA____. PJM further explained that the FERC-approved reform package reflected PJM-specific features that FERC's generic Order No. 2023 would undo or complicate if imposed piecemeal. *Id*. at 3-4, 16-18, JA____-__, ____-__. For example, PJM's FERC-approved three-phase interconnection study process applies the least complex study methodology that identifies the greatest financial impacts first, thereby reducing the number of projects in the interconnection process, before applying the more complex study methodologies in the second and third phases. *Id*. at 16-18, JA____-__. Order No. 2023, by contrast, applies all three study methodologies in two rounds. *Id*. If FERC required PJM to apply all three study methodologies at each stage, the time needed to perform interconnection studies would increase significantly and FERC would sacrifice the efficiencies of applying the least complex study methodology as a screen in the first phase. *Id*.

FERC refused to engage with PJM's arguments that FERC imposing a generic solution over regionally tailored solutions would slow the processing of

interconnection requests, the opposite of FERC's goal in Order No. 2023. *See* PJM Rehearing Request at 16, JA____. FERC held that because "no transmission provider has yet to adopt the entirety of Order No. 2023's broad suite of reforms," there would be no presumption that PJM's interconnection reforms complied with the new rule. Order No. 2023-A at P 78, JA____. Effectively, FERC required transmission providers to adopt "the entirety of Order No. 2023's broad suite of reforms" before even recently-approved reforms will receive a *presumption* of reasonableness. This turns the entire process on its head.

FERC's refusal to engage with PJM's arguments was arbitrary and capricious. *Belmont Mun. Light Dept. v. FERC*, 38 F.4th 173, 179 (D.C. Cir. 2022); *New Eng. Power Generators Ass'n v. FERC*, 881 F.3d 202, 212 (D.C. Cir. 2018). FERC made generalized statements about not disturbing ongoing transition processes, Order No. 2023 at P 961, JA____; Order No. 2023-A at P 73, JA____, but rejected even a presumption of reasonableness (much less a mechanism or carve out) to protect the PJM reforms FERC had just approved. FERC's decision to apply the generic Order No. 2023 rules inflexibly to PJM's comprehensive, integrated interconnection process creates uncertainty at the very time generators, transmission owners and transmission providers need certainty and threatens to slow down interconnection studies through a rule intended to do the opposite. PJM stakeholders invested a great deal of time, money, and effort to negotiate PJM's reformed interconnection process,

and generators are making decisions now based on that process.  Regardless, FERC imposed disruptive, generic requirements that are not supported by the record.  *See* PJM Rehearing Request at 9, 19, 25-26, JA ____, ____, ____-__.

In sum, FERC's insistence on imposing its generic rule on transmission providers that already have interconnection processes that meet the goals of Order No. 2023, without evidence that those processes are unjust and unreasonable, and its refusal to consider recently approved comprehensive, integrated interconnection reforms as an entire package, is arbitrary and capricious and should be vacated.[10]

## V.  MANDATING THAT AFFECTED SYSTEM TRANSMISSION PROVIDERS USE ONLY ENERGY SERVICE STANDARDS IS ARBITRARY AND CAPRICIOUS

Generators typically choose from two forms of interconnection service:  (1) Network Service, also known as "firm" service; or (2) Energy Service, also known as "non-firm" or "interruptible" service. *Tenaska Clear Creek Wind, LLC. v. FERC*, 108 F.4th 858, 864 (D.C. Cir. 2024), *reh'g denied*, Nos. 22-1059, *et al.* (D.C. Cir. Sept. 13, 2024).  Network Service "uses stricter modeling standards" to ensure that "electric output is deliverable" and "will likely identify more network upgrades" because it is a "higher level of interconnection service" than Energy Service.  Order

---

[10] PJM recognizes that FERC has yet to rule on PJM's compliance filing. However, FERC's insistence on a "line-by-line" justification to retain approved region-specific rules and avoid imposing FERC's new contradictory rules foreshadows FERC's eventual compliance rulings that will stem from the orders on review.

