## ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 23-1282, 23-1284, 23-1289, 23-1297, 23-1299, 23-1305, 23-1310, 23-1312, 23-1313, 23-1320, 23-1327, 23-1330, 23-1346, 24-1093, 24-1106, 24-1112, 24-1136, 24-1137, 24-1139, 24-1140, 24-1141 (consolidated)

ADVANCED ENERGY UNITED, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

_____

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

# REPLY BRIEF OF THE TRANSMISSION PROVIDER
# PETITIONERS

_____

Catherine P. McCarthy
Bracewell LLP
2001 M Street NW, Suite 900
Washington, DC 20006
(202) 828-5839
(800) 404-3970 (fax)
cathy.mccarthy@bracewell.com


*Counsel for Avangrid, Inc.*

Joshua Kirstein
Senior Attorney
Consolidated Edison Co. of
New York, Inc.
Orange and Rockland Utilities, Inc.
4 Irving Place
New York, New York 10003
(929) 656-5971
kirsteinj@coned.com

*Counsel for Consolidated Edison Co.
of New York, Inc. and Orange and
Rockland Utilities, Inc.*

Cheri Yochelson
Assistant General Counsel - DEV
Dominion Energy Services, Inc.
120 Tredegar Street, RS-5
Richmond, VA 23219
(804) 819-2691
cheri.yochelson@dominionenergy.com

Paul A. Colbert
Associate General Counsel -
Regulatory Affairs
Central Hudson Gas & Electric
Corporation
284 South Avenue
Poughkeepsie, New York 12601
(845) 486-5831(telephone)
pcolbert@cenhud.com

*Counsel for Central Hudson Gas &
Electric Corporation*

John Lee Shepherd, Jr.
Blake Grow
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com
bgrow@hunton.com

*Counsel for FirstEnergy Service
Company, Dominion Energy Services,
Inc., and Exelon Corporation*

Sara Weinberg
Assistant General Counsel - DESC
Dominion Energy Services, Inc.
220 Operation Way, MC OSC 1A,
Cayce, SC 29033
(803) 217-5753
sara.weinberg@dominionenergy.com

*Counsel for Dominion Energy Services, Inc. on behalf of Virginia Electric and
Power Company d/b/a Dominion Energy Virginia and Dominion Energy South
Carolina, Inc.*

Lisa B. Luftig
Assistant General Counsel
Exelon Corporation
701 Ninth Street, NW
Washington, DC 20068
(202) 428-1067
Lisa.Luftig@exeloncorp.com

*Counsel for Exelon Corporation*

Christopher D. Supino
Managing Senior Corporate Counsel
Midcontinent Independent
System Operator, Inc.
720 City Center Drive
Carmel, IN 46032
Telephone: (317) 249-5400
csupino@misoenergy.org

Ilia Levitine
Duane Morris LLP
901 New York Avenue, N.W.
Suite 700 East Washington, DC 20001
Phone: (202)776-5218
ILevitine@duanemorris.com

*Counsel for Midcontinent Independent
System Operator, Inc.*

Ted Murphy
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1588
tmurphy@hunton.com

*Counsel for New York Independent
System Operator, Inc.*

Andrew W. Tunnell
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3439 (telephone)
atunnell@balch.com

*Counsel for the Long Island Power
Authority*

Wendy N. Reed
Matthew J. Binette
Abraham F. Johns III
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005-3898
(202) 393-1200
reed@wrightlaw.com
binette@wrightlaw.com
johns@wrightlaw.com

*Counsel for the MISO Transmission
Owners*

Lyle D. Larson
Abigail C. Fox
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3441 (telephone)
llarson@balch.com

*Counsel for New York State Electric &
Gas Corporation and Rochester Gas
and Electric Corporation*

Andrew W. Tunnell
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3439 (telephone)
atunnell@balch.com

*Counsel for Niagara Mohawk Power
Corporation d/b/a/ National Grid*

Robert V. Eckenrod
Assistant General Counsel
PacifiCorp
825 N.E. Multnomah
Suite 2000
Portland, OR 97232
(503) 367-7259
robert.eckenrod@pacificorp.com

Christopher R. Jones
Antonia M. Douglas
Troutman Pepper Locke LLP
401 9th Street, NW
Suite 1000
Washington, DC 20004
(202) 662-2181
chris.jones@troutman.com
antonia.douglas@troutman.com

*Counsel for PacifiCorp*

Wendy B. Warren
David S. Berman
Elizabeth P. Trinkle
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005-3898
(202) 393-1200
warren@wrightlaw.com
berman@wrightlaw.com
trinkle@wrightlaw.com

Matthew J. Binette
Elizabeth P. Trinkle
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005-3898
(202) 393-1200
binette@wrightlaw.com
trinkle@wrightlaw.com

*Counsel for PJM Interconnection,
L.L.C.*

*Counsel for Southwest Power Pool,
Inc.*

March 19, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ......................................................... iii

GLOSSARY OF ABBREVIATIONS ................................................ vii

SUMMARY OF THE ARGUMENT ................................................... 1

ARGUMENT ............................................................................... 3

I.    FERC's Strict Liability Penalty Scheme Violates Constitutional
      Protections and the FPA ...................................................... 3

      A.    FERC's "Guilty Until Proven Innocent" Penalty Scheme and
            Novel "Appeal" Process Violates Due Process Protections ................ 3

            1.    FERC's "Appeal" Process Deprives Petitioners of
                  Significant Due Process Protections Against Cash
                  Penalties, Which Cannot be Likened to "Traffic Tickets" ........ 4

            2.    FERC Fails to Establish Fundamental Components of its
                  Inchoate "Appeal" Process ........................................ 6

      B.    Assessing Penalties Without Regard to Causation Is
            Confiscatory and Constitutes a Regulatory Taking ........................ 12

            1.    Petitioners' Confiscation Argument Was Not Untimely .......... 13

            2.    Petitioners' Confiscation Argument is Not Premature ............ 15

            3.    FERC Cannot Rebrand Confiscation as Compensation .......... 16

      C.    FERC Exceeded Its Authority Under the FPA by Imposing
            Automatic Penalties ........................................................ 18

II.   FERC's Strict Liability Penalty Scheme Is Not the Product of
      Reasoned Decisionmaking ...................................................... 20

      A.    There Is No Evidence, Substantial or Otherwise, that
            Transmission Providers Cause Interconnection Study Delays .......... 23

      B.    FERC Lacked a Valid Evidentiary Basis to Impose a Generic
            Interconnection Study Penalty Regime Under FPA Section 206 ....... 25

      C.    The Study Penalty Framework Unduly Discriminates Against
            Transmission Providers in Regions with Substantial Generation
            in Development .............................................................. 27

D.    FERC Has Not Demonstrated Imposing Interconnection Study Penalties on Transmission Providers Will Directly Affect, Much Less Ensure, Just and Reasonable Rates.................................29

E.    FERC Did Not Adequately Address Arguments That a Strict Liability Penalty Regime Would Create Perverse Incentives That Would Undermine FERC's Own Goals......................................30

III.    The Defects of the Strict Liability Penalty Scheme Are Exacerbated When Applied to System Operators ..............................................32

A.    FERC Fails to Meaningfully Engage Arguments Concerning System Operators ...................................................................32

B.    Respondent-Intervenors Misrepresent Petitioners' Arguments Concerning System Operators and Fail to Refute Them ...................36

IV.    FERC Departs from Reasoned Decisionmaking by Imposing a Generic Finding and New Set of Rules Under FPA section 206 Based on Outdated Evidence ...................................................................37

V.    FERC Has Not Supported Its Energy Service Standard Mandate for Affected System Studies...................................................................39

A.    Requiring the Use of Energy Service Modeling for All Affected System Studies Is Arbitrary and Capricious ......................................39

B.    FERC's Affected Systems Ruling Contravenes FERC Precedent ...............................................................................42

CONCLUSION ..................................................................................43

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C. Cir. 1987)..................25

*Austin v. United States*, 509 U.S. 602 (1993) ..........................................20

*Belmont Municipal Light Dep't v. FERC*, 38 F.4th 173 (D.C. Cir. 2022) ..................................................................................................38

*BP Energy Co. v. FERC*, 828 F.3d 959 (D.C. Cir. 2016).........................................28

*Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207 (D.C. Cir. 2007) ..................................................................................................15

*City of Orrville v. FERC*, 147 F.3d 979 (D.C. Cir. 1998) .........................................9

*Columbia Gulf Transmission, LLC v. FERC*, 106 F.4th 1220 (D.C. Cir. 2024) ..................................................................................................14

*Emera Maine v. FERC*, 854 F.3d 9 (D.C. Cir. 2017) ..........................................25, 27

*Erwin v. FAA*, 23 F.4th 999 (D.C. Cir. 2022)..........................................7

*FERC v. Electric Power Supply Ass'n*, 577 U.S. 260 (2016)..................................29

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...................................42

*\*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) .............................3, 10

*\*FPC v. Hope Natural Gas*, 320 U.S. 591 (1944)....................................................12

*Gabelli v. SEC*, 568 U.S. 442 (2013)........................................................................24

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970) ..................................................................................................42

*Hecate Energy LLC v. FERC*, 126 F.4th 660 (D.C. Cir. 2025).........................22 n.3

*In re NTE Connecticut, LLC*, 26 F.4th 980 (D.C. Cir. 2022) ...................................8

\*Authorities chiefly relied upon are marked with an asterisk.

