**ORAL ARGUMENT NOT YET SCHEDULED**

Nos. 23-1282, *et al.*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

ADVANCED ENERGY UNITED, *ET AL.,*
*Petitioners,*
*v.*
FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

On Petitions for Review of a Final Order of the
United States Federal Energy Regulatory Commission

**FINAL BRIEF OF RESPONDENT-INTERVENORS INTERCONNECTION
REFORM ADVOCATES**

Alexander L. Tom
Christine A. Powell
Ada Statler
Earthjustice
50 California Street
Suite 500
San Francisco, CA 94111
(415) 217-2111
atom@earthjustice.org

Nick Lawton
Earthjustice
1001 G Street, NW
Suite 1000
Washington, DC 20001
(202) 780-4835
nlawton@earthjustice.org

April 16, 2025

Linnet Davis-Stermitz
Earthjustice
810 Third Avenue
Suite 610
Seattle, WA 98104
(206) 343-7340
ldavisstermitz@earthjustice.org

*Counsel for Natural Resources
Defense Council, Inc. and Sierra Club*

John Moore
Natural Resources Defense Council
20 North Wacker Street, Suite 1600
Chicago, IL 60201
(312) 663-9900
jmoore@nrdc.org

Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 289-6868
creiser@nrdc.org

*Counsel for Natural Resources
Defense Council, Inc.*

Gregory E. Wannier
Justin Vickers
Sierra Club Environmental Law
Program
2101 Webster Street
Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org

*Counsel for Sierra Club*

Adam Kurland
Ted Kelly
Environmental Defense Fund
555 12th Street NW
Suite 400
Washington, DC 20004
(202) 387-3500
akurland@edf.org

*Counsel for Environmental Defense
Fund*

Ben Norris
Melissa Alfano
Solar Energy Industries Association
1425 K Street NW
Suite 1000
Washington, DC 20005
(202) 566-2873
bnorris@seia.org
malfano@seia.org

*Counsel for Solar Energy Industries
Association*

Gabriel Tabak
American Clean Power Association
1299 Pennsylvania Avenue NW
13th Floor
Washington, DC 20004
(202) 383-2500
gtabak@cleanpower.org

*Counsel for American Clean Power
Association*

Jeremy McDiarmid
Advanced Energy United, Inc.
1801 Pennsylvania Avenue NW
Suite 410
Washington, DC 20006
(617) 429-0677
jmcdiarmid@advancedenergyunited.org

*Counsel for Advanced Energy United, Inc.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici**

All parties, intervenors, and amici appearing in this Court are listed in the Initial Brief for Clean Energy Petitioners.

**B.    Rulings under Review**

1.    *Improvements to Generator Interconnection Procedures & Agreements, Final Rule*, 184 FERC ¶ 61,054 (July 28, 2023) (JA1432-2911) ("Order 2023");

2.    *Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration*, 184 FERC ¶ 62,163 (Sept. 28, 2023) (JA3400); and

3.    *Improvements to Generator Interconnection Procedures & Agreements*, *Order Addressing Arguments Raised on Rehearing, Setting Aside Prior Order, in Part, and Granting Clarification*, 186 FERC ¶ 61,199 (Mar. 21, 2024) (JA3408-4470) ("Order 2023-A").

**C.    Related Cases**

This case has not previously been before this Court or any other court. Cases consolidated with the captioned lead case are listed in the Initial Brief for Clean Energy Petitioners.

Respectfully submitted,

/s/ Alexander L. Tom
Alexander L. Tom
Earthjustice
50 California Street
Suite 500
San Francisco, CA 94111
(415) 217-2111
atom@earthjustice.org

*Counsel for Natural Resources*
*Defense Council, Inc. and Sierra Club*

Dated: April 16, 2025

# RULE 26.1 CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Respondent-Intervenor Interconnection Reform Advocates provide the following corporate disclosure statements.

1. Advanced Energy United, Inc. ("United") is a non-profit 501(c)(6) organization incorporated under the laws of the District of Columbia. United is a national non-profit industry association in the United States that represents the full range of advanced energy technologies and services, both grid-scale and distributed. United represents over 100 member companies and has a mission to achieve 100% clean power and transportation electrification across the United States. United is a non-profit corporation and, as such, no entity has any ownership interest in it. United does not have any outstanding shares or debt securities in the hands of the public nor any parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

2. The American Clean Power Association ("ACP") is a non-profit 501(c)(6) organization incorporated under the laws of the District of Columbia. ACP is a national non-profit trade association representing a range of member companies with a common interest in encouraging the deployment and expansion of wind, solar, energy storage, and electric transmission in the United States,

including project developers, project owners and operators, financiers, utilities, marketers and customers.

ACP is a non-profit corporation and, as such, no entity has any ownership interest in it. ACP does not have any outstanding shares or debt securities in the hands of the public nor any parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

3. The Solar Energy Industries Association ("SEIA") is a tax-exempt trade association pursuant to 26 U.S.C. § 501(c)(6) that represents nearly 1,000 member companies nationwide. SEIA represents the entire solar industry, including installers, project developers, manufacturers, contractors, financiers and non-profits. SEIA's member companies develop, manufacture, finance and build solar projects both domestically and abroad.

SEIA has no parent corporation and no publicly held company owns 10% or more of its stock.

4. Environmental Defense Fund, organized and existing under the laws of the State of New York, is a national non-profit organization that links science, economics, and the law to create solutions to urgent environmental problems. Environmental Defense Fund certifies that it is a non-profit corporation that does not issue stock, has no parent companies, and in which no publicly held corporations have any form of ownership interest.

5. Natural Resources Defense Council, Inc., is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Natural Resources Defense Council is a nongovernmental corporation that engages in research, advocacy, public education, and litigation to protect public health and the environment. Natural Resources Defense Council is a tax-exempt organization incorporated under the laws of the State of New York, with headquarters in New York City.

6. Sierra Club is a nonstock corporation that does not issue shares or debt securities, and it has no parent companies. Sierra Club is a nongovernmental corporation whose mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. Sierra Club is incorporated under the laws of the State of California, with its principal place of business in Oakland, California.

Respectfully submitted,

/s/ Alexander L. Tom
Alexander L. Tom
Earthjustice
50 California Street
Suite 500
San Francisco, CA 94111
(415) 217-2111
atom@earthjustice.org

*Counsel for Natural Resources
Defense Council, Inc. and Sierra Club*

Dated: April 16, 2025

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............... i

RULE 26.1 CORPORATE DISCLOSURE STATEMENTS .................................. iii

TABLE OF AUTHORITIES ........................................................... ix

GLOSSARY OF ABBREVIATIONS ................................................ xiiiiii

INTRODUCTION ..................................................................... 1

STATUTES AND REGULATIONS ................................................... 2

STATEMENT OF THE CASE ......................................................... 2

    I.   FERC'S 2003 INTERCONNECTION PROCEDURES FAIL TO SET FIRM DEADLINES FOR INTERCONNECTION STUDIES ...................... 2

    II.   FERC IDENTIFIES EXTENSIVE AND WORSENING INTERCONNECTION QUEUE BACKLOGS THAT IMPERIL NEW GENERATION, DRIVE UP CONSUMER COSTS, AND THWART STATE POLICIES ................................................................ 4

    III.  FERC ADOPTS BALANCED, COMPREHENSIVE REFORMS TO ADDRESS DRIVERS OF YEARS-LONG INTERCONNECTION DELAYS, INCLUDING CHRONICALLY LATE INTERCONNECTION STUDIES ................................................................ 7

    IV.  TRANSMISSION PETITIONERS CHALLENGE THE CONSEQUENCES FOR MISSING STUDY DEADLINES ..................... 9

SUMMARY OF ARGUMENT ......................................................... 10

ARGUMENT ........................................................................ 12

    I.   ORDER 2023 DOES NOT VIOLATE THE FIFTH AMENDMENT ......... 12

        A.  Transmission Petitioners' takings claim fails because they neither allege nor prove that Order 2023 would undermine any transmission provider's financial integrity ................................. 13

        B.  Order 2023's penalty framework does not violate procedural due process ................................................................ 16

           1.  Transmission Petitioners fail to assert a constitutionally-protected private interest ................................................ 16

2. Transmission Petitioners identify no deprivation prior to conclusion of the appeals process ...................................................................19

3. FERC's procedures easily satisfy due process ......................................20

    a. Any pre-appeal financial deprivation would be minimal....................21

    b. Transmission Petitioners show no value from additional procedures ............................................................................................22

    c. Requiring a hearing for each study delay would unduly burden FERC's resources ............................................................................25

II. AMPLE EVIDENCE SUPPORTS FERC'S DECISION TO UPDATE ITS MINIMUM REQUIREMENTS FOR INTERCONNECTION PROCESSES ON AN INDUSTRY-WIDE BASIS ........................................27

  A. Precedent forecloses Transmission Petitioners' argument that FERC had to first find individual tariffs unlawful...............................................27

  B. Transmission Petitioners' "isolated pockets" argument ignores the facts and the law ..............................................................................................29

    1. No transmission provider has eliminated the reasonable efforts standard—the subject of Transmission Petitioners' challenge ..............30

    2. FERC properly considered that some transmission providers have already implemented some of Order 2023's minimum requirements ....30

    3. Transmission Petitioners ignore the substantial evidence supporting FERC's findings of delays across all regions .........................................32

III. FERC reasonably rejected the argument that Order 2023 is unduly discriminatory...........................................................................................36

IV. FERC clearly and correctly explained why further reform was necessary in PJM ......................................................................................37

  A. FERC responded reasonably to PJM ......................................................38

  B. FERC's application of Order 2023 to PJM was foreseeable, reasonable, and based on ample evidence...................................................................39

CONCLUSION .................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Elec. Energy Consumers v. FERC*,
    290 F.3d 362 (D.C. Cir. 2002)..................................................25

*Associated Gas Distribs. v. FERC*,
    824 F.2d 981 (D.C. Cir. 1987)..................................................28

*Atkins v. Parker*,
    472 U.S. 115 (1985)..................................................17

*Bd. of Regents v. Roth*,
    408 U.S. 564 (1972)..................................................16, 19

*Belmont Mun. Light Dep't v. FERC*,
    38 F.4th 173 (D.C. Cir. 2022)..................................................39

*Duquesne Light Co. v. Barasch*,
    488 U.S. 299 (1989)..................................................13, 14

*Food & Water Watch v. FERC*,
    104 F.4th 336 (D.C. Cir. 2024)..................................................35