No. 2023 at PP 1256-57, JA____-__.  In some instances, interconnection requests may also impact neighboring systems.  These Affected Systems may require upgrades to allow connection to the host system.  *See Tenaska Clear Creek*, 108 F.4th at 863-64.

Order No. 2023 "require[s] affected system transmission providers to study all affected system interconnection requests using [Energy Service] modeling standards" regardless of whether the interconnection request seeks Energy Service or Network Service.  Order No. 2023 at P 1276, JA____; *see* Order No. 2023-A at PP 474, 507, JA____, ____.  FERC's mandate that Affected System operators utilize Energy Service modeling standards finds no support in the record, contravenes record evidence, and departs from precedent without sufficient explanation.  Therefore, FERC's Energy Service study mandate is arbitrary and capricious and should be vacated.

### A.    Requiring the Use of Energy Service Modeling for All Affected System Studies Is Arbitrary and Capricious

FERC's decision to require Affected System operators to study all interconnection requests on neighboring systems using the Energy Resource modeling standard is not supported by substantial evidence and fails to grapple with the problems SPP identified.

FERC claims  "the use of [Energy Service] in affected system studies is just and reasonable, given that the affected system transmission provider has no

obligation to continually ensure deliverability . . . on [the] host system." Order No. 2023 at P 1277, JA____. FERC avers this "is consistent with Order No. 2003 because interconnection is separate from the deliverability component of transmission service." *Id.*; *accord* Order No. 2003-A at P 507, JA____. However, FERC ignores that it has previously recognized the purpose of SPP's Affected System study is not to ensure deliverability within SPP, but to assess the impacts to SPP of deliverability on the host system. SPP Rehearing Request at 12-13, JA____-__; *see, e.g.*, *Midcontinent Indep. Sys. Operator, Inc.*, 171 FERC ¶ 61,275, at P 60 (2020). FERC ignored the fundamental difference between studies by the host system and the Affected System that SPP and other parties identified.

FERC acknowledged that the Energy Service standard can fail to capture all of the negative impacts to Affected Systems from the host utility's grant of Network Service. Order No. 2023 at P 1284, JA____. However, FERC attempts to sidestep the problem by claiming that the risks are low, "particularly in non-[System Operator] regions where interconnection service does not, by itself, allow a generating facility's power to flow." *Id.* In fact, FERC's justification for ignoring the problem arises from observations of what happens *outside* of System Operator areas. *Id.* at PP 1284, 1287-88, JA____, ____-__.

SPP refuted FERC's sweeping assumption—based solely on practices in non-System Operator areas—that Affected System operators have an opportunity to

address Network Service impacts *after* the interconnection study process at that transmission service stage. SPP Rehearing Request at 12-16, JA____-__; SPP Comments at 20-21, JA____-__. While SPP assesses deliverability of generation on its own system at the time it studies transmission service requests, other System Operators, including SPP's neighbor MISO, grant deliverability during the generator interconnection study process without a subsequent opportunity to assess at the transmission service study stage. Limiting Affected System operators to the Energy Resource standard creates significant equity issues when a generator is deemed "firm" by its host transmission provider during the interconnection study stage and the Affected System has no opportunity to address the impacts on its system at the transmission service study stage. SPP Rehearing Request at 12-16, JA____-__, SPP Comments at 20-21, JA____-__. Yet FERC's orders entirely ignore this difference.[11]

FERC reiterated its position that interconnection service is "separate from the deliverability component of[] transmission service," Order No. 2023-A at P 507, JA____. That is a *non-answer* to SPP's unrefuted evidence that some System Operators grant deliverability rights at the time of interconnection. FERC also

---

[11] SPP does not challenge MISO's process for determining deliverability. Instead, SPP challenges FERC's erroneous mandate based on a flawed assumption about when deliverability is granted.