*Industrial Energy Consumers of America v. FERC*, 125 F.4th 1156 (D.C. Cir. 2025) ..................................................................16

*Jersey Central Power & Light Co. v. FERC*, 810 F.2d 1168 (D.C. Cir. 1987) ................................................................. 12 & n.2, 13 n.2

*Kokesh v. SEC*, 581 U.S. 455 (2017) ...................................................18, 19, 20, 24

*Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)................................................................16

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ............................15, 16

*Meeker v. Lehigh Valley Railroad Co.*, 236 U.S. 412 (1915)..................................24

*Morgan Stanley Capital Group Inc. v. Public Utility District No. 1*, 554 U.S. 527 (2008).................................................................8

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29 (1983).....................................................21, 40

*New England Generators Association, Inc. v. FERC*, 881 F.3d 202 (D.C. Cir. 2018) .................................................................37

*Nelson v. Colorado*, 581 U.S. 128 (2017) .............................................................5

*Public Citizen Health Research Group v. Tyson*, 796 F.2d 1479 (D.C. Cir. 1986) ...........................................................................7

*Sierra Club v. FERC*, 97 F.4th 16 (D.C. Cir. 2024) ...................................................9

*South Carolina Public Service Authority*, 762 F.3d 41 (D.C. Cir. 2014) ...........................................................................25, 26, 27

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)......................................16

*Tenaska Clear Creek Wind, LLC. v. FERC*, 108 F.4th 858 (D.C. Cir. 2024) ...........................................................................41

*TransCanada Power Marketing Ltd. v. FERC*, 811 F.3d 1 (D.C. Cir. 2015) ...........................................................................23

*Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (2000)...........................................................................26, 27, 29

*Authorities chiefly relied upon are marked with an asterisk.

iv

*Tull v. United States*, 481 U.S. 412 (1987) ...........................................................23

*Village of Bensenville v. FAA*, 376 F.3d 1114 (D.C. Cir. 2004) ..............................8

**Statutes and Regulations**

18 C.F.R. § 35.28(f)(1)(ii) ...........................................................................................6

18 C.F.R. § 385.206 .....................................................................................................7

18 C.F.R. § 385.213(a)(2) ..........................................................................................13

Federal Power Act (FPA), 16 U.S.C. §§ 791-825r

     FPA section 205, 16 U.S.C. § 824d ...............................................................9

     FPA section 313, 16 U.S.C. § 825*l*................................................................14

     FPA section 316A, 16 U.S.C. § 825o-1 ........................................................18

**FERC Rulemaking Orders**

*Improvements to Generator Interconnection Procedures and Agreements*, Order No. 2023, 184 FERC ¶ 61,054 (2023)........... 5, 10, 11, 19, 21, 22, 31, 32, 33, 40

*Improvements to Generator Interconnection Procedures and Agreements*, Order No. 2023-A, 186 FERC ¶ 61,199 (2024) .....3, 4, 5, 6, 7, 8, 9, 10, 13, 18, 19, 24, 27, 28, 31, 33, 38, 41

*Prior Notice and Filing Requirements Under Part II of the Federal Power Act*, 64 FERC ¶ 61,139 (1993) ................................................................17

*Prior Notice and Filing Requirements Under Part II of the Federal Power Act*, 65 FERC ¶ 61,081 (1993) ................................................................17

*Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119 (2007).....................................4, 11

**FERC Adjudicatory Orders**

*Midcontinent Independent System Operator, Inc.*, 190 FERC ¶ 61,057 (2025) .........................................................................................................22 n.3

*Nevada Hydro Co., Inc.*,178 FERC ¶ 61,218 (2022)..............................................14

*Authorities chiefly relied upon are marked with an asterisk.

v

*PJM Interconnection, L.L.C.*, 190 FERC ¶ 61,084 (2024)................................23 n.3

**Other**

*New York Independent System Operator, Inc.*, Motion for Leave to
    Answer and Answer of the Clean Energy Associations, Docket No.
    ER24-1915 (July 12, 2024)..................................................................................35

Restatement (Third) of Restitution and Unjust Enrichment § 51 ...........................20

*Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Affected System | A transmission provider system that neighbors a transmission system where a generating resource seeks to interconnect, that is impacted by such interconnection on the neighboring system |
| APA | Administrative Procedure Act |
| Commission | Federal Energy Regulatory Commission |
| Energy Service | Energy Resource Interconnection Service, a level of interconnection service studied on a non-firm basis |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| *Hope* | *FPC v. Hope Natural Gas*, 320 U.S. 591 (1944) |
| LGIP | Large Generator Interconnection Procedures |
| Network Service | Network Resource Interconnection Service, a level of interconnection service that is studied assuming firm delivery of the generating resource |
| Order No. 890 | *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119 (2007) |
| Order No. 2003 | *Standardization of Generator Interconnection Agreements and* |

| | |
|---|---|
| | *Procedures*, Order No. 2003, 104 FERC ¶ 61,103 (2003) |
| Order No. 2023 | *Improvements to Generator Interconnection Procedures and Agreements*, Order No. 2023, 184 FERC ¶ 61,054 (2023) |
| Order No. 2023-A | *Improvements to Generator Interconnection Procedures and Agreements*, Order No. 2023-A, 186 FERC ¶ 61,199 (2024) |
| orders | Order No. 2023 and Order No. 2023-A |
| PJM | PJM Interconnection, L.L.C. |
| *Prior Notice* | *Prior Notice and Filing Requirements Under Part II of the Federal Power Act*, 64 FERC ¶ 61,139 (1993) |
| SPP | Southwest Power Pool, Inc. |
| System Operators | Regional Transmission Organizations and Independent System Operators |
| *TAPS* | *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (2000) |
| tariff | Open Access Transmission Tariff |

## SUMMARY OF THE ARGUMENT

FERC's imposition of automatic penalties for study delays under Order Nos. 2023 and 2023-A is unlawful, unsupported by substantial evidence, and inconsistent with longstanding regulatory principles. Transmission providers voluntarily adopted cluster study reforms to streamline studies for thousands of interconnection requests that would almost double all existing generation in the United States. The penalty scheme FERC superimposed on those successful reforms fails to address the root cause of study delays and improperly assumes transmission providers cause them. FERC's novel penalty framework disregards due process protections, exceeds its authority under Federal Power Act (FPA) section 206, and lacks the reasoned analysis required under the Administrative Procedure Act (APA).

The penalty structure cannot be reconciled with fundamental due process norms. FERC inverts the burden of proof and mandates automatic penalties without first determining whether a transmission provider caused a delay, leaving no option but an appeal. That framework is particularly problematic because FERC refused to provide a clear means for cost recovery, creating an unfair and confiscatory regulatory burden. The financial consequences of this uncertainty uniquely affect System Operators, which may be unable to pay penalties without special and uncertain authorization from FERC.

FERC also failed to meet the requirements of FPA section 206. FERC found the *existence* of study delays unjust and unreasonable but had no evidence that transmission providers cause delays, or that penalties are an effective means of accelerating studies, or that imposing penalties on transmission providers will "directly affect" consumer rates. At step one, FERC simply assumed transmission providers are culpable, notwithstanding the uncontrolled surge in speculative interconnection requests. FERC also relied on stale and incomplete evidence to justify layering penalties onto the successful "cluster study" reforms transmission providers voluntary adopted. At step two, FERC disregarded how its penalty scheme creates adversity and perverse incentives that undermine FERC's stated objectives. In sum, FERC's penalty structure is legally deficient, unsupported by the record, and counterproductive.

In addition to FERC's onerous and unlawful penalty scheme, FERC fails to reconcile its generic rules with ongoing efforts of transmission providers to reform their interconnection processes and erroneously requires transmission providers to use Energy Resource Interconnection Service (Energy Service) to study impacts even when customers on a neighboring system seek more robust Network Resource Interconnection Service (Network Service).

# ARGUMENT

## I. FERC'S STRICT LIABILITY PENALTY SCHEME VIOLATES CONSTITUTIONAL PROTECTIONS AND THE FPA

### A. FERC's "Guilty Until Proven Innocent" Penalty Scheme and Novel "Appeal" Process Violates Due Process Protections

Order No. 2023 imposed an unprecedented "guilty until proven innocent" penalty regime that violates fundamental due process requirements.  FERC's purported "safeguards"—including the inchoate "appeal" process sketched out in its rulemaking orders—do not cure those defects.  *See* Pet'r Br. Parts I.A 20-30, *id.* Part I.C 34-37.  "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained … 'is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citations omitted).  FERC's new penalty regime fails that test.

Importantly, FERC no longer thinks "transmission providers have due process rights relating to the appeals process the Commission chose to adopt in Order No. 2023," and only "assum[ed] *arguendo*" that such "potential rights to due process" exist.  Order No. 2023-A P 361-62, JA____-__.  That is a radical departure from FERC's prior rulemaking on transmission study penalty deadlines in Order No. 890, which stated "we believe the due process afforded the transmission provider is an important element of the penalty regime, so we decline to impose penalties

3

automatically, without a notification filing to the Commission."  Pet'r Br. 27-28

(quoting *Preventing Undue Discrimination & Preference in Transmission Serv.*,

Order No. 890, 118 FERC ¶ 61,119, at P 1347 (2007)).

FERC repeatedly asserts it created various "safeguards" against unjust

penalties.  *See, e.g.*, FERC Br. 27, 31, 44, 46, 56, 59, 61-63, 70, 77.  However,

FERC's "safeguard" argument focuses exclusively on FERC's "appeal" process.