*FPC v. Hope Nat. Gas*,
    320 U.S. 591 (1944)..................................................12, 13, 14, 17

*Goldberg v. Kelly*,
    397 U.S. 254 (1970)..................................................21

*Interstate Nat. Gas Ass'n of Am. v. FERC*,
    285 F.3d 18 (D.C. Cir. 2002)..................................................28

*Jersey Cent. Power & Light Co. v. FERC*,
    810 F.2d 1168 (D.C. Cir. 1987) (en banc)..................................................13, 14, 17

*Ky. Mun. Energy Agency v. FERC*,
    45 F.4th 162 (D.C. Cir. 2022)..................................................32

*La. Energy & Power Auth. v. FERC*,
141 F.3d 364 (D.C. Cir. 1998) ...................................................................36

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ..............................................16, 20, 21, 22, 25

*Mo. Pub. Serv. Comm'n v. FERC*,
337 F.3d 1066 (D.C. Cir. 2003) .................................................................15

*New England Power Generators Ass'n v. FERC*,
881 F.3d 202 (D.C. Cir. 2018) ...................................................................39

*NLRB v. Bell Aerospace*,
416 U.S. 267 (1974) ...................................................................................24

*In re Permian Basin Area Rate Cases*,
390 U.S. 747 (1968) ...................................................................................17

*Roberts v. United States*,
741 F.3d 152 (D.C. Cir. 2014) ...................................................................16

*S.C. Pub. Serv. Auth. v. FERC*,
762 F.3d 41 (D.C. Cir. 2014) .............................................27, 30, 31, 33

*Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*,
980 F.3d 109 (D.C. Cir. 2020) ...........................................................20, 25

*Transmission Access Pol'y Study Grp. v. FERC*,
225 F.3d 667 (D.C. Cir. 2000) ...........................................................27, 28, 33

*U.S. Telecom Ass'n v. FCC*,
825 F.3d 674 (D.C. Cir. 2016) ...................................................................24

*UDC Chairs Chapter v. Bd. of Trs. of Univ. of D.C.*,
56 F.3d 1469 (D.C. Cir. 1995) .............................................................12, 21

*Wisc. Gas Co. v. FERC*,
770 F.2d 1144 (D.C. Cir. 1985) .........................................................27, 30

**FERC Orders**

Order 845, 163 FERC ¶ 61,043 (2018)...............................................................3, 33

*Improvements to Generator Interconnection Procedures & Agreements, Final Rule*, 184 FERC ¶ 61,054 (2023) ("Order 2023")......................................................
......3, 4, 5, 6, 7, 8, 9, 15, 18, 19, 22, 23, 26, 28, 29, 31, 33, 34, 35, 36, 41, 42, 43

*Improvements to Generator Interconnection Procedures & Agreements, Notice of Proposed Rulemaking*, 179 FERC ¶ 61,194 (2022) ("Order 2023 NOPR") ........................................................................5

*Improvements to Generator Interconnection Procedures & Agreements, Order Addressing Arguments Raised on Rehearing, Setting Aside Prior Order, in Part, and Granting Clarification*, 186 FERC ¶ 61,199 (2024) ("Order 2023-A") .........
...................8, 9, 14, 15, 18, 22, 23, 24, 25, 26, 30, 31, 32, 34, 35, 36, 37, 38, 43

Order 904, 189 FERC ¶ 61,034 (2024)..............................................................19

*PJM Interconnection, L.L.C.,*
143 FERC ¶ 61,185 (2013) ...........................................................................24

*PJM Interconnection, L.L.C.,*
181 FERC ¶ 61,162 (2022) .................................................................40, 41, 43

**Statutes**

16 U.S.C. § 824(b) ...........................................................................................6

16 U.S.C. § 824d(a) ........................................................................................17

16 U.S.C. § 824d(b) ........................................................................................17

16 U.S.C. § 824e(a)..........................................................................................17

16 U.S.C. § 825*l*(a) ...........................................................................................8

16 U.S.C. § 825*l*(b) ..........................................................................................8

16 U.S.C. § 825*l*(c) .........................................................................................19

42 U.S.C. § 7173(c) .........................................................................................27

49 U.S.C. § 42305(a) .......................................................................................18

**Other Authorities**

Refunds and Other Consumer Protections,
89 Fed. Reg. 65,534 (Aug. 12, 2024) ...................................................................18

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **Act** | Federal Power Act |
| **Commission or FERC** | Federal Energy Regulatory Commission |
| **Clean Energy Petitioners** | Petitioners in case number 23-1282 |
| **Interconnection Reform Advocates** | Undersigned Respondent-Intervenors |
| **JA** | Joint Appendix |
| **PJM** | PJM Interconnection, LLC |
| **Order 2023** | *Improvements to Generator Interconnection Procedures & Agreements, Final Rule*, 184 FERC ¶ 61,054 (2023) |
| **Order 2023 NOPR** | *Improvements to Generator Interconnection Procedures & Agreements, Notice of Proposed Rulemaking*, 179 FERC ¶ 61,194 (2022) |
| **Order 2023-A** | *Improvements to Generator Interconnection Procedures & Agreements*, *Order Addressing Arguments Raised on Rehearing, Setting Aside Prior Order, in Part, and Granting Clarification*, 186 FERC ¶ 61,199 (2024) |
| **SJA** | Supplemental Joint Appendix |
| **System Operators** | Regional Transmission Organizations or Independent System Operators |
| **Transmission Petitioners** | Petitioners in all consolidated cases except case number 23-1282 |

# INTRODUCTION

Across the country, the process for connecting new power plants to the grid (known as interconnection) is broken. More than 10,000 projects sit in queues, facing average wait times of five years to obtain transmission providers' permission to interconnect. These delays have real costs. They destabilize projects' financing, threatening existing investments and discouraging new ones. They raise consumers' electricity bills by stifling competition from newer, cheaper generation. And they thwart states' authority to determine their own generation mix.

Transmission providers are responsible for much of the slowdown. They control interconnection processes, and they regularly miss deadlines to complete interconnection studies. Hardly a surprise. Under prior rules, transmission providers faced no meaningful consequences for their foot-dragging, while project proponents (interconnection customers) and consumers bore the brunt of delays.

In Order 2023, the Federal Energy Regulatory Commission ("FERC") stepped in to fix these problems, updating its minimum standards for interconnection procedures with a comprehensive set of reforms. FERC imposed numerous requirements to make it easier for transmission providers to process their backlogged queues. Most of those requirements fall on interconnection customers.

But some transmission providers ("Transmission Petitioners") resist any obligation on their part, challenging provisions that impose penalties for missing deadlines.

Transmission Petitioners offer no basis to overturn FERC's reasoned judgment and balanced reforms, as FERC's brief ably explains. Interconnection Reform Advocates' brief exposes further defects in Transmission Petitioners' arguments. They ignore threshold requirements to prove a takings or procedural due process claim—perhaps because they cannot meet them. They misconstrue FERC's authority to issue industry-wide rules and omit inconvenient facts. And FERC thoroughly and reasonably rejected the arguments Transmission Petitioners claim it ignored. The Court should deny their petitions for review.

## STATUTES AND REGULATIONS

Except for 42 U.S.C. § 7173 and 49 U.S.C. § 42305, all pertinent statutes and regulations are contained in the addendum to FERC's brief.

## STATEMENT OF THE CASE

I. **FERC'S 2003 INTERCONNECTION PROCEDURES FAIL TO SET FIRM DEADLINES FOR INTERCONNECTION STUDIES**

As FERC explains in detail (at 12-23), the Commission developed standardized interconnection processes to lay the foundation for competitive, nondiscriminatory wholesale power markets. Starting in 2003, those processes required transmission providers to conduct technical studies to evaluate interconnection requests, subject to a modest requirement that they expend

2

"reasonable efforts" to meet study deadlines. *Id.* at 17 (citation omitted).

Transmission providers faced no meaningful consequences for missing their deadlines and retained "significant discretion" to extend them. Order 2023, P 50 (JA1480). If transmission providers stayed within these generous bounds, interconnection customers had to pay all appropriate costs for studies, despite any delays. *See id.*, P 13 n.24 (JA1445).

Unsurprisingly, the reasonable efforts standard spawned extensive delays. In 2018, FERC scrutinized this standard more closely, as part of efforts to address widespread delays throughout interconnection processes. *See* Order 845, 163 FERC ¶ 61,043, P 24 (2018). Because the reasonable efforts standard was "challenging to apply" without information about the time and resources needed to complete studies, FERC required transmission providers to file quarterly reports documenting compliance with study deadlines. *Id.*, PP 290, 305-06. Some commenters urged FERC to go further, replacing the reasonable efforts standard with consequences for missing study deadlines. *Id.*, P 323. FERC found that step premature, but cautioned that those reports' results would inform the need for "future action." *Id.*

## II. FERC IDENTIFIES EXTENSIVE AND WORSENING INTERCONNECTION QUEUE BACKLOGS THAT IMPERIL NEW GENERATION, DRIVE UP CONSUMER COSTS, AND THWART STATE POLICIES

Five years later, FERC could wait no longer. "[A]cross all regions of the country," interconnection queue backlogs had "persisted and worsened," growing dramatically in both volume and duration. Order 2023, PP 38-39 (JA1468-71). At the end of 2022, over 10,000 requests were stuck in interconnection queues—representing over 2,000 gigawatts of power, more than the entire capacity of the country's existing generation. *Id.*, P 38 (JA1468-69). That backlog reflected a four-fold increase from 2010, and forty percent more than the end of 2021. *Id.* Average wait times from an interconnection request to commercial operation had more than doubled, rising from 2.1 years for facilities built in 2000-2010, to 3.7 years in 2011-2021, to "now roughly five years." *Id.*, P 39 (JA1470-71). "[E]very single region" faced these growing backlogs and increased wait times. *Id.*, P 38 (JA1468). The delays, in turn, derailed project completion. By end of 2022, fewer than twenty-five percent of interconnection requests received during 2000-2017 had reached commercial operation "in *any* region of the country." *Id.* (JA1468-69).

Several factors drove these problems. The number of interconnection requests had increased significantly, and many requests represented technologies with operating characteristics that prior procedures were not designed to address.