repeated that an interconnection customer seeking Network Service on its host system is not seeking—and the Affected System is not obligated to guarantee—deliverability. *Id.* FERC ignores that the purpose of Affected System studies is not to ensure deliverability on the host system (which is the host's responsibility), but to ensure that the Affected System is not harmed. Thus, studying a Network Service request using Network Service standards does not "result[] in unjust and unreasonable rates by increasing the cost . . . without a commensurate increase in service." Order No. 2023 at P 1288, JA____. Rather, it holds a Network Service customer accountable for the costs it inflicts on the Affected System. *See* Order No. 845-A at P 78 ("[I]t would be inconsistent with the cost causation principle to exempt an interconnection customer from interconnection facility and network upgrade costs that would not be necessary but for that interconnection request.").

FERC makes other sweeping claims that are not supported by the record. For example, FERC claims "any significant impact would generally be captured by an [Energy Service] study," relying on that fact that MISO uses Energy Service standards "in affected system studies without adverse reliability impacts." Order No. 2023 at P 1285, JA____-__; *see* Order No. 2023-A at P 510, JA____. However, when an interconnection request is made on SPP's system, "deliverability is assessed through the transmission service process, which also includes affected system coordination with neighbors" like MISO. SPP Rehearing Request at 14, JA____.

That means "MISO has the opportunity to assess the impacts on its system of firm deliverability granted to generators on the SPP system through transmission service study coordination, even after MISO, as affected system, has studied the interconnection of an SPP generator using [Energy Service]" modeling standards. *Id.* Thus, MISO's use of Energy Service standards for all Affected System studies does not support FERC's broad mandate. FERC also claims, without any evidence, that "in the majority of circumstances, interconnection alone is unlikely to affect the reliability of an affected system transmission provider's transmission system." Order No. 2023-A at P 507, JA____. The only support FERC cited for this proposition were comments that stated the obvious—using the lower Energy Service study threshold will result in lower cost assignments to generators. Order No. 2023-A at P 507 n.943, JA____ (citations omitted). That bromide is not substantial evidence.

FERC's mandate that Affected System operators use Energy Resource modeling standards for Network Service requests has nothing to do with protecting Affected Systems (and their customers), but has everything to do with saving generator interconnection customers money and (hopefully) reducing withdrawals from the interconnection queue. *See* Order No. 2023 at PP 1278-79, JA____-__. FERC's states "that adopting the [Energy Service] requirement for affected system transmission providers will provide important benefits," Order No. 2003-A at P 507,

JA____, but the only benefits FERC identified accrue solely to interconnection customers, *id.* at P 507 n.943, JA____-__. Reducing the interconnection customers' responsibility  to mitigate the adverse impacts they cause will unjustly and unreasonably shift those costs to the Affected System and its customers.  SPP Rehearing Request at 13 n.29, JA____.

Finally, FERC's purported "fix"—*i.e.*, that Affected System operators can submit FPA section 205 filings to propose to continue to use Network Service modeling standards for Affected System studies—rings hollow.  FERC has declared the use of Network Resource modeling unjust and unreasonable, prejudicing any future attempt to justify it.  *See, e.g.*, Order No. 2023 at P 1292, JA____.  "[I]t is hollow relief to cause a problem in one proceeding and claim that transmission providers can fix that problem in another proceeding, without any guarantee that [FERC] will accept that fix in the other proceeding."  SPP Rehearing Request at 13 n.30, JA ____

B. **Order No. 2023's Affected Systems Ruling Is Contrary to FERC Precedent**

Order No. 2023 also departs from recent FERC precedent without sufficient explanation.  Mere months before Order No. 2023 issued, FERC approved SPP's use of Network Resource modeling assumptions in an Affected System analysis, which this Court later affirmed.  *See Tenaska Clear Creek Wind, LLC v. Sw. Power Pool, Inc.*, 180 FERC ¶ 61,160, at P 62 (2022), *order on reh'g*, 182 FERC ¶ 61,084