*See* FERC Br. Part I.E. 76-82.  FERC's brief abandons any defense of its other

purported "safeguards" and ignores Part I.C of Petitioners' Brief, asserting only that

"[t]hese are meaningful protections, contrary to Transmission Petitioners'

contentions."  FERC Br. 77 (citing Pet'r Br. 34–38).[1]  That narrows the Court's

review to FERC's short and unavailing defense of its new "appeal" process.

### 1.    FERC's "Appeal" Process Deprives Petitioners of Significant Due Process Protections Against Cash Penalties, Which Cannot be Likened to "Traffic Tickets"

FERC contends its new penalty scheme is not a "strict liability" regime

because it includes an "appeal" process, Order No. 2023-A P 359, JA____.  But

FERC's defense of that process does not refute two indisputable points.  First, "the

only way to avoid the payment of penalties to interconnection customers is to file an

---

[1] Intervenors argue there is no due process concern because transmission providers suffer "no financial hardship … while penalties are stayed" pending appeal.  Interv. Br. 21.  However, Intervenors overlook Petitioners' due process concerns with the standardless, burden-inverting appeal process itself.

after-the-fact appeal with FERC;" second, FERC "shifts the burden from FERC to transmission providers by requiring transmission providers to prove that a penalty is *not* warranted."  Pet'r Br. 25; *see, e.g.*, Order No. 2023-A P 367, JA____ ("study delay penalties [are] incurred automatically under 18 CFR § 35.28(f)(1)(ii) or § 3.9 of the *pro forma* LGIP"); *id.* P 371, JA____ (describing "the presumptive imposition of penalties on transmission providers").

FERC dismisses these concerns, claiming its penalties are like "traffic tickets" because they are "incurred based on objectively identifiable criteria."  FERC Br. 70, 77; *accord* Order No. 2023-A P 427, JA____; Order No. 2023 P 1015, JA____.  That inapt comparison proves Petitioners' point.  First, it is ordinarily clear *which* driver violated a traffic rule, while the party responsible for missing a study deadline will often be ambiguous and disputed.  Second, traffic penalties are not automatic because it is "axiomatic and elementary" that a defendant is presumed innocent, and the burden of proof always rests with the government.  *Nelson v. Colorado*, 581 U.S. 128, 135-36 (2017) (citation omitted).  FERC's penalty appeal process affords neither of those protections; it inverts both.  Third, while traffic defendants can assert numerous affirmative defenses, such as equipment failure or exigent circumstances, FERC pointedly declined "to create generic exceptions for study delay penalties or to exempt transmission providers from such penalties in cases where they assert that force majeure applies," or to recognize any other "'self-effectuating' exceptions to

5

penalties where a delay is caused by factors outside of the control of the transmission provider," because that was "not a preferable approach to the appeals process." Order No. 2023-A P 369, JA____.  That is, FERC chose *not* to establish "objectively identifiable" procedures or standards because FERC prefers to develop standards through *ad hoc* litigation.  And, as next discussed, traffic tickets provide more procedural information than FERC's regulatory text or preambles do.

### 2.    FERC Fails to Establish Fundamental Components of its Inchoate "Appeal" Process

FERC's orders "fail to define how the appeal process works or prescribe the standard transmission providers must meet to overcome the presumption of fault" or to "provide any guidance about how it will adjudicate such appeals, including whether interventions or discovery will be permitted."  Pet'r Br. 27.  FERC argues transmission providers have "fair notice" about "the conduct that (absent an appeal demonstrating good cause for relief) will result in a penalty, the amount of the potential penalty, and the ability to seek relief from a penalty through the appeals process."  FERC Br. 78 (quoting Order No. 2023-A P 361, JA___).  That is not responsive to Petitioners' objection that FERC does not explain *how* "to seek relief from a penalty through the appeals process."  *Id.*

FERC's new regulation states only that "[a]ny public utility that conducts interconnection studies shall be liable for and eligible to appeal certain penalties [for] failure to complete an interconnection study by the appropriate deadline."  18 C.F.R.

6

§ 35.28(f)(1)(ii).  The only rules concerning that appeal consist of two deadlines and one sentence invoking a "good cause" standard found in an appendix to FERC's amended *pro forma* interconnection procedures:

> Transmission Provider may appeal to the Commission any penalties imposed under this Section.  Any such appeal must be filed no later than forty-five (45) Calendar Days after the late study has been completed.  While an appeal to the Commission is pending, Transmission Provider shall remain liable for the penalty, but need not distribute the penalty until forty-five (45) Calendar Days after (1) the deadline for filing a rehearing request has ended, if no requests for rehearing of the appeal have been filed, or (2) the date that any requests for rehearing of the Commission's decision on the appeal are no longer pending before the Commission.  The Commission may excuse Transmission Provider from penalties under this Section for good cause.

Order No. 2023-A, App'x C, Standard Large Generator Interconnection Procedures (LGIP), App. 12 § 3.9(3), JA____.  That skeletal guidance contrasts poorly against the voluminous procedural rules in Part 385 of FERC's regulations, which, for example, provide significantly more guidance about how to file a complaint.  *See* 18 C.F.R. § 385.206.

There cannot be procedural due process without actual procedures.  FERC may have "broad discretion to manage its own proceedings and priorities," FERC Br. 55 (listing cases), but FERC has not exercised that discretion to describe a process this Court can review.  Courts "cannot defer when the agency simply has not exercised its expertise." *Pub. Citizen Health Research Grp. v. Tyson*, 796 F.2d 1479, 1505 (D.C. Cir. 1986); *accord, e.g.*, *Erwin v. FAA*, 23 F.4th 999, 1007 (D.C. Cir.

2022) (An agency "must exercise that expertise and demonstrate sufficiently that it has done so else we have nothing to review much less defer to." (quoting *Village of Bensenville v. FAA*, 376 F.3d 1114, 1122 (D.C. Cir. 2004)).

Petitioners have asked legitimate questions about an entirely novel "appeal" process that threatens significant disgorgement penalties. FERC's failure to "respond meaningfully" to them is arbitrary and capricious. *E.g.*, *In re NTE Connecticut, LLC*, 26 F.4th 980, 989 (D.C. Cir. 2022) (citations omitted). FERC has had several years to do so, including a generous six-month extension beyond the statutory rehearing deadline.

FERC offers two responses concerning the defects in its "appeal" process; both are deeply flawed.

### a. "Good Cause" Is an Inappropriate Standard for Penalty Litigation Between Adverse Parties

FERC contends that "[t]he 'good cause' standard is a case-specific, common-sense standard that is familiar to the Commission and the Court." FERC Br. 79 (citation omitted). But that standard is not so much "familiar" as it is amorphous. Like the FPA's "just and reasonable" standard, it is "obviously incapable of precise judicial definition." *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532 (2008). While FERC's counsel may regard a "case-specific" standard as "common sense," FERC's orders explain it means whatever the arbitrary and capricious standard will bear. *See, e.g.*, Order No. 2023-A P 362, JA____. That

denies regulated entities the information they need to mitigate the risk of automatic penalties FERC has already determined are just-and-reasonable.

FERC has not previously attempted to apply the elastic "good cause" standard to the disgorgement of cash penalties to third parties—an inherently adverse money transfer based on relative culpability. The "good cause" standard is most commonly applied in the context of prospective procedural waivers that are not usually controversial, much less penal. For example, FERC may waive the 60-day notice period for tariff filings for "good cause shown." 16 U.S.C. § 824d(d). FERC also invokes this standard to extend construction milestones, *see, e.g.*, *Sierra Club v. FERC*, 97 F.4th 16, 27-29 (D.C. Cir. 2024), or grant late interventions, *City of Orrville v. FERC*, 147 F.3d 979, 987-88 (D.C. Cir. 1998). However, there is no statutory basis for applying the "good cause" standard to study penalties, and FERC clarified its traditional four-prong waiver test will not apply in this context. *See* Order No. 2023-A P 362 n.661, JA____.

FERC instead crafted a *sui generis* "good cause" test consisting of three factors FERC "may consider, among other factors," including:

> (1) extenuating circumstances outside the transmission provider's control, such as delays in affected system study results; (2) efforts of the transmission provider to mitigate delays; and (3) the extent to which the transmission provider has proposed process enhancements either in the stakeholder process or at the Commission to prevent future delays.

FERC Br. 79 (quoting Order No. 2023 P 987, JA____); *accord* Order No. 2023-A P 359 n.648, JA____.  That guidance is not in FERC's regulations and has varied in FERC's two rulemaking orders.  As noted above, FERC declined requests to clarify "factors outside of the control of the transmission provider" or "to exempt transmission providers from such penalties in cases where they assert that force majeure applies," because that was "not a preferable approach to the appeals process."  Order No. 2023-A P 369, JA____.  FERC's approach is, by design, "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fox Television Stations*, 567 U.S. at 253.

### b.    FERC Erroneously Claims the Study Penalty Appeal Process is Not "Novel"

FERC claims its "study delay penalties adopted here are not novel" but are "actually quite similar to the Commission review process adopted in Order No. 890." FERC Br. 80-81.  That is false.  FERC cannot pretend Order No. 890 and Order No. 2023 are not profoundly different when FERC's orders below squarely rejected the Order 890 "reasonable efforts" regime because it provided "significant discretion to the transmission providers" and was inadequate to address "significant and growing interconnection queue backlogs."  Order No. 2023 PP 50, 1013, JA____, ____.