4

*Id.*, P 41 (JA1471-74).  Chronically late studies were also a very "important contributor." *Id.*, P 40 (JA1471).  Most studies completed in 2022 were issued late, and most "transmission providers across the country regularly fail[ed] to meet interconnection study deadlines."  *Id.*, PP 40, 50 (JA1471, 1480-81).  Even transmission providers conducting cluster studies "still often fail[ed] to meet interconnection study deadlines."  Order 2023, Notice of Proposed Rulemaking ("NOPR"), P 166 (JA0197).

Lengthy study delays harmed interconnection customers.  They created uncertainty, "disrupt[ing]" project financing, Order 2023, P 43 (JA1474-75), and "threatening" project viability.  Order 2023 NOPR, P 30 (JA0106).  Projects could "los[e] site control rights and financing," SEIA Comments at 32 (JA1314), eligibility for state incentives, N.J. Comm'n Reply Comments at 5 (JA1398), and even face liquidated damages, Order 2023, P 43 n.127 (JA1475) (citing Interwest Initial Comments at 8 (JA1085)).  Study delays also saddled interconnection customers with higher costs for network upgrades later in the process, a problem exacerbated by those bills doubling or tripling over just a few years.  Order 2023, P 41 (JA1472-74).  Prohibitive cost estimates forced projects to withdraw from the queue, compounding backlogs by requiring inefficient and costly restudies.  *Id.*

FERC's "fundamental concern" was that consumers bore the costs of inefficiency and delay.  Order 2023 NOPR, P 30 (JA0106).  In addition to driving

up project costs, interconnection delays "artificially raise[d] the cost of electricity" by blocking "newer and more efficient technologies" from competing with older, inefficient generators. N.J. Comm'n Initial Comments at 7 (JA0960); *see also* Order 2023, P 43 (JA1475) (increased energy rates from "limited access to new and more competitive supplies of generation"). These delays also increased grid reliability risks, Order 2023, P 1007 (JA2084-85), and deprived local economies of over a million jobs, AEE Initial Comments at 5 (JA1178).

Interconnection backlogs also impeded states' reserved authority over their generation, *see* 16 U.S.C. § 824(b)(1), threatening their ability to comply with their own laws. *See, e.g.*, N.J. Comm'n Initial Comments at 7-8 (JA0960-61); ACE-NY Initial Comments at 2 (JA0781). In Illinois, for example, cancellations and "repeated and lengthy" interconnection delays "create[d] significant risks" to achieving a statutory deadline for deploying wind and solar projects. Ill. Comm'n Initial Comments at 5 (JA1324). The inability to interconnect new generation could also frustrate state emissions requirements by delaying fossil fuel plant retirements, N.J. Comm'n Reply Comments at 4 (JA1397), exposing the public to unnecessary and harmful pollution.

## III. FERC ADOPTS BALANCED, COMPREHENSIVE REFORMS TO ADDRESS DRIVERS OF YEARS-LONG INTERCONNECTION DELAYS, INCLUDING CHRONICALLY LATE INTERCONNECTION STUDIES

To address these problems, FERC reformed its standardized procedures in several key ways.

*First*, FERC shifted from a serial study process to one based on cluster studies, finding that this increasingly common procedure reflected a best practice. Order 2023, P 177 (JA1583-85). Cluster studies more efficiently examine multiple requests simultaneously, provide greater certainty on study timing and costs, and reduce the likelihood and impacts of withdrawals. *Id.*

*Second,* FERC prevented speculative interconnection requests from contributing to delays, including by providing interconnection customers with more information regarding the viability and costs of interconnection before submitting a request. *Id.*, PP 46, 135-37 (JA1476-78, 1550-54). FERC also increased study deposit amounts (to $35,000-$250,000 per request), strengthened stringent site control and commercial readiness requirements, and imposed penalties for withdrawing interconnection requests. *Id.*, PP 502, 583, 690-91, 780-81 (JA1777-78, 1823-24, 1886-88, 1941-43).

*Finally*, FERC imposed corresponding obligations on transmission providers to ensure timely studies. Citing "pervasive delays," Order 2023 eliminated the reasonable efforts standard, which did not "provide an adequate incentive" to meet

study deadlines because it imposed no consequences for missing them. *Id.*, PP 50, 966 (JA1481, 2056). Instead, FERC set firm deadlines with penalties for late studies. *Id.*, P 970 (JA2060). These penalties accrue by $1,000-$2,500 per business day, depending on the type of study. *Id.*, P 973 (JA2061-62). These penalties incentivize transmission providers to devote adequate resources to meet deadlines. *Id.*, P 1007 (JA2084-85). Notably, as providers make these investments, they may recoup increased costs from interconnection customers. *Id.*

Though labeled penalties, the charges function like a partial refund. A penalty cannot exceed the total deposits received for a study. *Id.*, P 984 (JA2067-68). And unlike a typical civil penalty paid to the government, transmission providers pay the charges to the interconnection customers in the cluster. *Id.*, P 990 (JA2072). Thus, a penalty "effectively reduce[s]" what transmission providers can "charge for such studies" when they fail to meet deadlines to complete them. Order 2023-A, P 388 (JA3722).

FERC carefully limited any burden from its new penalty structure. There are options to extend the deadline to complete studies, including a ten-business day grace period after a deadline. Order 2023, PP 981-82 (JA2066). Meanwhile, a transmission provider may appeal a penalty to FERC, seek rehearing if FERC rules against it, and then seek judicial review. *See id.*, P 987 (JA2069-70); 16 U.S.C. § 825*l*(a)-(b). Filing an appeal automatically stays the obligation to distribute the

penalty funds until forty-five days after (1) the deadline to seek rehearing, if no rehearing request is filed; or (2) the resolution of rehearing requests. Order 2023, P 987 (JA2070). To evaluate these appeals, FERC uses a "good cause" standard incorporating factors designed to accommodate good-faith efforts: (1) extenuating circumstances outside the transmission provider's control; (2) the transmission provider's efforts to mitigate delays; and (3) any proposed process enhancements to prevent future delays. *Id.* (JA2069-70). FERC considers requests for evidentiary hearings on a case-by-case basis. Order 2023-A, P 366 (JA3701).

FERC also allowed for flexibility. As in prior rules, transmission providers could either adopt the standardized procedures or propose variations. *See* Order 2023, P 1764 (JA2560-61) (describing FERC's "independent entity variation" and "consistent or superior to" standards (citations omitted)).

## IV.    TRANSMISSION PETITIONERS CHALLENGE THE CONSEQUENCES FOR MISSING STUDY DEADLINES

On rehearing, Transmission Petitioners challenged FERC's replacement of the reasonable efforts standard with firm deadlines backed by penalties. FERC rejected those challenges in Order 2023-A. Transmission Petitioners sought judicial review, and their petitions were consolidated before this Court. ECF No. 2023934. The Court granted Interconnection Reforms Advocates' timely motions

9

to intervene to defend against Transmission Petitioners' challenge.  ECF No. 2067826.

## SUMMARY OF ARGUMENT

**I.A.**  Transmission Petitioners show no constitutional violation.  The Court can easily dispense with their takings claim, which is untethered from the controlling constitutional standard.  The Constitution does not guarantee that regulated utilities recover every dollar they spend.  Instead, courts consider whether an order's "end result" compromises the utility's financial integrity—a showing that Transmission Petitioners do not and cannot make.

**I.B.**  Transmission Petitioners' procedural due process claim fails on multiple grounds.  They ignore the foundational requirement to establish a protected property interest, and under the Federal Power Act, they have no interest in charging unjust and unreasonable rates.  Even assuming a protected interest, they allege no deprivation that occurs during FERC's appeals process, which automatically stays penalties.  And even setting aside those threshold flaws, FERC's framework provides adequate process under the three-factor *Mathews* test.  Any financial injuries to Transmission Petitioners merit little weight.  The procedures they demand—preliminary, in-person evidentiary hearings in all cases—have no apparent value, given that FERC will hear an appeal before they pay a penalty and will consider requests for evidentiary hearings.  Nor do they

10

justify burdening FERC's resources with unnecessary hearings and diluting Order 2023's efforts to ensure timely interconnection studies.

**II.** Contrary to Transmission Petitioners' arguments, ample evidence supported eliminating the reasonable efforts standard industry-wide. Transmission Petitioners' narrow challenge, premised on some transmission providers' adoption of cluster study processes, does not withstand scrutiny. Controlling precedent contradicts their legal claims that FERC must make findings regarding individual tariffs or that partial adoption of some Order 2023 reforms—and not the one challenged here—precludes FERC from promulgating comprehensive reforms. And the record demonstrates that their factual premises are equally baseless. For example, Transmission Petitioners do not acknowledge or rebut FERC's finding that regions with cluster study processes still experience significant study delays— nor could they, given the substantial evidence on which the Commission relied.

**III.** The record similarly refutes Transmission Petitioners' contentions that FERC failed to respond to various arguments. FERC not only addressed their claim of undue discrimination against regions with more interconnection customers, but also reasonably explained the need to ensure that those regions devote adequate resources to timely studies (including costs that interconnection customers ultimately bear).

**IV.** FERC similarly explained why Order 2023's reforms were necessary in the mid-Atlantic region served by PJM Interconnection, LLC ("PJM"). Despite PJM's recent amendments to its interconnection process, PJM had one of the nation's longest and most backlogged interconnection queues when FERC adopted Order 2023—and it still does. Given PJM's severe problems and the gulf between PJM's amended process and what Order 2023 requires, FERC reasonably declined to exempt PJM from Order 2023's reforms.

## ARGUMENT

### I. ORDER 2023 DOES NOT VIOLATE THE FIFTH AMENDMENT

Transmission Petitioners' Fifth Amendment arguments fail at every turn. Transmission Petitioners make no serious showing that the "total effect" of Order 2023 undermines their "financial integrity," as they must to show an unconstitutional taking. *FPC v. Hope Nat. Gas*, 320 U.S. 591, 602-03 (1944). Nor does Order 2023 violate any procedural due process rights. To make out such a claim, Transmission Petitioners must show that they were "deprived of a protected interest" and that they failed to "receive[] the process they were due." *UDC Chairs Chapter v. Bd. of Trs. of Univ. of D.C.*, 56 F.3d 1469, 1471 (D.C. Cir. 1995). They can show neither a protected interest nor a deprivation, and FERC provides adequate process in any event.