(2023), *aff'd sub nom. Clear Creek*, 108 F.4th 858.  Earlier, in 2019, FERC held that Network Resource modeling in the Affected System study process is just and reasonable and that variances among RTO modeling practices "justify each [System Operator] using its own approach."  *EDF Renewable Energy Inc. v. Midcontinent Indep. Sys. Operator, Inc.*, 168 FERC ¶ 61,173, at P 86 (2019).  Order No. 2023 barely mentions these decisions, and does not explain why they are no longer appropriate, choosing instead to focus on reducing costs to interconnection customers rather than allowing Affected Systems to protect their customers.  Order 2023-A at P 511, JA___-__.  FERC also claims that the issue in prior cases was transparency, *id.* at P 512, JA____, when the real issue was protecting the Affected System from adverse impacts.  *See Midcontinent Indep. Sys. Operator, Inc.*, 171 FERC ¶ 61,275, at P 60.  FERC's failure to grapple with its precedents is arbitrary and capricious.

## CONCLUSION

For the reasons set forth above, the petitions for review should be granted and FERC's orders should be vacated.[12]

Respectfully submitted,

---

[12] Avangrid, Inc., New York State Electric & Gas Corp., and Rochester Gas and Electric Corp. join only Parts I, II, and IV of this brief.  The MISO Transmission Owners, defined supra at vii, and PacifiCorp join only Parts I and II.  Long Island Power Authority joins only Parts I and V.  MISO does not join Part V.

/s/ Catherine P. McCarthy
Catherine P. McCarthy
Bracewell LLP
2001 M Street NW, Suite 900
Washington, DC 20006
(202) 828-5839
(800) 404-3970 (fax)
cathy.mccarthy@bracewell.com


*Counsel for Avangrid, Inc.*


/s/ Paul Savage
Paul Savage
Associate Counsel
Joshua Kirstein
Senior Attorney
Consolidated Edison Co. of
New York, Inc.
Orange and Rockland Utilities, Inc.
4 Irving Place
New York, New York 10003
(212) 460-2764
(929) 656-5971
kirsteinj@coned.com
savagep@coned.com


*Counsel for Consolidated Edison Co.
of New York, Inc. and Orange and
Rockland Utilities, Inc.*

/s/ Paul A. Colbert
Paul A. Colbert
Associate General Counsel -
Regulatory Affairs
Central Hudson Gas & Electric
Corporation
284 South Avenue
Poughkeepsie, New York 12601
(845) 486-5831(telephone)
pcolbert@cenhud.com


*Counsel for Central Hudson Gas &
Electric Corporation*

/s/ John Lee Shepherd, Jr.
John Lee Shepherd, Jr.
Blake Grow
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com
bgrow@hunton.com


*Counsel for FirstEnergy Service
Company, Dominion Energy Services,
Inc., and Exelon Corporation*

87

/s/ Cheri Yochelson
Cheri Yochelson
Assistant General Counsel - DEV
Dominion Energy Services, Inc.
120 Tredegar Street, RS-5
Richmond, VA 23219
(804) 819-2691
cheri.yochelson@dominionenergy.com

/s/ Sara Weinberg
Sara Weinberg
Assistant General Counsel - DESC
Dominion Energy Services, Inc.
220 Operation Way, MC OSC 1A,
Cayce, SC 29033
(803) 217-5753
sara.weinberg@dominionenergy.com

*Counsel for Dominion Energy Services, Inc.*

/s/ Lisa B. Luftig
Lisa B. Luftig
Assistant General Counsel
Exelon Corporation
701 Ninth Street, NW
Washington, DC 20068
(202) 428-1067
Lisa.Luftig@exeloncorp.com

*Counsel for Exelon Corporation*

/s/ Andrew W. Tunnell
Andrew W. Tunnell
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3439 (telephone)
atunnell@balch.com