The only feature Order No. 890 and Order No. 2023 share is that transmission providers may argue a delay was beyond their control.  However, Order No. 890, which no one challenged on review, stated FERC "will waive" penalties when delays

are "caused by the transmission customer," Order No. 890 P 1343, and that the "reasonable efforts" standard provides "protection against unexpected and unpredictable events [for] both the transmission provider and transmission customer," *id.* P 1664. By contrast, the Order No. 2023 appeal process "may excuse" penalties for "good cause," *pro forma* LGIP § 3.9(3), JA_____, that could "potentially" include delays caused by interconnection customers, Order No. 2023 P 993, JA_____.

Most glaringly, Order No. 890 "decline[d] to impose penalties automatically" because FERC then "believe[d] the due process afforded the transmission provider is an important element of the penalty regime." Order No. 890 P 1347. FERC contends its about-face is "warranted by the significant and growing interconnection queue backlogs." FERC Br. 82 (quoting Order No. 2023 P 1013, JA_____). Expedience is a stunning justification for reversing an agency's position on due process requirements for adjudicating cash penalties paid to third parties. It is one thing to impose a penalty in the (mistaken) belief that doing so will "incent" transmission providers to process interconnection cluster studies more swiftly; it is quite a different thing to invert the process for adjudicating penalties by making them automatic, placing the evidentiary burden on the penalized party, and declaring that FERC's decisionmaking is bound only by whatever FERC thinks is "good cause"— the least restrictive standard in administrative law.

11

**B.    Assessing Penalties Without Regard to Causation Is Confiscatory and Constitutes a Regulatory Taking**

Rate regulation is unconstitutionally confiscatory when it denies a public utility the actual costs it incurs to provide a jurisdictional service or, if that minimum threshold is met, denies a reasonable rate of return on the investment made to deliver that service.  *See Jersey Cent. Power & Light Co.*, 810 F.2d 1168, 1175-78 (D.C. Cir. 1987) (en banc) (construing *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944), and its progeny).  To prevent confiscation, "it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business," including "service on the debt and dividends on the stock."  *Id.* at 1178 (quoting *Hope*, 320 U.S. at 603).

"FERC's new penalty regime is confiscatory because it requires all transmission providers to provide a jurisdictional service—*i.e.*, interconnection studies—but does not permit transmission providers to recover the actual costs of that service when a study deadline is missed, and transmission providers could recover none of these costs if FERC imposes the maximum available penalty it has created."  Pet'r Br. 32.  FERC nowhere denies that its penalty regime permits confiscation of transmission providers' out-of-pocket costs.[2]  That omission is fatal.

---

[2] Intervenors do not deny this fact either, but argue that there is no taking because utilities have no right to a "profit."  Interv. Br. 17.  That argument misreads Petitioners' argument and *Jersey Central*, which distinguished between actual costs and profit, *see* 810 F.2d at 1178 (quoted above), and likewise rejected arguments

The Court should vacate the Commission's orders and remand with directions that FERC's penalty regime must, at a minimum, provide for recovery of transmission providers' actual costs to perform a required service.

FERC attempts to evade Petitioners' confiscation argument in three ways: first, it claims this argument came too late because it was first presented on rehearing; second, FERC also claims it is premature because penalties have not yet been imposed; and third, FERC contends the penalties are not confiscatory because they are effectively refunds.  Those defenses lack merit.

### 1.    Petitioners' Confiscation Argument Was Not Untimely

FERC contends Petitioners' confiscation argument was "untimely" because it "typically" prefers to reject arguments raised for the first time on rehearing, and new arguments are "disruptive to the administrative process."  FERC Br. 74 (quoting Order No. 2023-A P 386 & n.720, JA____).  This "disruption" occurs because FERC has a default procedural rule that bars answers to rehearing requests—as well as other types of common pleadings—unless FERC chooses to entertain them.  *See* 18 C.F.R. § 385.213(a)(2).  In practice, FERC sets that bar very low and routinely accepts answers prohibited by Rule 213 if they have "assisted the Commission's

---

than confiscation requires losses that would drive a utility into bankruptcy, *id.* at 1180.  The hardship at issue in *Hope* was not failure to recover actual costs, but instead an insufficient "return on *investment*."  *Id.* at 1181.  This distinction is recognized in landmark FERC precedent establishing remedies for unauthorized charges as well disgorgement remedies in non-FERC contexts. *See infra* at 17, 20.

consideration," although this is comparatively uncommon for answers to rehearing requests. *E.g.*, *Nev. Hydro Co., Inc.*, 178 FERC ¶ 61,218, at P 12 (2022).

FERC does not claim the Court lacks jurisdiction or that the confiscation argument was waived; FERC's argument is best read as a defense to its own basis for rejection. In any event, FERC's tortured reading of its own procedural rules cannot override the text of FPA section 313 and decades of precedent holding that "a party before FERC 'may propound novel arguments based upon evidence already in the record as late as that party's petition for rehearing and still preserve them for review in the court of appeals.'" Pet'r Br. 33 (citations omitted). Indeed, FPA section 313(b) permits new arguments to be raised for the first time on judicial review if "there is reasonable ground for failure so to do" in pleadings at FERC. 16 U.S.C. § 825*l*(b).

Order No. 2023-A did not cite judicial precedent holding FERC may reject any argument first raised on rehearing. FERC's brief implies (at 74) that is what this Court recently held in *Columbia Gulf Transmission, LLC v. FERC*, 106 F.4th 1220 (D.C. Cir. 2024), but that is incorrect. *Columbia* narrowly held that a petitioner's argument "came too late" because the petitioner attempted to use its rehearing request to offer a new basis for relief that was not originally included in its own complaint. *Id.* at 1231. Arguments on rehearing that respond to theories propounded *by FERC* are entirely different because, as here, the rulemaking order was the first

14

indication of FERC's disposition and no party can accurately forecast what FERC will do "before FERC's final action [is] known."  Pet'r Br. 32-33.

### 2.    Petitioners' Confiscation Argument is Not Premature

FERC contends Petitioners' confiscation argument is "premature" and "speculative" because transmission providers might escape liability through FERC's newly-minted appeal process, or propose "a default structure for recovering study delay penalties, or propose to recover the costs of specific study delay penalties." FERC Br. 74.  FERC does not, and cannot, challenge Petitioners' standing to challenge a rule that directly governs their primary conduct and imposes penalties for non-compliance.  *See, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced.").

FERC's prudential ripeness argument conflicts with this Court's repeated holdings across multiple administrative contexts "that a purely legal claim in the context of a facial challenge ... is 'presumptively reviewable.'"  *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007) (citations omitted). FERC provides no basis for defeating that presumption.  The various prophylactic measures through which Petitioners might hope to escape a confiscatory penalty

under Order No. 2023 are "effectively coerced."  *MedImmune*, 549 U.S. at 129.

FERC's penalty regime cannot be constitutional if it permits confiscation of

transmission providers' actual costs.

Furthermore, there is good reason to doubt the vitality of the prudential

ripeness doctrine.  *See Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156,

1163-67 (D.C. Cir. 2025) (Henderson, J., concurring) (citing, *inter alia*, *Susan B.

Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5, 167 (2014) (emphasizing "tension"

with the duty to hear a proper case or controversy, but declining to "resolve the

continuing vitality of the prudential ripeness doctrine"); *Lexmark Int'l, Inc. v. Static

Control Components, Inc.*, 572 U.S. 118, 127-28 & n.4 (2014)).

### 3.    FERC Cannot Rebrand Confiscation as Compensation

Finally, FERC contends its new penalty regime is not confiscatory because it

"merely represents a refund of payments for a service (to the interconnection

customer) that has not been timely provided" and is thus consistent with *Hope*

because it involves "balancing of the investor and the consumer interests."  FERC

Br. 75-76.  This "rebranding" is newborn in Order No. 2023-A.  Pet'r Br. 38.

Because interconnection studies cost money, "refunding" study charges to customers

after studies have been completed is an obvious penalty because it causes the utility

a financial loss.  Nor does FERC's penalty scheme balance investor and consumer

interests.  System Operators, which lead the interconnection study process in their

respective regions, are non-profit entities with no investors to bear a penalty; interconnection customers are not consumers, they are would-be sellers of power to consumers.

Recasting penalties as refunds changes nothing about their confiscatory impact. FERC clearly recognizes this distinction in other contexts, most notably in its landmark order establishing the remedy when a public utility improperly charges customers a rate that conflicts with the filed rate or was never accepted for filing at all. *See Prior Notice and Filing Requirements Under Part II of the Federal Power Act*, 64 FERC ¶ 61,139 (*Prior Notice*), *order on reh'g*, 65 FERC ¶ 61,081 (1993). FERC held public utilities are not required to refund their *actual* costs, but are required to refund any *return* on those costs, such that the "utility will receive the equivalent of a cost-based rate, less the time value remedy applicable to the unauthorized late filing of cost-based rates, until the date of Commission authorization." *Prior Notice* at 61,980. Importantly, *Prior Notice* permits recovery of a utility's actual costs, notwithstanding the filed rate violation, in direct response to arguments that refunding actual costs "is essentially a prohibited civil penalty" or "unconstitutional because it amounts to a confiscatory taking" and that "any attempt to deter future violations cannot justify lowering a particular rate below the zone of reasonableness." *Id.* at 61,789. Those are precisely the arguments Petitioners have raised here. FERC forgot its guiding principles in the orders below.