**A.** **Transmission Petitioners' takings claim fails because they neither allege nor prove that Order 2023 would undermine any transmission provider's financial integrity**

Order 2023 does not effect an unconstitutional taking. In utility regulation, the Takings Clause imposes only a limited prohibition against rates "so unjust as to be confiscatory," *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989) (cleaned up), which turns on a rate order's "end result," *Hope,* 320 U.S. at 603-06. That inquiry considers whether FERC reasonably balanced utilities' "interest in maintaining financial integrity and access to capital markets and the consumer interest in being charged non-exploitative rates." *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1177-78 (D.C. Cir. 1987) (en banc); *id.* at 1175 (*Hope*'s Natural Gas Act holding applies "interchangeably" to Federal Power Act). To show an unconstitutional taking, a utility must demonstrate that an order's end result would prevent it from maintaining its financial integrity or attracting necessary capital. *See id.* at 1178-79 (finding that FERC must consider utilities' allegations that met this standard). Transmission Petitioners cannot do so.

At the outset, Transmission Petitioners get the law wrong. They barely mention *Hope*'s "end results" test, simply asserting that the Order is "confiscatory and, therefore, an uncompensated taking," because it may not guarantee that utilities recover the full cost of interconnection studies. Transmission Pet'rs ("TP") Br. 31. But utilities are not guaranteed recovery for every expense. *Hope*

itself upheld an order that allowed no return on $17 million in costs because the end result still allowed the utility "to maintain its financial integrity." 320 U.S. at 605-06.

As to Order 2023's end results, Transmission Petitioners make no showing that penalties for late studies would compromise any transmission provider's "financial integrity." At most, they suggest that "PJM and similarly-situated transmission providers could face eight-figure penalties for delays." TP Br. 37. It is hard to see how: at $1,000-$2,500 per business day, a study would have to be roughly sixteen to forty years late to incur an eight-figure penalty. *See* Order 2023-A, P 454 (JA3777). But even if one were, Transmission Petitioners present no evidence of how such an outcome would affect any transmission provider's bottom line—a difficult showing for utilities that often earn billions each year—and a prerequisite to a valid taking claim. *See, e.g., Jersey Cent.*, 810 F.2d at 1181 n.3 (noting that "absent the sort of deep financial hardship described in *Hope*, there is no taking"); *Duquesne Light*, 488 U.S. at 311 ("overall effect" of denying recovery of entire $35 million investment to utility earning annual returns on almost $1.8 billion rate base was "well within the bounds of *Hope*"). And as to System Operators like PJM, the argument is nonsensical. System Operators—non-profit entities that, unlike a traditional utility, manage regional grids without owning transmission or generation—have multiple avenues to pass penalty expenses onto

their transmission-owning members, including filing "a default structure for recovering study delay penalties."  Order 2023, P 994 (JA2074).  So penalties will likely be divided among individual transmission providers *within* PJM—diluting their impact on any single utility's profits—and PJM itself will face none.  *See* Order 2023-A, P 401 (JA3733).

Transmission Petitioners also ignore the countervailing interests that FERC must balance against any utility's claims of threats to its financial integrity.  *See Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1074 (D.C. Cir. 2003) (invalidating order that neglected "costs of requiring customers to pay rates" with "no nexus to the value" they received).  Transmission Petitioners' balancing argument (at 31) exclusively complains that they won't be able to fully recover study costs, without acknowledging FERC's finding that reducing their compensation for late studies accounts for harms that delays inflict on interconnection customers and consumers.  Order 2023-A, P 389 (JA3723).  FERC reasonably balanced the competing interests by, for example, establishing deadlines that the record proved are attainable, *id.*, PP 318-22 (JA3660-63), and by creating an appeals process to ensure that "penalties are fair and not triggered if good cause justifies the delay," Order 2023, P 988 (JA2070).

**B.** **Order 2023's penalty framework does not violate procedural due process**

Transmission Petitioners' procedural due process claim also fails. First, they ignore the threshold requirement to establish a protected property interest, and under the Federal Power Act, they have none. Second, even if Transmission Petitioners had a protected interest, they identify no deprivation during the appeals process they attack. Transmission Petitioners complain (at 21) that FERC provides no meaningful opportunity to be heard until after a penalty is "imposed," but omit that an appeal automatically stays the penalty. Third, even if Transmission Petitioners could nonetheless show a protected interest *and* some functional deprivation, the traditional factors all demonstrate that Order 2023's regime satisfies due process. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

**1.** **Transmission Petitioners fail to assert a constitutionally-protected private interest**

Transmission Petitioners' procedural due process claim fails at the outset because they identify no protected property interest. *See Roberts v. United States*, 741 F.3d 152, 162 (D.C. Cir. 2014). As with their takings claim, they seem to assume a protected interest in recovering the full costs of studies and avoiding refund penalties. TP Br. 21. But property interests are "created and defined by statutory terms." *Bd. of Regents v. Roth*, 408 U.S. 564, 578 (1972); *see also id.* at 577 (property interests require a "legitimate claim of entitlement" that derives

16

"from an independent source" such as a "statute defining eligibility"). And the

Federal Power Act does not give regulated utilities a blank check.

As the Supreme Court has explained, the constitutional interest that

regulated utilities possess is narrow—charging rates that maintain their financial

integrity and access to capital. *See Hope*, 320 U.S. at 602-03. Under the Act, they

are not entitled to recover any particular costs, nor to charge whatever rates they

please. *See Jersey Cent.*, 810 F.2d at 1181-82 ("A regulated utility has no

constitutional right to a profit, and a company that is unable to survive without

charging exploitative rates has no entitlement to such rates." (citation omitted)).

Instead, they may charge only rates that FERC finds just and reasonable, and not

unduly discriminatory or preferential. 16 U.S.C. § 824d(a)-(b). Moreover, FERC

must ensure that rates remain just and reasonable, and where they are not, must fix

rates that are. *Id.* § 824e(a); *cf. Atkins v. Parker*, 472 U.S. 115, 129 (1985)

(procedural due process does not limit government's ability to "make substantive

changes" to benefits levels (citation omitted)). In short, utilities have no

constitutional interest in charging rates that FERC determines are unjust and

unreasonable. *See In re Permian Basin Area Rate Cases*, 390 U.S. 747, 770 (1968)

(explaining that "just and reasonable standard" of parallel Natural Gas Act

"coincides with the applicable constitutional standards" and that "any rate selected

by the Commission from the broad zone of reasonableness permitted by the Act cannot properly be attacked as confiscatory").

That is just what happened here. FERC determined that it was no longer just and reasonable for utilities to recover the full costs of late studies, which were "an important contributor" to interconnection backlogs, threatening projects and driving up consumers' costs. Order 2023, PP 38-40, 50 (JA1468-71, 1480-82); *see, e.g.*, *id.*, P 43 (JA1474-75); N.J. Comm'n Initial Comments at 7 (JA0960); AEE Initial Comments at 5-6 (JA1178-79). FERC adjusted its interconnection procedures accordingly, requiring penalty payments to interconnection customers affected by late studies—capped at those customers' total study deposits—such that "the amount transmission providers can charge for [interconnection] studies" is "effectively reduced if transmission providers fail to meet the relevant deadlines." Order 2023-A, P 388 (JA3722). Order 2023's penalty scheme thus reflects a commonsense understanding that some services lose value when they are badly delayed.[1]

FERC determinations define the boundaries of *any* due process interest in compensation under the Federal Power Act, as some Transmission Petitioners here

---

[1] For example, Congress recently required airlines to automatically refund customers for significantly delayed flights. *See* 49 U.S.C. § 42305(a); Refunds and Other Consumer Protections, 89 Fed. Reg. 65,534, 65,534 (Aug. 12, 2024) (describing law's codification of earlier Department of Transportation rule).

recently recognized. In a Section 206 proceeding that eliminated transmission

providers' obligation to pay interconnection customers for providing reactive

power services, those Transmission Petitioners successfully opposed customers'

claims of property interests in "compensation for the services they provide"

because customers had "only a unilateral expectation of payment" for those

services and no "legitimate claim of entitlement" under the Act. Order 904, 189

FERC ¶ 61,034, PP 44-45, 56 n.145 (2024) (adopting MISO Transmission Owners'

argument) (citing *Roth*, 408 U.S. at 577). So too here.

### 2. Transmission Petitioners identify no deprivation prior to conclusion of the appeals process

Even if Transmission Petitioners could demonstrate a protected interest, their

claim still fails because they identify no deprivation that occurs during the process

they challenge. Transmission Petitioners primarily complain that FERC does not

provide a pre-deprivation hearing. *See* TP Br. 22-24. But filing an appeal

automatically stays any obligation to pay penalties until after FERC resolves the

appeal and any rehearing requests. Order 2023, P 987 (JA2069-70).[2]

Transmission Petitioners' brief—which neglects to even mention this stay

provision—does not identify any property they will lose while the appeals process

resolves.

---

[2] A transmission provider may also seek a stay from the court pending judicial
review. 16 U.S.C. § 825*l*(c).

To the extent that Transmission Petitioners argue that due process categorically requires a hearing prior to any initial liability determination, that is meritless. Due process is "flexible" and imposes no such form-over-substance requirement. *Mathews*, 424 U.S. at 334 (citation omitted). Indeed, this Court has found due process satisfied where an agency similarly provided an initial bond breach determination and allowed entities to obtain a hearing through an administrative appeal that stayed collection. *Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*, 980 F.3d 109, 118-19 (D.C. Cir. 2020).

### 3. FERC's procedures easily satisfy due process

Even if Transmission Petitioners could show a protected interest and some pre-appeal deprivation to support a procedural due process claim, the relevant factors demonstrate the adequacy of FERC's procedures.

Under *Mathews*, courts evaluate (1) the "private interest" at stake; (2) the fairness and the reliability of the government's existing procedures and "the probable value, if any, of additional or substitute procedural safeguards"; and (3) the "Government's interest," including the "fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. No factor supports Transmission Petitioners. Their interests are purely financial and compensable through appeals. They come nowhere near the high bar for mandatory preliminary hearings, which courts reserve for extreme financial

20

hardships.  Moreover, FERC's system is fair and reliable, and Transmission

Petitioners' requested procedures would add no value.  Finally, FERC and the

public have strong interests in an efficient and effective interconnection process

that isn't bogged down with hearings about every missed deadline.