*Counsel for the Long Island Power Authority*

/s/ Christopher D. Supino
Christopher D. Supino
Managing Senior Corporate Counsel
Midcontinent Independent
System Operator, Inc.
720 City Center Drive
Carmel, IN 46032
Telephone: (317) 249-5400
csupino@misoenergy.org

*Counsel for Midcontinent Independent System Operator, Inc.*

/s/ Wendy N. Reed
Wendy N. Reed
Matthew J. Binette
Abraham F. Johns III
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005
(202) 393-1200 (phone)
reed@wrightlaw.com
binette@wrightlaw.com
johns@wrightlaw.com

*Counsel for the MISO Transmission Owners*

/s/ Ilia Levitine
Ilia Levitine
Duane Morris LLP
901 New York Avenue, N.W.
Suite 700 East Washington, DC 20001
Phone: (202)776-5218
ILevitine@duanemorris.com

*Counsel for Midcontinent Independent System Operator, Inc.*

/s/ Ted J. Murphy
Ted Murphy
Blake Grow
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1588
(202) 955-1991
tmurphy@hunton.com
bgrow@hunton.com

*Counsel for New York Independent System Operator, Inc.*

/s/ Andrew W. Tunnell
Andrew W. Tunnell
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3439 (telephone)
atunnell@balch.com

*Counsel for Niagara Mohawk Power Corporation d/b/a/ National Grid*

/s/ Lyle D. Larson
Lyle D. Larson
Abigail C. Fox
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3441 (telephone)
llarson@balch.com

*Counsel for New York State Electric & Gas Corporation and Rochester Gas and Electric Corporation*

89

/s/ Robert V. Eckenrod
Robert V. Eckenrod
Assistant General Counsel
PacifiCorp
825 N.E. Multnomah
Suite 2000
Portland, OR 97232
(503) 367-7259
robert.eckenrod@pacificorp.com

/s/ Christopher R. Jones
Christopher R. Jones
Antonia M. Douglas
Troutman Pepper
Hamilton Sanders LLP
401 9th Street, NW
Suite 1000
Washington, DC 20004
(202) 662-2181
chris.jones@troutman.com
antonia.douglas@troutman.com

/s/ Adrienne Thompson
Adrienne Thompson
Troutman Pepper
Hamilton Sanders LLP
100 SW Main Street
Suite 1000
Portland OR 97204
(503) 290-2347
adrienne.thompson@troutman.com

*Counsel for PacifiCorp*

/s/ Wendy B. Warren
Wendy B. Warren
David S. Berman
Elizabeth P. Trinkle
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005
(202) 393-1200 (phone)
warren@wrightlaw.com
berman@wrightlaw.com
trinkle@wrightlaw.com

*Counsel for PJM Interconnection, L.L.C.*

/s/ Matthew J. Binette
Matthew J. Binette
Elizabeth P. Trinkle
Priyanka Vashisht
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005-3898
(202) 393-1200 (phone)
binette@wrightlaw.com
trinkle@wrightlaw.com
vashisht@wrightlaw.com

*Counsel for Southwest Power Pool, Inc.*

October 30, 2024

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in 14-point Times New Roman, a proportionally spaced font.  I further certify that this brief complies with the type-volume limitations of D.C. Circuit Rule 32(e) and the Court's August 5, 2024 scheduling order because it contains 19,495 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), according to the count of Microsoft Word.