### C. FERC Exceeded Its Authority Under the FPA by Imposing Automatic Penalties

FERC's unprecedented study penalty regime not only disregards due process norms and unlawfully confiscates transmission providers' costs to provide mandatory jurisdictional services, but also circumvents the hearing and review requirements to impose penalties under FPA section 316A, 16 U.S.C. § 825o-1(b). *See* Pet'r Br. 38-41. FERC contends its "study delay penalties" are not penalties within the meaning of FPA section 316A, but that characterization defies the Supreme Court's comprehensive review of disgorgement penalties in *Kokesh v. SEC*, 581 U.S. 455 (2017). Furthermore, FERC's position is internally inconsistent in its own orders and on brief.

First, FERC claims study delay penalties "do not reflect a Commission judgment that transmission providers are at fault." FERC Br. 69. That assertion cannot be squared with FERC's repeated statements that it imputes liability for study delays to transmission providers *by default* because they are the "entit[ies] with the most control over whether the study deadline is met." *E.g.*, *id.* at 45 (quoting Order No. 2023-A P 284, JA____). Moreover, System Operators, not transmission-owning utilities, exert the "most control" over managing the queue in RTO/ISO regions (although System Operators are not responsible for all study deadlines or delays).

18

Second, FERC claims that "study delay penalties are not punitive. Instead, they are more akin to traffic tickets." *Id.* at 70. The claim that "penalties are not punitive" is oxymoronic, and FERC's repeated comparison to traffic tickets is misguided. Traffic tickets, like study delay penalties, are financial "[s]anctions imposed for the purpose of deterring infractions of public laws" and thus "inherently punitive." *Kokesh*, 581 U.S. at 464.

FERC presses the Orwellian distinction that "study delay penalties are not 'imposed as *punishment* to redress a wrong to the public,'" but instead "serve as an *incentive* for transmission providers to timely complete interconnection studies." FERC Br. 73 (emphasis added) (quoting Order No. 2023-A P 308, JA____). However, FERC cannot rebrand a "penalty" as an "incentive" to compel compliance with deadlines. *See, e.g.*, Order No. 2023 P 974, JA____ (finding that "$500 per business day is too low to create an incentive for transmission providers to meet study deadlines"). That form of "incentive" is called "deterrence" and it is "inherently punitive because 'deterrence is not a legitimate nonpunitive governmental objective.'" *Kokesh*, 581 U.S. at 464 (cleaned up) (citations omitted).

Third, FERC emphasizes that "study delay penalties take the form of refunds to interconnection customers (not the U.S. Treasury)." FERC Br. 73. However, that distinction loses its force because FERC's penalty regime requires disgorgement for purposes other than compensation. "'A civil sanction that cannot fairly be said *solely*

to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.'" *Kokesh*, 581 U.S. at 464 (quoting *Austin v. United States*, 509 U.S. 602, 621 (1993)).

Moreover, like the disgorgement penalties in *Kokesh*, FERC's study penalties are not only "ordered without consideration of a defendant's expenses," but are also confiscatory because the required "disgorgement does not simply restore the status quo; it leaves the defendant worse off." *Id.* (citing Restatement (Third) of Restitution and Unjust Enrichment § 51 comment *h* ("As a general rule, the defendant is entitled to … all marginal costs incurred in producing the revenues that are subject to disgorgement…. [M]aking the defendant liable in excess of net gains, results in a punitive sanction that the law of restitution normally attempts to avoid.").

## II.  FERC'S STRICT LIABILITY PENALTY SCHEME IS NOT THE PRODUCT OF REASONED DECISIONMAKING

FERC's decision to impose penalties relies on the following syllogism: (i) interconnection study delays exist (major premise); (ii) interconnection studies are administered by transmission providers (minor premise); and therefore (iii) FERC must impose study delay penalties on transmission providers to "incentivize" faster processing (conclusion). FERC's conclusion is invalid because it lacks evidence of causation. Notwithstanding the colossal amount of text expended in its rulemaking proceeding, FERC's decision to impose study delay

20

penalties falls short of its dual burdens under FPA section 206 because there is no evidence demonstrating transmission providers cause study delays through their actions or omissions, nor any evidence that penalties will accelerate interconnection studies. That is a failure of reasoned decisionmaking because, absent causation, FERC has failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

FERC's brief initially claims penalties are one of three elements that FERC intended to work "in tandem" with one another and that transmission providers overlook how these other reforms—*i.e.*, "stricter requirements" on interconnection requests and the "cluster study" reform—should mitigate the risk that transmission providers will face study delay penalties. FERC Br. 45-47. That argument ignores reality. The core problem is the uncontrolled surge of speculative generation projects chasing federal and state renewable energy incentives. *See, e.g.*, Order No. 2023 P 30, JA____ (noting "commenters generally agree that the unprecedented volume of generation in the interconnection queue, which is almost equal to the current U.S. generation fleet, has resulted in severe backlogs in interconnection processes across the country"). This is why Petitioners did not challenge the "stricter requirements" FERC imposed on interconnection customers to mitigate speculative

interconnection requests. Petitioners did not challenge the "cluster study" reform, as most transmission providers voluntarily implemented that approach before FERC mandated it. Experience from "early adopters" showed cluster studies are far superior to the outdated "first come, first-served" process under Order No. 2003, which was not designed to handle a host of constantly-evolving interconnection requests.

The penalty regime must stand on its own merits. Neither the cluster study reform, nor the enhanced requirements for interconnection requests, is a panacea that removes the risk of study delays. The fundamental driver of delays is the overwhelming volume of interconnection requests, often for small intermittent power projects that do not materialize yet strain study processes beyond their intended capacity. *See, e.g.*, Order No. 2023 P 3, JA____. Penalizing transmission providers will not stem the influx of speculative interconnection requests or alleviate the structural inefficiencies driving study delays. Rather, transmission providers have been forced to take steps outside compliance with Order No. 2023 to address the real problem.[3]

---

[3] *See, e.g.*, *Hecate Energy LLC v. FERC*, 126 F.4th 660 (D.C. Cir. 2025) (upholding FERC's acceptance of PJM's proposal to reduce its interconnection queue by expediting requests projected to have upgrade costs of $5 million or less); *Midcontinent Indep. Sys. Operator, Inc.*, 190 FERC ¶ 61,057, at P 57 (2025) (accepting queue cap at 50% of peak system load to prevent "unrealistic modeling assumptions" and "inaccurate upgrade costs estimates" that "would drive withdrawals from the queue, further affecting study results and causing delays");

A.     **There Is No Evidence, Substantial or Otherwise, that Transmission Providers Cause Interconnection Study Delays**

FERC's decision to impose study delay penalties rests on the unsupported inference that study delays are widespread and therefore transmission providers must cause those delays.  However, the record evidence "only demonstrates that delays exist, not that transmission providers cause them."  Pet'r Br. 43 (quoting rehearing request).  Order No. 2023 "contains no evidence that action or inaction by transmission providers is the predominant, or even contributing, factor in study delays.  Rather, the record is replete with evidence and comments arguing just the opposite."  *Id.* (same).  And "Order No. 2023-A did not acknowledge that argument at all, much less 'respond meaningfully' to it, as the APA requires."  *Id.* (quoting *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015)).

On brief, FERC absolves itself from its fatal lack of substantial evidence by asserting it "was not required to demonstrate that transmission providers cause interconnection study delays in order to implement study delay penalties."  FERC Br. 46.  That stunning claim takes FERC's rebranding of "penalties" as "incentives" too far.  It is axiomatic that penalties are "intended to punish culpable individuals," not "to extract compensation or restore the status quo."  *Tull v. United States*, 481

---

*PJM Interconnection, L.L.C.*, 190 FERC ¶ 61,084, at P 1 (2025) (accepting Reliability Resource Initiative criteria to accelerate projects needed to address near-term resource adequacy concerns).

U.S. 412, 422 (1987). As *Kokesh* recently reinforced, penalties in the form of "disgorgement orders 'go beyond compensation, are intended to punish, and label defendants wrongdoers' as a consequence of violating public laws." 581 U.S. at 467 (quoting *Gabelli v. SEC*, 568 U.S. 442, 451–52 (2013) (citing *Meeker v. Lehigh Valley R. Co.,* 236 U.S. 412, 423 (1915))).

In support of the remarkable proposition that FERC need not show wrongdoing before imposing penalties, FERC states it "explained [that] findings of bad faith, misconduct, or lack of effort are 'not necessary predicates to concluding that the interconnection study process must occur more expeditiously.'" FERC Br. 46 (quoting Order No. 2023-A P 290, JA____). That is an unacceptable *non sequitur*. The question is not whether FERC had a reason to seek more expedient interconnection studies, which is a goal transmission providers share, but whether FERC has demonstrated that penalizing transmission providers is a necessary or effective way to achieve that objective when reasonable efforts are somehow insufficient. There is no evidence in the record that transmission providers intentionally delay studies or fail to exercise diligence to complete them on time. FERC cannot sidestep that fundamental defect by contending it does not need evidence of misconduct or indolence before imposing cash penalties on transmission providers.