### a.    Any pre-appeal financial deprivation would be minimal

Transmission Petitioners' arguments implicate—at most—financial interests

that would merit little weight in the *Mathews* analysis.  Precedent sets a high bar

for mandating pre-deprivation hearings for "purely financial" losses that, as here,

are "completely compensable" by "post-deprivation decision[s]."  *UDC Chairs

Chapter*, 56 F.3d at 1474.  For example, welfare recipients "on the very margin of

subsistence" have a sufficient need for a hearing before even a temporary loss of

benefits.  *Mathews*, 424 U.S. at 340 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263-

64 (1970)).  But even "significant" hardships for disability benefits claimants do

not rise to that level of need.  *Id.* at 342.

Transmission Petitioners cannot meet that demanding standard.  They

describe no financial hardship that occurs while penalties are stayed.  Nor do they

show that they will ultimately face penalties that threaten their financial integrity,

*see supra*, Argument I.A, let alone in a manner comparable to a welfare recipient's

loss of benefits.

**b.** **Transmission Petitioners show no value from additional procedures**

Transmission Petitioners' arguments neither undermine the "fairness and reliability" of FERC's penalty process nor show any "probable value" to "additional procedural safeguards." *Mathews*, 424 U.S. at 343.

**1.** Order 2023 creates a fair and reliable system for issuing penalties that incentivize timely studies and reduce transmission providers' compensation for missed deadlines. Transmission providers suffer no "erroneous deprivation," *id.* at 335, when they receive reduced compensation for delayed studies that provide less value to interconnection customers and increase consumer costs. *See, e.g.*, Order 2023, P 43 (JA1475); N.J. Comm'n Initial Comments at 7 (JA0960); *supra*, Statement of Case II. Moreover, Order 2023 gives transmission providers abundant opportunities to avoid penalties and includes safeguards to avoid unfair results.

*First*, FERC fairly places the risk of penalties on transmission providers that have "the most control over whether the study deadline is met," including the timing and methods for studies and what resources to allocate to them. Order 2023-A, PP 284-85 (JA3626-28). And when transmission providers proactively invest more resources in timely studies, they recover those costs from interconnection customers. *Id.*, P 302 (JA3644-45). Moreover, Order 2023 "took significant other steps" to make transmission providers' jobs easier by ensuring

that interconnection customers do not cause study delays, *id.*, P 288 (JA3630), including increased study deposits, hefty withdrawal penalties, and more stringent prerequisites to join and stay in a study cluster. *See* FERC Br. 37-39.

*Second*, Order 2023 retained flexibility regarding deadlines by including a ten-business day grace period and providing thirty-business day extensions with the agreement of interconnection customers. Order 2023-A, P 324 (JA3664-65). Obtaining agreement for such extensions is not "fanciful." TP Br. 36. At most, refusing a thirty-day extension would add $30,000-$75,000 to a penalty. *See* Order 2023, P 973 (JA2061-62). Divided among "scores or hundreds" of interconnection customers in a cluster, that is hardly the "windfall" Transmission Petitioners suggest. TP Br. 36-37.

Indeed, that amount pales in comparison to interconnection customers' financial interests in ensuring accuracy of studies that assign them millions in network upgrade costs, *see* Clean Energy Pet'rs Br. 10-11, and, ultimately, in bringing projects online. Order 2023-A, P 335 n.587 (JA3674-75) (delays jeopardize financing, site control rights, and project viability). FERC therefore reasonably found penalty refunds unlikely to induce interconnection customers to oppose extensions that would ultimately accelerate the interconnection process. *Id.*, P 335 (JA3673-75).

*Finally*, Order 2023's appeal process allows FERC to evaluate whether there was good cause for a delay before transmission providers issue a refund. *Id.*, P 361 (JA3695-96). Transmission Petitioners complain (at 26-28) that the appeals process is too vague, but FERC specified the factors "most likely to be pertinent to establishing good cause" and allowed transmission providers to present "any other circumstances that they deem pertinent." Order 2023-A, P 359 (JA3693-94). FERC has discretion to further "develop[] [good cause] standards in a case-by-case manner." *See NLRB v. Bell Aerospace*, 416 U.S. 267, 294 (1974); *PJM Interconnection, L.L.C.*, 143 FERC ¶ 61,185, PP 5-6 (2013) (development of "good cause" factors for waiving other tariff provisions). Moreover, "multifactor standard[s] applied on a case-by-case basis" comport with vagueness requirements, which allow "flexibility and reasonable breadth, rather than [the] meticulous specificity" on which Transmission Petitioners insist. *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 737 (D.C. Cir. 2016) (citation omitted). The appeals process significantly reduces any risk of erroneous deprivation.

**2.** Nor do Transmission Petitioners demonstrate any probable value to the additional procedures they demand—an in-person hearing before a penalty applies. TP Br. 22-24. Regarding hearing timing, they identify no functional difference between an appeals process with an automatic stay, *supra*, Argument II.B.2, and their requested "preliminary adjudication." TP Br. 23. Regarding the type of

hearing, FERC *will* consider requests for evidentiary hearings on a case-by-case basis. Order 2023-A, P 366 (JA3701), and due process does not compel in-person hearings for appeals that can be resolved on the written record. *See Mathews*, 424 U.S. at 344-47 (written record suitable for disability benefits determination); *Statewide Bonding*, 980 F.3d at 119 (agency "typically base[d] decision on the record" but could grant oral argument); *cf. Ark. Elec. Energy Consumers v. FERC,* 290 F.3d 362, 369-70 (D.C. Cir. 2002) (FERC's general discretion to hold evidentiary hearing). Transmission providers may challenge FERC's denial of an evidentiary hearing in an individual case, but their arguments are premature and unsuitable for a facial due process claim.

### c. Requiring a hearing for each study delay would unduly burden FERC's resources

Meanwhile, FERC and the public have weighty interests in "conserving scarce fiscal and administrative resources" through an efficient deadline structure that ensures just, reasonable, and nondiscriminatory rates. *Mathews*, 424 U.S. at 348. Transmission Petitioners do not justify "the administrative burden and other societal costs" from requiring an enforcement action and an evidentiary hearing for every missed deadline. *Id.* at 347.

Transmission Petitioners' preferred procedures would place a burden on FERC that "would not be insubstantial." *Id.* FERC would have to investigate and initiate an enforcement action for every study delay—even though transmission

providers control the conduct of studies, Order 2023-A, P 284 (JA3626-27), and therefore already possess the relevant information regarding delays. Instead, FERC reasonably put the onus to appeal on the party best positioned to initially evaluate whether it had good cause to miss a deadline. *See, e.g.*, Order 2023, P 987 (JA2069) (relevant factors include transmission providers' efforts "to mitigate delays" and any "process enhancements" they propose). Requiring transmission providers to exercise judgment about whether to seek a good cause determination allows FERC and all affected parties to focus their efforts on appeals most deserving of their resources. If Transmission Petitioners had their way, FERC would devote unnecessary resources to investigation and hearings, diluting Order 2023's incentive for timely studies and undermining FERC's effort to remedy harms to interconnection customers, consumers, and states. *See, e.g.*, *id.*, P 43 (JA1474-75); N.J. Comm'n Reply Comments at 4-5 (JA1397-98); *supra*, Statement of Case II.

Transmission Petitioners offer no basis for imposing these burdens on FERC and the public, particularly given their failure to identify a protected interest, a deprivation of that interest, or any value to their additional procedures.

## II. AMPLE EVIDENCE SUPPORTS FERC'S DECISION TO UPDATE ITS MINIMUM REQUIREMENTS FOR INTERCONNECTION PROCESSES ON AN INDUSTRY-WIDE BASIS

Transmission Petitioners likewise make no showing that FERC abused its "broad discretion" to address study delays through an industry-wide rule, rather than case-by-case adjudication. *See Wisc. Gas Co. v. FERC*, 770 F.2d 1144, 1166 (D.C. Cir. 1985). FERC exercised express authority to establish "rates and charges under the Federal Power Act" via "rulemaking procedures." *Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 688 (D.C. Cir. 2000) (quoting 42 U.S.C. § 7173(c)). FERC properly relied on "general findings of a systemic problem to support imposition of an industry-wide solution." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 67 (D.C. Cir. 2014) (cleaned up). And contrary to Transmission Petitioners' narrow challenge to FERC's basis for eliminating the reasonable efforts standard, the agency's solution does not reflect "an extreme disproportion of remedy to ailment"; under the reasonable efforts standard, study delays remained problematic across the industry, not just in "isolated pockets." *Id.* (cleaned up).

### A. Precedent forecloses Transmission Petitioners' argument that FERC had to first find individual tariffs unlawful

For starters, Transmission Petitioners misrepresent the law. They contend that FERC improperly adopted industry-wide reforms "without finding any specific transmission provider tariff unjust and unreasonable." TP Br. 48-49. But this Court has repeatedly held that FERC need not "make specific findings that

27

individual rates" are unlawful "before promulgating a generic rule." *Transmission Access*, 225 F.3d at 688 (citing *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1008-09 (D.C. Cir. 1987)); *see also id.* (upholding rule based on "general findings of systemic monopoly conditions and the resulting potential for anti-competitive behavior, rather than evidence of monopoly and undue discrimination on the part of individual utilities"); *Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 37 (D.C. Cir. 2002) (rejecting argument that FERC must make "detailed showing 'that every pipeline's existing tariff was unjust and unreasonable" and that new policy was "just and reasonable for any pipeline" (cleaned up)).

FERC followed established precedent here by relying on general findings to reform its standardized interconnection procedures. It also continued its practice of promulgating default standards while leaving room to accommodate individual entities' needs. Just as FERC has done for similar industry-wide rules, it required transmission providers to submit compliance filings, allowing entities to request individualized variations. *See* Order 2023, PP 1764 (JA2560-61) (listing prior rules); *Interstate Nat. Gas*, 285 F.3d at 37 (upholding Commission rule that deferred to "individual compliance proceedings" whether "any particular pipeline's tariff was unjust or unreasonable"). Given those individual compliance proceedings, it is both baseless and premature for Transmission Petitioners to

28

complain that the Commission imposed a "one size fits-all" solution and gave no opportunity to address individual regions' "unique concerns."  TP Br. 49-51.

### B.  Transmission Petitioners' "isolated pockets" argument ignores the facts and the law

Transmission Petitioners complain that FERC improperly acted based on "isolated pockets" of problems because some regions have already adopted *another* of Order 2023's reforms—processing interconnection studies in clusters rather than serially.  *Id.* at 49-50 (citation omitted); *see* Order 2023, PP 47, 177 (JA1478-79, 1583-85).