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com

*On behalf of Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2024, I caused this brief to be electronically filed with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com

*On behalf of Petitioners*

# ATTACHMENT A
# STATUTORY ADDENDUM

# TABLE OF CONTENTS

5 U.S.C. § 706 ........................................................................................ A-1

Federal Power Act section 205, 16 U.S.C. § 824d ............................... A-2

Federal Power Act section 206, 16 U.S.C. § 824e................................ A-6

Federal Power Act section 313, 16 U.S.C. § 825*l* ............................... A-10

Federal Power Act section 316A, 16 U.S.C. § 825o-1 ........................ A-12

**5 U.S.C. § 706 - Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

**16 U.S.C. § 824d - Rates and charges; schedules; suspension of new rates; automatic adjustment clauses**

**(a) JUST AND REASONABLE RATES**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) PREFERENCE OR ADVANTAGE UNLAWFUL**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) SCHEDULES**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) NOTICE REQUIRED FOR RATE CHANGES**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e)** SUSPENSION OF NEW RATES; HEARINGS; FIVE-MONTH PERIOD

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f)** REVIEW OF AUTOMATIC ADJUSTMENT CLAUSES AND PUBLIC UTILITY PRACTICES; ACTION BY COMMISSION; "AUTOMATIC ADJUSTMENT CLAUSE" DEFINED

> **(1)** Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—
>
> > **(A)** whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

**(B)** whether any such clause reflects any costs other than costs which are—

**(i)** subject to periodic fluctuations and

**(ii)** not susceptible to precise determinations in rate cases prior to the time such costs are incurred.
Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

**(2)** Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

**(3)** The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

**(A)** modify the terms and provisions of any automatic adjustment clause, or

**(B)** cease any practice in connection with the clause, if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

**(4)** As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g)** INACTION OF COMMISSIONERS

**(1)** IN GENERAL

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners

are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

**(A)** the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825l(a) of this title; and

**(B)** each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) APPEAL**
If, pursuant to this subsection, a person seeks a rehearing under section 825l(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825l(b) of this title.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, § 3006, Oct. 23, 2018, 132 Stat. 3868.)

## 16 U.S.C. § 824e - Power of Commission to fix rates and charges; determination of cost of production or transmission

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory,

or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: Provided, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) REFUND CONSIDERATIONS; SHIFTING COSTS; REDUCTION IN REVENUES; "ELECTRIC UTILITY COMPANIES" AND "REGISTERED HOLDING COMPANY" DEFINED**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: Provided, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.

**(d) INVESTIGATION OF COSTS**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of

electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) SHORT-TERM SALES**

**(1)** In this subsection:

**(A)** The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

**(B)** The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

**(2)** If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

**(3)** This section shall not apply to—

**(A)** any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

**(B)** an electric cooperative.

**(4)**

**(A)** The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

**(B)** The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged

by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

**(C)** In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

(June 10, 1920, ch. 285, pt. II, § 206, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 852; amended Pub. L. 100–473, § 2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§ 1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

# 16 U.S.C. § 825*l* - Review of orders

**(a) APPLICATION FOR REHEARING; TIME PERIODS; MODIFICATION OF ORDER**

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) JUDICIAL REVIEW**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable

grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

### (c) STAY OF COMMISSION'S ORDER

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, § 313, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 860; amended June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, § 1284(c), Aug. 8, 2005, 119 Stat. 980.)

## 16 U.S.C. § 825o–1 - Enforcement of certain provisions

**(a) VIOLATIONS**

It shall be unlawful for any person to violate any provision of subchapter II or any rule or order issued under any such provision.

**(b) CIVIL PENALTIES**

Any person who violates any provision of subchapter II or any provision of any rule or order thereunder shall be subject to a civil penalty of not more than $1,000,000 for each day that such violation continues. Such penalty shall be assessed by the Commission, after notice and opportunity for public hearing, in accordance with the same provisions as are applicable under section 823b(d) of this title in the case of civil penalties assessed under section 823b of this title. In determining the amount of a proposed penalty, the Commission shall take into consideration the seriousness of the violation and the efforts of such person to remedy the violation in a timely manner.

(June 10, 1920, ch. 285, pt. III, § 316A, as added Pub. L. 102–486, title VII, § 725(b), Oct. 24, 1992, 106 Stat. 2920; amended Pub. L. 109–58, title XII, § 1284(e), Aug. 8, 2005, 119 Stat. 980.)