**B.** **FERC Lacked a Valid Evidentiary Basis to Impose a Generic Interconnection Study Penalty Regime Under FPA Section 206**

It is unlawful for FERC to impose "an industry-wide solution for a problem that exists only in isolated pockets." *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1019 (D.C. Cir. 1987). Here, FERC was not "operating in an environment of industry-wide noncompliance with its proposed reforms," because "the majority of transmission providers had already implemented the cluster study reforms directed by Order No. 2023." Pet'r Br. 48-50. Nevertheless, FERC declared "all tariffs unjust and unreasonable without establishing that a single transmission provider's interconnection processes was unjust and unreasonable" because the voluntarily-adopted cluster study reforms did not include the automatic penalties FERC required in Order No. 2023. *Id.* That approach violates FPA section 206 because FERC found *all* existing tariffs unlawful at step one because they lacked the automatic penalties FERC deemed more just and reasonable under step two. *See, e.g.*, *Emera Maine v. FERC*, 854 F.3d 9, 26 (D.C. Cir. 2017) (vacating orders that "relied on [FERC's] assumption that all ROEs other than the one FERC identifies as the utility's just and reasonable ROE are *per se* unlawful in a section 206 proceeding").

FERC contends the Court should rely on its "generic, systemic findings in adopting a nationwide rule" because they are "very similar to those supporting the Commission's Order No. 1000 regional transmission planning reforms" upheld in *South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014), and

25

"the Commission's Order No. 888 open-access transmission rulemaking," upheld in *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000) (*TAPS*). Intervenors echo FERC. *See* Interv. Br. 27-29. That comparison is facile.

Order No. 888 enforced the Energy Policy Act of 1992, "which amended sections 211 and 212 of the FPA to authorize FERC to order utilities to 'wheel' power—*i.e.*, transmit power for wholesale sellers of power over the utilities' transmission lines—on a case-by-case basis." *TAPS*, 225 F.3d at 682. FERC mandated open access because it found "relying upon voluntary arrangements and § 211 orders would not remedy the fundamentally anti-competitive structure of the transmission industry." *Id.* at 684. Order No. 1000 directed transmission planning reforms based on evidence that planning processes were not identifying more cost-effective regional transmission projects. FERC did not rely solely upon a "theoretical threat," but also upon "actual experiences of problems cited in the record." *South Carolina*, 762 F.3d at 64; *id.* at 65 (discussing evidence submitted in FERC's 2009 technical conferences)). Moreover, Order Nos. 888 and 1000 were promulgated to remedy identifiable "undue discrimination and preference in transmission service," *see, e.g.*, *id.* at 48, not the alleged impact on consumer rates that FERC's orders below vaguely assert and never develop.

In each rule, FERC identified the concrete cause of a problem and acted directly upon the specific cause of that problem based on record evidence. Here,

there is zero evidence that transmission providers fail to study transmission projects diligently, or that they have any motivation to dither, or that imposing penalties will improve interconnection studies in any way. And neither Order No. 888 nor Order No. 1000 imposed preemptive penalties to compel compliance.

Moreover, Order No. 1000 and Order No. 888 were issued pursuant to both FPA sections 205 and 206. *See South Carolina*, 762 F.3d at 57. Order No. 2023 was issued under FPA section 206, *see* Order No. 2023-A P 10, JA____, which is more restrictive than section 205. Action under section 205 does not require "individualized findings of discrimination by specific transmission providers." *TAPS*, 225 F.3d at 683. Action under section 206, by contrast, requires FERC to first make an "explicit finding that the existing rate is unlawful." *Emera Maine*, 854 F.3d at 24.

### C. The Study Penalty Framework Unduly Discriminates Against Transmission Providers in Regions with Substantial Generation in Development

FERC ignored stark regional differences in interconnection queue lengths and "place[d] a disproportionate burden on transmission providers located in areas that are particularly suited for renewable development or in states that have aggressive renewable energy mandates." Pet'r Br. 52. For example, PJM had 2,748 projects under study across 18 zones, of which half were in two zones, AEP and Dominion. *Id.* "Transmission providers are not similarly situated," even within the same

planning regions, and FERC's uniform study penalty regime "takes no account of the discriminatory impact Order No. 2023 has on the transmission providers that bear the heaviest burdens." *Id.* at 53.

FERC has not meaningfully engaged with this argument. FERC does not deny this could happen, but simply reiterates that "it is not necessarily the case that some transmission providers will be more likely to have to pay penalties than others based on the uneven distribution of interconnection requests." FERC Br. 56 (quoting Order No. 2023-A P 384, JA____). And, even if "disparate outcomes" do result, that would not "necessarily render Order No. 2023's study delay penalty structure unduly discriminatory." FERC Br. 57 (citing Order No. 2023-A P 385, JA____). That tepid response does not satisfy the standard for assessing undue discrimination.[4]

FERC does not indicate whether it thinks transmission providers are similarly situated with respect to their comparative study burdens. Contrary to the standard FERC itself cites, FERC's decision does not provide "a rational basis" to accept disparate impacts on transmission providers and is not "based on relevant, significant facts which are explained." *BP Energy Co. v. FERC*, 828 F.3d 959, 967 (D.C. Cir. 2016) (citation omitted).

---

[4] Intervenors' makeweight argument on this point says nothing that merits a response. *See* Interv. Br. 36-37.

FERC's reliance on *TAPS* is similarly inapt.  There, FPA section 211 expressly permitted "FERC to impose involuntary wheeling generally" and the Court found "FERC ha[d] adequately explained why its open access requirement is not unduly discriminatory" by "[r]elying upon extensive commentary as well as its own experiences" to "conclude[] that, as a general matter, transmission industry conditions were conducive to discriminatory practices and anti-competitive behavior, such that case-by-case adjudication could not adequately address the problem."  *TAPS*, 225 F.3d at 688-89.  FERC has done nothing of the sort here. While *TAPS* noted that the utility petitioner could seek individual relief through a section 206 complaint, the Court nowhere suggested the option to seek relief in a collateral proceeding, standing alone, was sufficient to absolve FERC from its duty to explain why its orders are not unduly discriminatory.

### D. FERC Has Not Demonstrated Imposing Interconnection Study Penalties on Transmission Providers Will Directly Affect, Much Less Ensure, Just and Reasonable Rates

FERC may only regulate practices that "*directly affect* the rate or are closely related to the rate."  *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016). FERC complacently assumes it is self-evident that study penalties "directly affect" rates, but provides no evidence or explanation for two propositions:  "first, that interconnection delays directly affect rates in a harmful manner; and second, that penalties are necessary to ensure just and reasonable rates."  Pet'r Br. 55.

On brief, FERC claims Petitioners take an "overly narrow view" of its jurisdiction, FERC Br. 40, but never explains how penalties "directly affect" rates. Instead, FERC describes the standard of review, *id.* at 39, and cites cases supporting its jurisdiction to regulate interconnection, *id.* at 40-42. Between those cases, FERC wedges the bald assertion that it "amply explained its conclusion that interconnection delays result in unjust and unreasonable rates, and that [its] reforms, including study delay penalties, represent a just and reasonable replacement rate." *Id.* at 41. That fog of words is unresponsive to Petitioners' argument. If FERC cannot show penalties will "directly affect" rates, which it has repeatedly declined to demonstrate, it has no basis to impose them under FPA section 206.

### E.    FERC Did Not Adequately Address Arguments That a Strict Liability Penalty Regime Would Create Perverse Incentives That Would Undermine FERC's Own Goals

FERC's penalty regime creates numerous perverse incentives outweighing possible benefits associated with increasing "accountability." Pet'r Br. 56. Penalties simultaneously incentivize transmission providers to "prioritize meeting deadlines over the completeness and quality of studies" while encouraging interconnection customers to "cause study delays since they are held harmless from the penalty assessments and are the beneficiaries of the penalty payments." *Id.* When transmission providers are forced to choose between compliance with FERC's new study deadlines or mandatory reliability requirements, "transmission providers will

never sacrifice compliance" with reliability requirements. *Id.* at 57. FERC's disregard for these incentives does not reflect reasoned decisionmaking.

FERC's terse response boils down to repeating the inadequate statement that Petitioners "present a false dichotomy between the accuracy of interconnection studies and their timely completion," ignore the risks associated with failing to "timely interconnect new generating facilities," and fail to consider the "safeguards" in the strict liability penalty regime. FERC Br. 59 (quoting Order No. 2023-A P 375, JA____). In FERC's view, penalties will incentivize transmission providers to "improve interconnection study processes and policies and take other measures, such as hiring additional staff," to meet their "responsibilities to deliver accurate studies and to ensure system reliability." *Id.* at 59 (citing Order No. 2023 P 1007, JA____).

FERC's response denies the obvious: penalties force transmission providers to prioritize study speed over thorough analysis. FERC finds that tension "unpersuasive," but that blithe disregard is difficult to endure from a federal agency that routinely fails to adhere to *statutory* deadlines to issue orders and seeks abeyance from judicial review for the sake of providing more thorough responses to rehearing requests, as it did in this case and in many others before and since. As for hiring more employees, that assumes qualified engineers are available and, in any event, will drive up costs for transmission providers and, unlike penalties, those costs will be recovered from the same consumers whose rates FERC claims it desires to reduce.

## III. THE DEFECTS OF THE STRICT LIABILITY PENALTY SCHEME ARE EXACERBATED WHEN APPLIED TO SYSTEM OPERATORS

### A. FERC Fails to Meaningfully Engage Arguments Concerning System Operators

All of the constitutional and statutory defects in FERC's strict liability penalty scheme discussed *supra* are intensified with respect to System Operators. *See* Pet'r Br. Part III 58-73. On review, as below, FERC fails to meaningfully engage the serious legal and logical flaws particular to System Operators.

FERC begins by suggesting there is no cause for concern because Petitioners "acknowledged that study delay penalties work differently for System Operators." FERC Br. 60. But that is precisely the point. Study penalties "work differently" for System Operators because they are even more adversely impacted by the flaws in FERC's strict liability scheme.