Their argument makes no sense.  Transmission Petitioners do not contest FERC's decision to require cluster studies industry-wide, and no transmission provider had previously adopted the reform they actually challenge: elimination of the reasonable efforts standard.  At bottom, Transmission Petitioners' complaint seems to be that individual regions' cluster study processes rendered industry-wide deadline reforms either unlawful or unnecessary.  But they are wrong on both counts.  Transmission Petitioners overlook precedent confirming that FERC may adopt a package of industry-wide reforms even where some entities already meet minimum standards.  And they likewise misrepresent FERC's rationale and neglect contrary evidence, including express findings of delays in cluster study regions.

1. **No transmission provider has eliminated the reasonable efforts standard—the subject of Transmission Petitioners' challenge**

Transmission Petitioners' entire isolated pockets argument depends on the false premise that the industry consists of "a sea of compliance with possible islands of noncompliance." TP Br. 50. But *no* transmission provider complies with the reform that they challenge here: eliminating the reasonable efforts standard and adopting a penalty-based incentive for interconnection study deadlines. *See* Order 2023-A, P 48 (JA3446). Accordingly, once FERC determined that the reasonable efforts standard contributes to unjust and unreasonable rates, it faced an industry-wide problem, rather than one limited to isolated pockets.

2. **FERC properly considered that some transmission providers have already implemented some of Order 2023's minimum requirements**

Even looking at the entire package of Order 2023's reforms, Transmission Petitioners ignore FERC's established authority to set minimum standards even where some entities already comply with some of those requirements. A problem does not exist in "isolated pockets" merely because some entities already "engage in sufficient . . . processes" under FERC's new rule. *S.C. Pub. Serv. Auth.*, 762 F.3d at 67. This type of partial compliance "is as unastonishing as it is irrelevant." *Id.* (quoting *Wisc. Gas*, 770 F.2d at 1157).

Transmission Petitioners' unsupported assertion that *South Carolina* involved "industry-wide noncompliance with [FERC's] proposed reforms," TP Br. 50, fails to distinguish the case. In *South Carolina*, FERC noted that "some current practices in some regions may have already been satisfying a minimum set of requirements that must be met under the Final Rule," although "all of these requirements are not satisfied in all regions." 762 F.3d at 67 (cleaned up). Similarly, FERC acknowledged here that "many transmission providers have adopted many of the reforms in Order No. 2023." Order 2023-A, P 48 (JA3446). But FERC emphasized that "no transmission provider has yet adopted *all* of the reforms in Order No. 2023," which FERC found necessary—"as a whole"—to ensure just and reasonable rates. *Id.*

The approach approved in *South Carolina* (and applied in countless other Commission rules[3]) sensibly allows FERC to incorporate existing best practices into uniform minimum standards, rather than precluding efficient reforms whenever any region develops an incremental improvement. *See also id.*, P 49 (JA3447) (waiting for stream of regional reforms to play out would postpone updates to FERC's minimum standards for "a very long time indeed"). That is precisely what FERC did here, "carefully examin[ing] recent queue reform

---

[3] *See, e.g.*, Order 2023, P 1764 (JA2560) (prior rules allowing variations "consistent with or superior to" default standards).

31

proposals to identify best practices to implement nationwide," such as cluster study processes. *Id.*, P 48 (JA3446).

### 3. Transmission Petitioners ignore the substantial evidence supporting FERC's findings of delays across all regions

Finally, FERC's general findings were "reasonably explained" and supported by "substantial evidence." *Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 174 (D.C. Cir. 2022). FERC supported a commonsense proposition—that a toothless deadline results in late studies—with ample evidence of delays across all regions and informed predictions based on its expertise. Transmission Petitioners attack FERC's purported "overreliance" on data from regions with serial study processes (particularly PJM), suggesting that these delays do not reflect conditions in regions with cluster study processes and are thus limited to "isolated pockets." TP Br. 49-50; *see also id.* at 44-47. But even if serial study regions qualified as "isolated pockets," their brief nowhere mentions—let alone rebuts—the Commission's express findings of problematic delays *in cluster study regions*. They likewise ignore FERC's explanation that PJM's data did not alter its conclusions, and the other evidence supporting FERC's findings.

As described above, FERC documented industry-wide problems at each step of its reasoning, including interconnection study delays. *See supra*, Statement of Case II. Most relevant here, FERC concluded that the reasonable efforts standard did "not provide an adequate incentive" to complete studies on time because it

32

gave transmission providers "significant discretion" to extend their own deadlines and imposed "few, if any, consequences" for missing them. Order 2023, PP 50, 966 (JA1480-82, 2056). Moreover, FERC found "every reason to believe" that pressures on interconnection queues "will persist," underscoring the need to incentivize timely studies. *Id.*, P 966 (JA2057). FERC's commonsense finding that deadlines need consequences requires little, if any, empirical evidence. *See S.C. Pub. Serv. Auth.*, 762 F.3d at 65 ("Agencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall . . . ." (citation omitted)); *Transmission Access*, 225 F.3d at 687 (Commission's reliance on understanding of "incentives for monopolists to behave discriminatorily").

FERC nonetheless provided a robust record to corroborate its conclusion, including data from Order 845's first step of gathering more data on study delays. *See* Order 845, 163 FERC ¶ 61,043, P 323. The "majority of transmission providers across the country regularly fail to meet interconnection study deadlines," Order 2023, P 50 (JA1480-81), making delayed studies "an important contributor to interconnection queue backlogs nationwide," *id.*, P 40 (JA1471). Eighty percent of transmission providers had delayed studies in the prior three years, and overall, sixty-eight percent of interconnection studies completed in 2022 were issued late. *Id.*, PP 40, 50 n.137 (JA1471, 1481).

Critically, FERC found that cluster study reforms did not obviate the need for firm study deadlines. FERC determined that "cluster studies alone" were not "sufficient to remedy interconnection queue backlogs," because "a number of transmission providers that have already adopted cluster studies still experience substantial study delays." Order 2023-A, P 293 (JA3635) (citing Order 2023, P 40 (JA1471)). That finding echoed comments from state utility regulators, which also stressed that "nearly all transmission providers across the country, including many transmission providers that have implemented queue reforms, regularly fail to meet interconnection study deadlines." Order 2023, P 50 n.137 (JA1481) (quoting NARUC Initial Comments at 13 (JA0605)). FERC therefore reasonably concluded that study delays were not confined to "isolated pockets."

Instead of rebutting this key finding, Transmission Petitioners argue at length that FERC erred by including 2022 data from PJM during its transition to a cluster study process. TP Br. 44-47. Transmission Petitioners complain that this data inflated the total number of delayed studies at end of 2022. *Id.* But FERC gave this data little weight: the Commission acknowledged that PJM accounted for many of those delayed studies and emphasized that it would have reached the same conclusions even without PJM's delays. Order 2023-A, P 292 (JA3634-35); Order 2023, P 40 n.116 (JA1471).

Regardless, FERC "relied on much more than just" PJM's data, *Food & Water Watch v. FERC*, 104 F.4th 336, 347 (D.C. Cir. 2024), using multiple metrics to diagnose a widespread problem. FERC considered not only "delayed" studies that remained incomplete, but also that a significant majority of studies were completed late. Order 2023, P 40 (JA1471) (sixty-eight percent in 2022); Order 2023-A, P 292 (JA3934-35). Notably, while Transmission Petitioners tout purportedly few delayed studies among non-PJM System Operators using cluster study processes, TP Br. 44-45, those entities still completed *almost all* studies late. ISO New England completed 46/51 studies late (over ninety percent), Midcontinent Independent System Operator completed 597/609 studies late (ninety-eight percent), and New York Independent System Operator completed 72/84 studies late (eighty-six percent). Order 2023, app. B, tbl. 2 (JA2587); *cf.* TP Br. 10-11, 50 (highlighting those entities' reforms).

FERC also assessed whether an industry-wide problem existed by looking beyond nationwide totals, examining how many different transmission providers missed deadlines and how often. Again, FERC found that "a majority" of those entities "regularly fail to meet interconnection study deadlines." Order 2023, P 50 (JA1480-81); *see also, e.g.*, *id.*, P 40, app. B (JA1471, 2591-92) (all System Operators and 14/24 non-System Operators had delayed studies at end of 2022);

Order 2023-A, PP 292-93, 293 n.484 (JA3634-35) (16/24 non-System Operators, including ones with cluster study reforms, had late studies in 2022).

Nor did FERC rely purely on a static assessment of prior years' data. Instead, FERC applied two decades of experience with incremental interconnection reforms, including individual cluster study processes, when deciding to eliminate the reasonable efforts standard. *See, e.g.*, Order 2023, PP 15-17 (JA1446-49) (history of reforms to standardized requirements); TP Br. 10-11 (history of cluster study reforms). Moreover, FERC relied on informed predictions that pressures on interconnection queues would persist or worsen, making late studies more likely without a meaningful incentive to meet deadlines. *See, e.g.*, Order 2023, P 966 (JA2056-58); Order 2023-A, P 294 (JA3637). That is the sort of "reasonable agency prediction about the future impact of its own regulatory policies" on which FERC can rely. *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 370 (D.C. Cir. 1998).

In short, the record refutes Transmission Petitioners' complaints about PJM's data and reveals a comprehensively explained Commission decision, backed by substantial evidence.

## III. FERC reasonably rejected the argument that Order 2023 is unduly discriminatory

The record likewise belies Transmission Petitioners' claim that a uniform penalty system unduly discriminates against regions with more demand for

interconnection. FERC explains (at 53-58) why that claim fails on the merits. But it has two further flaws as well. First, Transmission Petitioners are simply wrong when they complain (at 52-54) of FERC's "complete lack of engagement" with this argument. *See* Order 2023-A, PP 325-26, 384-85 (JA3666-67, 3718-19). And second, their rhetoric (at 52-53) regarding "burdens" on those regions, misleadingly omits that where regions with heavier workloads appropriately devote more resources to meet deadlines, they will recover those additional costs from interconnection customers. *See id.*, P 302 (JA3644-45).

## IV. FERC clearly and correctly explained why further reform was necessary in PJM

Transmission Petitioners' objections to Order 2023's application to PJM are similarly defective. TP Br. 75-79. As an initial matter, they wrongly presume that FERC had to make a specific finding regarding PJM. *See supra*, Argument II.A; Order 2023-A, P 42 (JA3443). Moreover, FERC did respond to PJM's arguments, and the evidence amply supported the Commission's conclusion. When FERC issued Order 2023, PJM had one of the longest and most backlogged interconnection queues of any region. It still does. Because PJM's process is slower, less accountable, and less affordable than Order 2023 requires, FERC was right to require further reforms.