FERC's remarkable assertion that its penalties are not punitive is particularly egregious as applied to System Operators. If study delay penalties are not actually penalties, then FERC had no reason to acknowledge they "may raise several unique issues" that necessitated the adoption of special "safeguards" for System Operators. Order No. 2023 P 876, JA____. FERC's attempt to rebrand its penalties defies credulity because System Operators face disproportionate financial risks in their potential inability to withstand penalty costs. FERC's statement that "penalties

defray [interconnection customers'] study costs," FERC Br. 64, is irrelevant to the question of System Operators' ability to pay penalties at all.

It is not true that FERC has adequately accounted for the acknowledged issues facing System Operators by giving them "discretion and flexibility" to plead for recovery on a case-by-case basis, or to propose a "default structure" for recovery that FERC has not explained. FERC Br. 61-62. The discretion lies exclusively with FERC because FERC reserves the right to reject System Operator cost recovery filings. *See* Order No. 2023-A P 405, JA____. System Operators may not be able to pay penalties unless FERC gives them special permission to pass costs through to transmission customers who played no role in causing delays and who may object to any form of System Operator filing. The financial uncertainty facing System Operators is even greater now than when the orders were issued. FERC's recently appointed Chairman wrote concurrences urging that consumers be protected from indirectly having to bear the cost of such passthroughs. *See* Order No. 2023 (Christie, Comm'r concurring) PP 19-20, JA____-__; Order No. 2023-A (Christie, Comm'r concurring) P 7, JA____.

FERC's recitation of its supposed "safeguards" for System Operators, FERC Br. 62-63, is not responsive to Petitioners' arguments that FERC has provided System Operators with no practical protection. The vague and underdeveloped "appeal" process is insufficient to cure the due process problems of a strict liability

33

regime, *see supra* I.A. 6-11, and FERC's brief does not defend the defects in its other purported "safeguards," which are especially ineffectual in the case of System Operators given they span large regions and must perform the largest volume of studies for the greatest number of interconnection requests.

FERC also persists in failing to explain what permissible "sources of revenue" System Operators may use to pay penalties. FERC Br. 64. FERC has been quite clear that it will not allow System Operators to recover penalty costs from their transmission customers without FERC's express permission. *See id.* at 60. It is unclear why FERC thinks System Operator "revenues from sales of transmission service and administrative fees," *id.* at 64, would be exempt from this rule. Given FERC's repeated failure to clarify how these "other sources of revenue" could be used, FERC should not be allowed to rely on them as a defense.

FERC claims that System Operators will be protected because their transmission-owning members will "often" conduct studies, and will automatically be assigned penalties for finishing them late. *Id.* at 61-62. "Often" is carrying more weight than it can bear. FERC again fails to address the fact that transmission-owning members are not involved in certain studies while responsibility for others is shared between System Operators and their members. FERC does not "safeguard" System Operators for studies that they perform and leaves them exposed to disputes and potential penalties for studies undertaken collaboratively. FERC's failure to

address reality highlights the perverse incentives FERC is creating for parties to prioritize speed over accuracy in their analyses. *See supra* II.E 30-31.

The Court should not allow FERC to escape defending its flawed penalty scheme here on the ground that objections are allegedly premature, *see* FERC Br. 63-64, or that System Operators have the flexibility to propose variations from standard requirements on compliance, *see id.* at 65-67. The lawfulness of FERC's penalty scheme as applied to System Operators is squarely before the Court now. FERC chose to impose the same penalty scheme on System Operators as other transmission providers and should not be permitted to defer challenges to its rule to individual adjudications. Petitioner System Operators have each made compliance proposals that ask for regional variations from FERC's default requirements. FERC has not acted on these proposals for over ten months, there is no deadline for FERC to act, and FERC may reject some or all the proposals after this case concludes. Indeed, several Respondent-Intervenors have asked FERC to reject System Operator proposals for extended deadlines that would be more realistic for their regions. *See, e.g.*, Motion for Leave to Answer and Answer of the Clean Energy Associations, Docket No. ER24-1915 at 3-8 (July 12, 2024). Requiring FERC to fix the flaws in its penalty scheme now will only assist the resolution of individual System Operator compliance proceedings.

**B.    Respondent-Intervenors Misrepresent Petitioners' Arguments Concerning System Operators and Fail to Refute Them**

Respondent-Intervenors' misrepresent Petitioners' arguments regarding the unlawfulness of applying the strict liability regime to System Operators and fail to refute them.  They claim Petitioners have not shown that FERC's penalty regime "would compromise any transmission provider's 'financial integrity.'"  Interv. Br. 14.  This misstates the issue: System Operators handling "hundreds of interconnection requests in a single cluster" could face eight-figure penalties in months, not decades.  Pet'r Br. 37; *see* PJM Rehearing Request at 23-24, JA____-__.  At $1,000 to$2,500 per business day *per study*, these penalties would compound rapidly, not over decades.  Moreover, Respondent-Intervenors also misplace reliance on FERC's "multiple avenues" for penalty cost recovery.  Interv. Br at 14-15.  All such avenues depend on FERC's discretion, and some remain vague and untested, offering no assurance of potential relief.  System Operators cannot absorb penalties absent FERC authorization, System Operators may not be able to pay penalties absent FERC authorization, increasing the risk to their financial integrity.

This undermines Respondent-Intervenors' position.  Their takings argument collapses because large cash penalties do threaten the financial integrity of System Operators that lack the means to pay penalties.  Respondent-Intervenors' takings argument also fails because it ignores how strict-liability penalties on entities without assured cost recovery implicate constitutionally protected property interests.

Finally, Respondent-Intervenors distort Petitioners' procedural argument. They claim Petitioners demand full evidentiary hearings, burdening FERC. *See, e.g.*, Interv. Br. 20-21. That is false. Petitioners argue only that due process and the FPA require some form of hearing before penalties are imposed, without dictating format. *See* Pet'r Br. 28-29. Paper hearings—routinely used by FERC—could satisfy this obligation. Ensuring due process is FERC's responsibility, not Petitioners.

## IV. FERC DEPARTS FROM REASONED DECISIONMAKING BY IMPOSING A GENERIC FINDING AND NEW SET OF RULES UNDER FPA SECTION 206 BASED ON OUTDATED EVIDENCE

FERC argues that there is no precedent barring it from adopting industry-wide reforms even when some parts of the industry have already implemented reforms. FERC Br. 50. This argument misses the forest for the trees. As PJM has explained, FERC's failure to acknowledge or reconcile its new rules with its findings on the same subject for PJM only eight months before results in a pointless iterative process with no logical end. This is a clear example of arbitrary and capricious regulatory action. FERC does not "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *New Eng. Power Generators Ass'n v. FERC*, 881 F.3d 202, 210 (D.C. Cir. 2018) (citation omitted). And FERC's layering of regulatory processes through a piecemeal and

inflexible approach does not bode well for FERC's eventual compliance rulings that will stem from the orders on review.

PJM's interconnection reform package was comprehensively developed and is the product of significant investments of time, money, and effort to arrive at a process that is consistent with the objectives of Order No. 2023.  *See* PJM Rehearing Request at 9, 19, 25-26, JA____, ____, ____-__.  PJM, generators and other participants in the process have continued to invest time, money and effort in implementing PJM's new process.  Yet FERC, rather than appreciating that effort and investment and the progress made to date to achieve a process that meets the objectives of Order No. 2023, requires PJM to explain each and every departure its comprehensive reforms make from FERC's generic and unsupported rules.  Use of a bludgeon in place of a scalpel is the hallmark of the arbitrary and capricious standard.  *See Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 179 (D.C. Cir. 2022) (rejecting orders "designed to compensate *all* eligible market participants … without any assurance that [particular] generators will improve winter energy reliability").

FERC also cites "significant delays" in PJM as a basis for its insistence on generic reforms over PJM's tailored package of reforms.  FERC Br. 52 (citing Order No. 2023-A P 292, JA____).  But the evidence on which Order No. 2023 relies *pre-dates* PJM's reformed interconnection process.  This Court need not accept Order

38

No. 2023's use of obsolete data as a reasonable basis for FERC's determination that PJM's reformed interconnection package cannot be evaluated as a comprehensive whole but must be measured against FERC's nationwide rules in minute detail.

## V. FERC HAS NOT SUPPORTED ITS ENERGY SERVICE STANDARD MANDATE FOR AFFECTED SYSTEM STUDIES

### A. Requiring the Use of Energy Service Modeling for All Affected System Studies Is Arbitrary and Capricious

Rather than grapple with evidence that forcing transmission providers to use the Energy Service standard by default for all Affected System studies is unreasonable and unsupported, FERC maligns these concerns as "narrow" and dependent on "highly specific conditions." FERC Br. 117.[5] Setting aside the fact such purportedly "narrow" concerns apply to Affected Systems coordination among System Operators spanning numerous states, FERC's rationale for requiring System Operators to utilize Energy Service modeling was supported primarily by what happens *outside* of System Operator regions. *See* Pet'r Br. 81-82 (collecting examples). FERC's default rule discriminates against customers of System Operators whose neighbors grant deliverability at the interconnection stage, and its failure to engage with these arguments renders Order No. 2023 arbitrary and

---

[5] FERC belittles reliability concerns as "equity issues," but the "equity" involved is the inability of an Affected System operator to ensure a Network Service customer granted deliverability on a neighboring system pays to mitigate reliability impacts on the Affected System. SPP Rehearing at 20-21, JA____-__.

capricious because FERC "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs.*, 463 U.S. at 43.[6]

FERC avers that Petitioners ignore the claimed benefits from FERC's Energy Service modeling mandate. FERC Br. 115-17 & n.15. But it is FERC that ignores harms to Affected Systems that are denied the opportunity to ensure that Network Service deliverability on a host system will not cause reliability issues on their systems. FERC argues that the Energy Service standard will "provide transparency" and "consistency" for interconnection customers. FERC Br. 115 (citing Order No. 2023 P 1280, JA____). But any benefit resulting from increased transparency and consistency imposes risks to Affected Systems from impacts that they would not have a reasonable opportunity to evaluate, SPP Rehearing Request at 12, JA____, and FERC fails to recognize that consistency and transparency could be achieved by less damaging requirements, such as requiring Affected Systems to declare their modeling policy and apply it consistently.