**A.    FERC responded reasonably to PJM**

Transmission Petitioners claim that FERC "refused to engage" with PJM's rehearing arguments.  *See* TP Br. 77-78.  Not so.

As FERC explained, Order 2023 specifically accounted for "ongoing, recently approved" reforms like PJM's.  Order 2023-A, P 78 (JA3468).  Indeed, FERC identified the "best practices to implement nationwide" precisely by "carefully examin[ing] recent queue reform proposals," including cluster study processes adopted by PJM and others.  *Id.*, P 48 (JA3446).  But no region—PJM included—"ha[d] yet adopted *all* of the reforms" FERC found necessary, such as eliminating the reasonable efforts standard.  *Id.*  And what PJM had done, standing alone, was insufficient.  The Order's "broad suite of reforms, *as a whole, is necessary* to ensure that" interconnection occurs "in a reliable, efficient, transparent, and timely manner."  *Id.* (emphasis added).  For similar reasons, FERC declined to presume that existing queue processes, like PJM's, already comply with Order 2023.  *Id.*, P 78 (JA3468-69).

And, FERC explained, PJM had not shown otherwise.  There was no evidence that PJM was "unaffected by the underlying factors that are persistent and increasing drivers of widespread interconnection queue delays and backlogs."  *Id.*, P 40 (JA3441-42).  Nor had PJM provided any evidence that its reforms would resolve the concerns that required interconnection reform nationwide.  *Id.* (noting

38

that the "record does not contain any information regarding the effects of such reforms," including whether PJM met study deadlines, overall wait times, or how many projects reach commercial operation).

FERC therefore did not "completely disregard[] the core of petitioners' theory." *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 186 (D.C. Cir. 2022) (citation omitted). And FERC reasonably distinguished its prior approval of PJM's initial reforms by explaining why further reforms remained necessary. *Cf. New England Power Generators Ass'n v. FERC*, 881 F.3d 202, 212-13 (D.C. Cir. 2018) (faulting FERC for accepting a proposal functionally identical to one it recently rejected).

**B.    FERC's application of Order 2023 to PJM was foreseeable, reasonable, and based on ample evidence**

FERC's rejection of PJM's arguments was reasonable. PJM suggests it was somehow caught off guard and that its existing reforms were sufficient to address FERC's concerns. TP Br. 75-77. Neither could be further from the truth. PJM itself anticipated—and was explicitly warned—that Order 2023 might impose further obligations on the region. And with good reason: The evidence showed that PJM was a poster child for FERC's concerns and that PJM's reforms would be slower, less accountable, and less affordable than FERC's comprehensive reforms.

PJM knew that Order 2023 might require further changes. For example, when proposing its reforms, PJM argued that FERC could safely disregard then-

proposed Order 2023, because "[s]hould the Commission order changes in its Final Rule, PJM would address those issues on compliance." PJM Mot. for Leave to Answer & Answer at 26-27, Docket No. ER22-2110 (Aug. 2, 2022). And PJM specifically urged FERC to punt on the issue of study delay penalties because PJM would address any "directives coming out of any Final Rule on the subject of penalties" in that compliance filing. *Id.* at 28-29.

FERC also specifically warned PJM that Order 2023 might require further reforms, including penalties for study delays. FERC acknowledged PJM's contention that the penalty issue was "best addressed holistically as a policy matter in the interconnection rulemaking," *PJM Interconnection, L.L.C.*, 181 FERC ¶ 61,162, P 120 (2022), and ultimately took that route. FERC also explained that PJM's proposal to retain the reasonable efforts standard appropriately reflected the "currently applicable standard" *prior to* Order 2023; as such, FERC declined only "*at this time . . .* to require PJM to adopt firm study deadlines." *Id.*, P 138 (emphasis added). Then-Commissioner Clements's "reluctant[]" concurrence foreshadowed further reforms even more starkly, expressing concerns that PJM's reformed process "remains too slow" and cautioning that Order 2023's "broader record may well provide a basis for further changes." *Id.* (Clements, Comm'r, concurring at PP 1-2, 10).

FERC's decision to require further reforms in PJM was unsurprising and reasonable, given PJM's severe interconnection problems. PJM had, and still has, one of the longest and most-backlogged interconnection queues of any region. FERC extensively documented how thousands of projects had endured years of delay in PJM's queue. Order 2023, P 39 (JA1469-71). For example, FERC reviewed annual studies showing that in 2021 and 2022, PJM had the largest interconnection queue of any region. Queued Up 2022 at 12 (SJA12); Queued Up 2023 at 7 (SJA40).[4] And that is so despite PJM's interconnection reforms including a "four-year pause on new interconnection requests"—longer than any other region—while PJM clears its backlogged queue; under this process, PJM will wait until at least 2026 before even *beginning* studies for any projects that entered the queue after September 2021. *See PJM Interconnection*, 181 FERC ¶ 61,162, P 57.

Ongoing queue delays in PJM are still causing dire challenges for the reliability and affordability of electricity in the region. As Order 2023 predicted, queue delays harm new projects by inflicting "financial harm when study deadlines

---

[4] The most recent version of that study showed that PJM's queue remains among the nation's longest, in terms of the number of projects, total capacity, or how long projects await studies. Joseph Rand et al., Lawrence Berkeley Nat'l Lab'y, *Queued Up: 2024 Edition, Characteristics of Power Plants Seeking Transmission Interconnection*, at 9, 35 (Apr. 2024), https://emp.lbl.gov/sites/default/files/2024-04/Queued%20Up%202024%20Edition_1.pdf.

are not met, ultimately inhibiting their ability to interconnect to the system in a reliable, efficient, transparent, and timely manner." Order 2023, P 971 (JA2060). And so they have. As PJM recognizes, its years-long slog to clear its backlogged interconnection queue has contributed to a plummeting rate of new generation coming online.[5] With few new power plants coming online, electricity shortages loom, and prices in PJM's capacity market have skyrocketed by over $12 billion.[6]

PJM's ongoing interconnection problems have spawned contentious proceedings at FERC. Both the governor of Pennsylvania and consumer advocates from Illinois, Maryland, New Jersey, Ohio, and the District of Columbia filed complaints arguing that PJM's capacity market has become unjust and unreasonable, because while that market aims to send price signals for new generation to come online, PJM's extensive interconnection queue delays make

---

[5] *See, e.g., PJM Interconnection LLC*, Revisions to Reliability Pricing Model, Docket No. ER25-682 (Dec. 9, 2024), Attach. D, Graf & Marzewski Aff., P 41(c) (noting that "PJM's interconnection queue process has created a bottleneck, slowing the entry of new capacity"); *see also* Abraham Silverman et al., *Outlook for Pending Generation in the PJM Interconnection Queue* at 7 (May 2024), https://www.energypolicy.columbia.edu/wp-content/uploads/2024/05/PJM-Interconnection-CGEP_Report_042924-2.pdf (making "key finding" that PJM's "lengthy interconnection process is exacerbating siting and permitting challenges and leading to knock-on delays in equipment procurement and financing decisions").

[6] *See* Compl. at 2, *Joint Consumer Advocs. v. PJM Interconnection, L.L.C.*, Docket No. EL25-18 (Nov. 18, 2024).

timely new entry impossible.[7]  In short, FERC was not only justified in finding that

Order 2023's reforms would be necessary in PJM, but recent developments have

proved the Commission right.

The gulf between Order 2023's integrated reforms and PJM's process

further supports FERC's decision not to exempt PJM.  PJM's process retains the

flawed reasonable efforts standard.  *PJM Interconnection*, 181 FERC ¶ 61,162, P

138.  Order 2023 also sets a 150-day cluster study deadline, *see* Order 2023, P 324

(JA1665-66), whereas PJM's three-phase process takes at least 480 days, *see PJM*

*Interconnection*, 181 FERC ¶ 61,162, P 11.  Further, unlike PJM's process, Order

2023 requires reforms to promote affordability, such as considering advanced

transmission technologies and requiring accurate studies of batteries.  *See* Order

---

[7] *See id.* at 1–5; Compl. at 1–5, *Governor Josh Shapiro v. PJM Interconnection, L.L.C.*, Docket No. EL25-46 (Dec. 30, 2024).  PJM may settle one complaint by temporarily limiting capacity market prices.  Stipulation of Satisfaction & Joint Mot. to Dismiss, Docket No. EL25-46 (Feb. 14, 2025).  But PJM's underlying interconnection problems remain unresolved.  Several governors have also questioned whether their states should remain in PJM given high prices driven by interconnection delays.  Letter from Josh Shapiro, Pa. Governor, to Mark Takahashi, PJM Chair (Jan. 13, 2025), https://www.pjm.com/-/media/DotCom/about-pjm/who-we-are/public-disclosures/2025/20250113-pa-gov-shapiro-letter-re-capacity-market-price-cap.pdf; Letter from Philip D. Murphy, N.J. Governor, to Mark Takahashi, PJM Chair (Jan. 17, 2025), https://www.pjm.com/-/media/DotCom/about-pjm/who-we-are/public-disclosures/2025/20250121-nj-gov-murphy-letter-re-capacity-market-price-cap.pdf; Letter from Wes Moore, Md. Governor, to Mark Takahashi, PJM Chair (Jan. 21, 2025), https://www.pjm.com/-/media/DotCom/about-pjm/who-we-are/public-disclosures/2025/20250121-md-governor-moore-letter-regarding-capacity-market-price-cap.pdf.

2023-A, PP 577-80, 616-17 (JA3870-73, 3904-05).  Given the meaningful differences between Order 2023 and PJM's half-measures, FERC's decision to apply Order 2023 to PJM was entirely reasonable.

## CONCLUSION

For the foregoing reasons, the Court should deny Transmission Petitioners' petitions.