FERC further asserts its mandate creates benefits from "reducing the risk of significant upgrade costs." FERC Br. 115 (citing Order No. 2023 P 1279, JA____).

---

[6] FERC erroneously suggests that SPP's injury is self-inflicted because of its "apparently voluntary decision to grant full deliverability to Midcontinent customers on its own network." FERC Br. 118 & n.16, 120. However, SPP does not grant deliverability on its system to customers on another system. Instead, the identified injury stems from reliability impacts *imposed on SPP* from a *neighbor* granting deliverability on its system. SPP Rehearing at 20-21, JA____-__; Pet'r Br. 83.

Obviously, studying requests using less stringent standards results in fewer identified impacts, but despite FERC's insistence to the contrary, *see id.* at 121, this rationale conflicts with FERC's longstanding policy of holding interconnection customers responsible for the costs of Network Upgrades that would not be required "but for" their interconnection, whether on the host system or an Affected System. Pet'r Br. 83 (citing Order No. 845-A at P 78, JA____); *see Tenaska Clear Creek Wind, LLC. v. FERC*, 108 F.4th 858, 869 (D.C. Cir. 2024).

Finally, FERC claims that the use of Network Service models produces a "mismatch" between the costs an interconnection customer pays and the "services received" from the Affected System. FERC Br. 116 (citing Order No. 2023-A P 511, JA____). FERC again fails to contend with its abandonment of the cost-causation principle by allowing Affected System impacts to go unaddressed by the cost causers. FERC relies on *Tenaska* to claim its mandate is consistent with precedent requiring that costs are assigned to those who benefit "to some degree." FERC Br. 121 (citing *Tenaska*, 108 F.4th at 869). But nothing in *Tenaska* supports FERC excusing cost causers from responsibility to pay the "but for" costs their Network Service-level operation imposes on an Affected System.

Having failed to contend with its mandate's infirmities, FERC points to its "alternative" that Affected System operators can simply apply under FPA section 205 for individualized relief. FERC Br. 119. Petitioners showed that such relief is

illusory. Pet'r Br. 85; SPP Rehearing at 13 n.30, JA____. Rather than refusing "to do the paperwork," FERC Br. 119, would-be filers face the real prospect that their "paperwork" would be deemed dead on arrival. *Id.* Order No. 2023 and FERC's brief provide no assurances that FERC would impartially entertain under FPA section 205 a practice that it has just sweepingly declared unjust and unreasonable under FPA section 206. The Court should not take FERC's bait.

### B. FERC's Affected Systems Ruling Contravenes FERC Precedent

FERC argues that its default Energy Service standard should be upheld because it has "now made findings that use of Network Service models would often result in unjust and unreasonable rates," and, as such, argues it was free to depart from its prior decisions allowing for Network Resource modeling because it has a "reasonable basis" for doing so. FERC Br. 122 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). As previously explained, FERC's basis here is not reasonable or supported by the record; accordingly, FERC has not justified its about-face by supplying "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).

42

## CONCLUSION

For the reasons set forth above, the petitions for review should be granted and

FERC's orders should be vacated.[7]

Respectfully submitted,

_/s/ Catherine P. McCarthy_
Catherine P. McCarthy
Bracewell LLP
2001 M Street NW, Suite 900
Washington, DC 20006
(202) 828-5839
(800) 404-3970 (fax)
cathy.mccarthy@bracewell.com


_Counsel for Avangrid, Inc._

_/s/ Joshua Kirstein_
Joshua Kirstein
Senior Attorney
Consolidated Edison Co. of
New York, Inc.
Orange and Rockland Utilities, Inc.
4 Irving Place
New York, New York 10003
(929) 656-5971
kirsteinj@coned.com


_Counsel for Consolidated Edison Co.
of New York, Inc. and Orange and
Rockland Utilities, Inc._

_/s/ Paul A. Colbert_
Paul A. Colbert
Associate General Counsel -
Regulatory Affairs
Central Hudson Gas & Electric
Corporation
284 South Avenue
Poughkeepsie, New York 12601
(845) 486-5831(telephone)
pcolbert@cenhud.com

_Counsel for Central Hudson Gas &
Electric Corporation_

_/s/ John Lee Shepherd, Jr._
John Lee Shepherd, Jr.
Blake Grow
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com
bgrow@hunton.com

_Counsel for FirstEnergy Service
Company, Dominion Energy Services,
Inc., and Exelon Corporation_

---

[7] Petitioners' alignment on specific arguments herein remains unchanged. _See_ Pet'r Brief at 86 n.12.

/s/ Cheri Yochelson
Cheri Yochelson
Assistant General Counsel - DEV
Dominion Energy Services, Inc.
120 Tredegar Street, RS-5
Richmond, VA 23219
(804) 819-2691
cheri.yochelson@dominionenergy.com

/s/ Sara Weinberg
Sara Weinberg
Assistant General Counsel - DESC
Dominion Energy Services, Inc.
220 Operation Way, MC OSC 1A,
Cayce, SC 29033
(803) 217-5753
sara.weinberg@dominionenergy.com

*Counsel for Dominion Energy Services, Inc. on behalf of Virginia Electric and Power Company d/b/a Dominion Energy Virginia and Dominion Energy South Carolina, Inc.*

/s/ Lisa B. Luftig
Lisa B. Luftig
Assistant General Counsel
Exelon Corporation
701 Ninth Street, NW
Washington, DC 20068
(202) 428-1067
Lisa.Luftig@exeloncorp.com

*Counsel for Exelon Corporation*

/s/ Andrew W. Tunnell
Andrew W. Tunnell
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3439 (telephone)
atunnell@balch.com

*Counsel for the Long Island Power Authority*

/s/ Christopher D. Supino
Christopher D. Supino
Managing Senior Corporate Counsel
Midcontinent Independent
System Operator, Inc.
720 City Center Drive
Carmel, IN 46032
Telephone: (317) 249-5400
csupino@misoenergy.org

*Counsel for Midcontinent Independent System Operator, Inc.*

/s/ Wendy N. Reed
Wendy N. Reed
Matthew J. Binette
Abraham F. Johns III
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005-3898
(202) 393-1200
reed@wrightlaw.com
binette@wrightlaw.com
johns@wrightlaw.com

*Counsel for the MISO Transmission Owners*

/s/ Ilia Levitine
Ilia Levitine
Duane Morris LLP
901 New York Avenue, N.W.
Suite 700 East Washington, DC 20001
Phone: (202)776-5218
ILevitine@duanemorris.com

*Counsel for Midcontinent Independent
System Operator, Inc.*

/s/ Ted J. Murphy
Ted Murphy
Blake Grow
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1588
(202) 955-1991
tmurphy@hunton.com
bgrow@hunton.com

*Counsel for New York Independent
System Operator, Inc.*

/s/ Robert V. Eckenrod
Robert V. Eckenrod
Assistant General Counsel
PacifiCorp
825 N.E. Multnomah
Suite 2000
Portland, OR 97232
(503) 367-7259
robert.eckenrod@pacificorp.com

/s/ Andrew W. Tunnell
Andrew W. Tunnell
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3439 (telephone)
atunnell@balch.com

*Counsel for Niagara Mohawk Power
Corporation d/b/a/ National Grid*

/s/ Lyle D. Larson
Lyle D. Larson
Abigail C. Fox
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3441 (telephone)
llarson@balch.com

*Counsel for New York State Electric &
Gas Corporation and Rochester Gas
and Electric Corporation*

/s/ Christopher R. Jones
Christopher R. Jones
Antonia M. Douglas
Troutman Pepper Locke LLP
401 9th Street, NW
Suite 1000
Washington, DC 20004
(202) 662-2181
chris.jones@troutman.com
antonia.douglas@troutman.com

*Counsel for PacifiCorp*

*/s/ Wendy B. Warren*
Wendy B. Warren
David S. Berman
Elizabeth P. Trinkle
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005-3898
(202) 393-1200
warren@wrightlaw.com
berman@wrightlaw.com
trinkle@wrightlaw.com

*Counsel for PJM Interconnection, L.L.C.*

March 19, 2025

*/s/ Matthew J. Binette*
Matthew J. Binette
Elizabeth P. Trinkle
Wright & Talisman, P.C.
1200 G Street, NW, Suite 600
Washington, DC 20005-3898
(202) 393-1200
binette@wrightlaw.com
trinkle@wrightlaw.com

*Counsel for Southwest Power Pool, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I further certify that this brief complies with the type-volume limitations of D.C. Circuit Rule 32(e) and the Court's August 5, 2024 scheduling order because it contains 9,767 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), according to the count of Microsoft Word.

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com

*On behalf of Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2025, I caused this brief to be electronically filed with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com

*On behalf of Petitioners*