Dated: April 16, 2025                    Respectfully submitted,

                                         /s/ Alexander L. Tom

Nick Lawton                              Alexander L. Tom
Earthjustice                             Christine A. Powell
1001 G Street, NW                        Ada Statler
Suite 1000                               Earthjustice
Washington, DC 20001                     50 California Street
(202) 780-4835                           Suite 500
nlawton@earthjustice.org                 San Francisco, CA 94111
                                         (415) 217-2111
                                         atom@earthjustice.org

                                         Linnet Davis-Stermitz
                                         Earthjustice
                                         810 Third Avenue
                                         Suite 610
                                         Seattle, WA 98104
                                         (206) 343-7340
                                         ldavisstermitz@earthjustice.org

*Counsel for Natural Resources Defense Council, Inc. and Sierra Club*

44

John Moore
Natural Resources Defense Council
20 North Wacker Street, Suite 1600
Chicago, IL 60201
(312) 663-9900
jmoore@nrdc.org

Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 289-6868
creiser@nrdc.org

*Counsel for Natural Resources Defense Council, Inc.*

Gregory E. Wannier
Justin Vickers
Sierra Club Environmental Law Program
2101 Webster Street
Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org

*Counsel for Sierra Club*

Adam Kurland
Ted Kelly
Environmental Defense Fund
555 12th Street NW
Suite 400
Washington, DC 20004
(202) 387-3500
akurland@edf.org

*Counsel for Environmental Defense Fund*

Ben Norris
Melissa Alfano
Solar Energy Industries Association
1425 K Street NW
Suite 1000
Washington, DC 20005
(202) 566-2873
bnorris@seia.org
malfano@seia.org

*Counsel for Solar Energy Industries Association*

Gabriel Tabak
American Clean Power Association
1299 Pennsylvania Avenue NW
13th Floor
Washington, DC 20004
(202) 383-2500
gtabak@cleanpower.org

*Counsel for American Clean Power Association*

Jeremy McDiarmid
Advanced Energy United, Inc.
1801 Pennsylvania Avenue NW
Suite 410
Washington, DC 20006
(617) 429-0677
jmcdiarmid@advancedenergyunited.org

*Counsel for Advanced Energy United, Inc.*

45

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Circuit Rule 32(e)(2)(B) because it contains 9,073 words, excluding the parts exempted by Rule 32(f) of the Federal Rules of Appellate Procedure and Circuit Rule 32(e)(1). I further certify that the brief complies with the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

/s/ Alexander L. Tom
Alexander L. Tom
Earthjustice
50 California Street
Suite 500
San Francisco, CA 94111
(415) 217-2111
atom@earthjustice.org

*Counsel for Natural Resources*
*Defense Council, Inc. and Sierra Club*

Dated: April 16, 2025

# ADDENDUM

# TABLE OF CONTENTS

**Statutes**:

42 U.S.C. § 7173 ................................................................. A1

49 U.S.C. § 42305 ............................................................... A3

# 42 U.S.C. § 7173

**(reproduced from uscode.house.gov)**

**42 USC 7173: Initiation of rulemaking procedures before Commission**
Text contains those laws in effect on February 18, 2025

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
    CHAPTER 84-DEPARTMENT OF ENERGY
    SUBCHAPTER IV-FEDERAL ENERGY REGULATORY COMMISSION
**Jump To:**
    **Source Credit**
    **Miscellaneous**
    **References In Text**

## §7173. Initiation of rulemaking procedures before Commission

### (a) Proposal of rules, regulations, and statements of policy of general applicability by Secretary and Commission

The Secretary and the Commission are authorized to propose rules, regulations, and statements of policy of general applicability with respect to any function within the jurisdiction of the Commission under section 7172 of this title.

### (b) Consideration and final action on proposals of Secretary

The Commission shall have exclusive jurisdiction with respect to any proposal made under subsection (a), and shall consider and take final action on any proposal made by the Secretary under such subsection in an expeditious manner in accordance with such reasonable time limits as may be set by the Secretary for the completion of action by the Commission on any such proposal.

### (c) Utilization of rulemaking procedures for establishment of rates and charges under Federal Power Act and Natural Gas Act

Any function described in section 7172 of this title which relates to the establishment of rates and charges under the Federal Power Act [16 U.S.C. 791a et seq.] or the Natural Gas Act [15 U.S.C. 717 et seq.], may be conducted by rulemaking procedures. Except as provided in subsection (d), the procedures in such a rulemaking proceeding shall assure full consideration of the issues and an opportunity for interested persons to present their views.

### (d) Submission of written questions by interested persons

With respect to any rule or regulation promulgated by the Commission to establish rates and charges for the first sale of natural gas by a producer or gatherer to a natural gas pipeline under the Natural Gas Act [15 U.S.C. 717 et seq.], the Commission may afford any interested person a reasonable opportunity to submit written questions with respect to disputed issues of fact to other interested persons participating in the rulemaking proceedings. The Commission may establish a reasonable time for both the submission of questions and responses thereto.

( Pub. L. 95–91, title IV, §403, Aug. 4, 1977, 91 Stat. 585 .)

### EDITORIAL NOTES

### REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (c), is act June 10, 1920, ch. 285, 41 Stat. 1063 , which is classified generally to chapter 12 (§791a et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

The Natural Gas Act, referred to in subsecs. (c) and (d), is act June 21, 1938, ch. 556, 52 Stat. 821 , which is classified generally to chapter 15B (§717 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 717w of Title 15 and Tables.

# 49 U.S.C. § 42305

**(reproduced from uscode.house.gov)**

**49 USC 42305: Refunds for cancelled or significantly delayed or changed flights**
Text contains those laws in effect on February 18, 2025

**From Title 49-TRANSPORTATION**
    SUBTITLE VII-AVIATION PROGRAMS
    PART A-AIR COMMERCE AND SAFETY
    subpart ii-economic regulation
    CHAPTER 423-PASSENGER AIR SERVICE IMPROVEMENTS
**Jump To:**
    **Source Credit**
    **Miscellaneous**
    **References In Text**

## §42305. Refunds for cancelled or significantly delayed or changed flights

(a) IN GENERAL.-In the case of a passenger that holds a nonrefundable ticket on a scheduled flight to, from, or within the United States, an air carrier or a foreign air carrier shall, upon request as set forth in subsection (f), provide a full refund, including any taxes and ancillary fees, for the fare such carrier collected for any cancelled flight or significantly delayed or changed flight where the passenger chooses not to-

    (1) fly on the significantly delayed or changed flight or accept rebooking on an alternative flight; or

    (2) accept any voucher, credit, or other form of compensation offered by the air carrier or foreign air carrier pursuant to subsection (c).

(b) TIMING OF REFUND.-Any refund required under subsection (a) shall be issued by the air carrier or foreign air carrier-

    (1) in the case of a ticket purchased with a credit card, not later than 7 business days after the earliest date the refund was requested as set forth in subsection (f); or

    (2) in the case of a ticket purchased with cash or another form of payment, not later than 20 days after the earliest date the refund was requested as set forth in subsection (f).

(c) ALTERNATIVE TO REFUND.-An air carrier and a foreign air carrier may offer a voucher, credit, or other form of compensation as an explicit alternative to providing a refund required by subsection (a) but only if-

    (1) the offer includes a clear and conspicuous notice of-

      (A) the terms of the offer; and

      (B) the passenger's right to a full refund under this section;

    (2) the voucher, credit, or other form of compensation offered explicitly as an alternative to providing a refund required by subsection (a) remains valid and redeemable by the consumer for a period of at least 5 years from the date on which such voucher, credit, or other form of compensation is issued;

    (3) upon the issuance of such voucher, credit, or other form of compensation, an air carrier, foreign air carrier, or ticket agent, where applicable, notifies the recipient of the expiration date of the voucher, credit, or other form of compensation; and

    (4) upon request by an individual who self-identifies as having a disability (as defined in section 382.3 of title 14, Code of Federal Regulations), an air carrier, foreign air carrier, or ticket agent provides a notification under paragraph (3) in an electronic format that is accessible to the recipient.

(d) SIGNIFICANTLY DELAYED OR CHANGED FLIGHT DEFINED.-In this section, the term "significantly delayed or changed flight" includes, at a minimum, a flight where the passenger arrives at a destination airport-

    (1) in the case of a domestic flight, 3 or more hours after the original scheduled arrival time; and

    (2) in the case of an international flight, 6 or more hours after the original scheduled arrival time.

(e) APPLICATION TO TICKET AGENTS.-

    (1) IN GENERAL.-Not later than 1 year after the date of enactment of this section, the Secretary shall issue a final rule to apply refund requirements to ticket agents in the case of cancelled flights and significantly delayed or changed flights.

    (2) TRANSFER OF FUNDS.-The Secretary shall issue regulations requiring air carriers and foreign air carriers to promptly transfer funds to a ticket agent if-

      (A) the Secretary has determined that the ticket agent is responsible for providing the refund; and

      (B) the ticket agent does not possess the funds of the passenger.

    (3) Timing and alternatives.-A refund provided by a ticket agent shall comply with the requirements in subsections (b) and (c) of this section.

    (f) Refund.-An air carrier and a foreign air carrier shall consider a passenger to have requested a refund if-
    (1) a flight is cancelled and a passenger is not offered an alternative flight or any voucher, credit, or other form of compensation by the air carrier or foreign air carrier pursuant to subsection (c);
    (2) a passenger rejects the significantly delayed or changed flight, rebooking on an alternative flight, or any voucher, credit, or other form of compensation offered by the air carrier or foreign air carrier pursuant to subsection (c); or
    (3) a passenger does not respond to an offer of-
      (A) a significantly delayed or changed flight or an alternative flight and the flight departs without the passenger; or
      (B) a voucher, credit, or other form of compensation by the date on which the cancelled flight was scheduled to depart or the date that the significantly delayed or changed flight departs.

    (g) Refund Notification.-An air carrier and a foreign air carrier shall update their passenger notification systems to ensure passengers owed a refund under this section are notified of their right to receive a refund.

(Added Pub. L. 118–63, title V, §503(a), May 16, 2024, 138 Stat. 1188 .)

## Editorial Notes

## References in Text

    The date of enactment of this section, referred to in subsec. (e)(1), is the date of enactment of Pub. L. 118–63, which was approved May 16, 2024.

# CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2025, I electronically filed the foregoing brief and addendum via the Court's CM/ECF system, which effected service on all registered parties to this case and the consolidated proceedings (23-1284, 23-1289, 23-1297, 23-1299, 23-1305, 23-1310, 23-1312, 23-1313, 23-1320, 23-1327, 23-1330, 23-1346, 24-1093, 24-1106, 24-1112, 24-1136, 24-1137, 24-1139, 24-1140, 24-1141).

/s/ Alexander L. Tom
Alexander L. Tom
Earthjustice
50 California Street
Suite 500
San Francisco, CA 94111
(415) 217-2111
atom@earthjustice.org

*Counsel for Natural Resources*
*Defense Council, Inc. and Sierra Club*

Dated: April 16, 2025